**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| NATIONAL SHOOTING SPORTS FOUNDATION, | ) ) ) |
| Plaintiff, | ) ) |
| v. | )   C.A. No. _____ ) ) |
| KATHY JENNINGS, ATTORNEY GENERAL OF THE STATE OF DELAWARE, | ) ) ) |
| Defendant. | ) ) ) |

## COMPLAINT

Plaintiff the National Shooting Sports Foundation ("NSSF") brings this complaint against Kathy Jennings, in her official capacity as Attorney General for the State of Delaware.  NSSF brings this complaint based on personal knowledge as to all NSSF facts, and on information and belief as to all other matters.

## PRELIMINARY STATEMENT

1.      This lawsuit challenges the constitutionality of a new Delaware "public nuisance" statute specifically designed to evade the judgment of Congress—and the Constitution.

2.      On June 30, 2022, Governor Carney signed into law Senate Bill 302 ("SB 302"), which radically redefines the tort of "public nuisance" in Delaware as it applies to members of the firearm industry.  Under SB 302, the lawful and constitutionally protected "sale, manufacturing, distribution, importing, or marketing of a firearm-related product" may be deemed to violate Delaware law and justify the imposition of sweeping liability if a Delaware judge or jury later finds that such conduct "knowingly or recklessly" "create[d], maintain[ed], or contribute[d] to a … condition" that impinges in any way upon the "health, safety, peace, comfort, or convenience"

of Delawareans.  Del. Code Ann. tit. 10, §3930(b), (c).

3.      SB 302 is breathtaking in its scope.  Although criminal misuse of a firearm triggers the statute's application, SB 302 does not regulate the use of firearms.  Nor does SB 302 impose liability on individuals who misuse firearms to the detriment of themselves or others.  Instead, it regulates selling, manufacturing, and advertising lawful (and constitutionally protected) firearms and related products.  In other words, SB 302 regulates commerce in and speech relating to arms—even when that commerce and speech takes place entirely outside of Delaware, as will often be the case.  SB 302 also removes traditional elements of tort law that ensure that judges and juries do not impose liability on private parties for constitutionally protected conduct.  For instance, speech-based torts traditionally required proof of reliance.  SB 302 not only does away with that bedrock requirement, but allows judges and juries to impose liability based on truthful, non-misleading speech about lawful products.  Making matters worse, SB 302 redefines proximate cause to include criminal misuse by third parties with whom a defendant never dealt—which is not proximate cause at all.

4.      None of that is consistent with the Constitution.  The Commerce Clause prohibits states from regulating commerce (selling, manufacturing, marketing, etc.) that takes place beyond their borders, even when that commerce has effects within the state.  The First Amendment prohibits states from punishing wide swaths of truthful speech about lawful products, even if the products are dangerous or the speech is unpopular.  The Second Amendment protects commerce in arms.  And the Due Process Clause prohibits states from punishing one private party for the conduct of someone else.

5.      All of that is reason enough to invalidate Delaware's new statute.  But there is an even more obvious problem with SB 302:  It is squarely preempted by federal law.  In the late

1990s and early 2000s, several state and local governments sought to use novel applications of common-law theories like negligence and nuisance to impose civil liability on manufacturers and sellers of firearms and ammunition when third parties misused their products.  Congress saw these lawsuits for what they were: unconstitutional efforts to stamp out lawful and constitutionally protected activity.  To end such incursions, Congress enacted the Protection of Lawful Commerce in Arms Act ("PLCAA") in 2005 by wide margins on a substantially bipartisan basis.  The PLCAA expressly prohibits and preempts state-law civil actions "brought by any person against a manufacturer or seller of [firearms or ammunition] … for damages, punitive damages, injunctive or declaratory relief, abatement, restitution, fines, or penalties, or other relief, resulting from the criminal or unlawful misuse of [firearms or ammunition] by the person or a third party."  15 U.S.C. §7903(5)(A).

6.      Delaware is now trying to resurrect the very kinds of lawsuits that the PLCAA was enacted to eliminate.  Indeed, SB 302 acknowledges on its face that it is crafted to try to evade the PLCAA.  While the state may get credit for its candor, that does not make its law any more consistent with the protections afforded by Congress and the Constitution.

7.      For these reasons and those set forth below, NSSF seeks a declaration that SB 302 is preempted and unconstitutional, an injunction preventing Delaware from enforcing the statute against NSSF or its members, and nominal damages.

## THE PARTIES

8.      NSSF is a Connecticut non-profit, tax-exempt, non-stock corporation with its principal place of business in Connecticut.  It is the trade association for the firearm, ammunition, and hunting and shooting sports industry.  It has a membership of more than 9,000 manufacturers, distributors, and retailers of firearms, ammunition, and related products, as well as other industry members throughout the United States.

9.      NSSF's mission is to promote, protect, and preserve hunting and shooting sports by providing leadership in addressing industry challenges, advancing participation in and understanding of hunting and shooting sports, reaffirming and strengthening its members' commitment to the safe and responsible sale and use of their products, and promoting a political environment supportive of America's traditional hunting and shooting heritage.

10.     NSSF serves the interests of its members, which are impaired by the threat of sweeping liability under SB 302 not only to members, but to their employees and agents as well.

11.     NSSF is authorized by its board of directors to bring this action on its members' behalf.

12.     Defendant Kathy Jennings is the Attorney General of Delaware.  She is Delaware's chief law enforcement officer and, in that capacity, has a "duty to 'prosecute or defend litigation for the State.'"  *Matter of Acierno*, 582 A.2d 934 (Del. 1990).  Attorney General Jennings is a resident of Delaware, and her principal place of business is 802 North French St., Wilmington, DE 19801.  She is sued in her official capacity and her personal capacity.  At all relevant times, Attorney General Jennings, as well as those subject to her supervision, direction, or control, are and will be acting under color of state law.

## BACKGROUND

**Congress Enacted the PLCAA to Prevent State-Law Civil Actions that Unduly Burden the National Firearm Industry and Infringe Fundamental Constitutional Rights.**

13.     The Constitution "confer[s] an individual right to keep and bear arms."  *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S.Ct. 2111, 2127 (2022) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008)); *see* U.S. Const. amend. II.  And "the core Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to acquire arms."  *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017).

14.     Nevertheless, in the late 1990s, state and local governments began trying to use novel applications of state tort law to hold "manufacturers, distributors, dealers, and importers of firearms that operate as designed and intended" accountable "for the harm caused by the misuse of firearms by third parties, including criminals."  15 U.S.C. §7901(a)(3); *see id.* §7901(a)(4). They invoked a variety of theories, including: strict liability for abnormally dangerous activities or defective design, *Penelas v. Arms Tech., Inc.*, 778 So.2d 1042, 1043-44 (Fla. Ct. App. 2001); negligent marketing, *City of St. Louis v. Cernicek*, 145 S.W.3d 37, 38, 40 (Mo. Ct. App. 2004) (per curiam); negligent distribution, *District of Columbia v. Beretta U.S.A. Corp.*, 847 A.2d 1127, 1131 (D.C. Ct. App. 2004); deceptive trade practices, *Taurus Holdings, Inc. v. U.S. Fidelity & Guar. Co.*, 367 F.2d 1252, 1252-53 (11th Cir. 2004); and public nuisance, *Sills v. Smith & Wesson Corp.*, 2000 WL 33113806, at \*7 (Del. Super. Ct. Dec. 1, 2000), among others.

15.     Some of these suits succeeded in stretching the common law far beyond its traditional limits—and in permitting one state's courts to police the business practices of industry members operating elsewhere.  *See, e.g.*, *City of Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136, 1143-47 (Ohio 2002); *James v. Arms Tech., Inc.*, 820 A.2d 27, 37-44, 46-47, 50-53 (N.J. Super. Ct. 2003); *City of Gary ex rel. King v. Smith & Wesson Corp.*, 801 N.E.2d 1222, 1231-32, 1241-42 (Ind. 2003).   Others were unsuccessful.   *See, e.g.*, *Camden Cnty. Bd. of Chosen Freeholders v. Beretta, U.S.A. Corp.*, 273 F.3d 536, 540 (3d Cir. 2001) (per curiam); *City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099, 1147-48 (Ill. 2004).

16.     But the final tally told only part of the story.  Had these sprawling suits been permitted to persist and proliferate, "[t]he legal fees alone" would have been "enough to bankrupt the industry."  Sharon Walsh, *Gun Industry Views Accord as Dangerous Crack in Its Unity*, Wash. Post (Mar. 18, 2000), https://wapo.st/2Zcp5KS.  That, indeed, was in large part the point:

"[M]unicipal leaders pressed on regardless of their chance of success, spending taxpayers' money in a war of attrition against the firearms industry."  Recent Legislation, *Protection of Lawful Commerce in Arms Act*, 119 Harv. L. Rev. 1939, 1940 (2006).

17.    It did not take long for Congress to recognize these lawsuits for what they were:  a coordinated effort to try to destroy the firearm industry by saddling it with liability for the acts of criminals.  States pressed "theories without foundation in hundreds of years of the common law and jurisprudence of the United States" and threatened interstate comity by permitting one state to penalize lawful conduct in another state. 15 U.S.C. §7901(a)(7)-(8).  They did so, moreover, at substantial cost to individual rights, including the Second Amendment right to keep and bear arms, *id.* §7901(a)(2), (a)(6), as well as the rights of industry members to pursue their trade consistent with the Constitution's privileges and immunities guarantee, *id.* §7901(a)(7).  And it was profoundly unfair, to boot, to hold lawful businesses engaged in the lawful sale of constitutionally protected products liable "for the harm caused by those who criminally or unlawfully misuse … products that function as designed and intended."  *Id.* §7901(a)(5).

18.    Congress enacted the PLCAA to put an end to such state-law actions.  Indeed, the PLCAA's very first enumerated "purpose[]" is to "prohibit causes of action against manufacturers, distributors, dealers, and importers of firearms or ammunition products, and their trade associations" based on harm "caused by the criminal or unlawful misuse of firearm products" by third parties. *Id.* §7901(b)(l); *see also id.* §790l(a)(6) (finding that such suits are "an abuse of the legal system, … threaten[] the diminution of a basic constitutional right and civil liberty, … and constitute[] an unreasonable burden on interstate and foreign commerce").

19.    The statute makes good on that promise, prohibiting all such suits from being "brought in any Federal or State court."  *Id.* §7902(a).  The PLCAA preempts "civil action[s] …

brought by any person against a manufacturer or seller of a qualified product, or a trade association, for damages, punitive damages, injunctive or declaratory relief, abatement, restitution, fines, or penalties, or other relief, resulting from the criminal or unlawful misuse of a qualified product by the person or a third party."  *Id.* §7903(5)(A); *see id.* §7903(2)-(4), (6), (8)-(9) (defining "person," "manufacturer," "seller," "trade association," "qualified product," and "unlawful misuse").

20.     Only six enumerated types of claims are not so prohibited.  *See id.* §7903(5)(A). These exceptions are limited to circumstances in which the manufacturer or seller itself engaged in some well-defined type of wrongful conduct, such as claims for design or manufacturing defect, fraudulent transfer, negligent entrustment, and breach of contract or warranty.

21.     None of the enumerated exceptions extends to state laws that authorize the imposition of liability against manufacturers and sellers of firearms and ammunition for an alleged "public nuisance" caused by the criminal conduct of third parties.  In fact, such efforts, founded on novel expansions of general common-law tort theories, are exactly what the PLCAA was enacted to—and does—stamp out.  *See* 15 U.S.C. §7901(a)(7); *Camden Cnty.*, 273 F.3d at 540-41 ("To extend public nuisance law to embrace the manufacture of handguns would be unprecedented….").

**Courts Uphold the PLCAA Against Constitutional Challenges and Routinely Reject Efforts to Circumvent Its Protections.**

22.     After Congress passed the PLCAA, federal and state courts routinely rejected efforts to evade the law's protections for the firearms industry.

23.     Some plaintiffs challenged the statute's constitutionality, but courts across the country rejected such challenges, holding that the PLCAA is a lawful exercise of Congress' Commerce power, *see, e.g.*, *Adames v. Sheahan*, 909 N.E.2d 742, 765 (Ill. 2009); *City of N.Y. v. Beretta U.S.A. Corp.*, 524 F.3d 384, 393-95 (2d Cir. 2008); that the PLCAA is consistent with the

Constitution's separation of powers, *see, e.g.*, *Ileto v. Glock, Inc.*, 565 F.3d 1126, 1139-40 (9th Cir. 2009); *District of Columbia v. Beretta*, 940 A.2d 163, 172-73 (D.C. Ct. App. 2008); *City of N.Y.*, 524 F.3d at 395-96; that the PLCAA comports with the Tenth Amendment, *see, e.g.*, *Delana v. CED Sales, Inc.*, 486 S.W.3d 316, 323-24 (Mo. 2016); *City of N.Y.*, 524 F.3d at 396-97; *Adames*, 909 N.E.2d at 765; and that the PLCAA does not violate the Takings, Equal Protection, Due Process, or Petition Clauses, *see, e.g.*, *Ileto*, 565 F.3d at 1140-42; *Delana*, 486 S.W.3d at 324; *District of Columbia*, 940 A.2d at 173-82; *City of N.Y.*, 524 F.3d at 397-98.

24.     Other plaintiffs sought to skirt the PLCAA's general prohibition on covered actions. Just as often, courts carefully policed the statute's ban and rejected efforts to expand its narrow exceptions.  For instance, the Missouri Supreme Court held that, to qualify as a prohibited action "resulting from criminal misuse" of a firearm under §7903(5)(A), the PLCAA does not require the criminal misuse to have resulted in criminal conviction or to have been the sole cause of injury. *Delana*, 486 S.W.3d at 321.  The Supreme Court of Texas rejected an effort to invoke the negligent entrustment exception under §7903(5)(A)(ii) because that state's common law did not recognize such an action.  *In re Academy, Ltd.*, 625 S.W.3d 19, 30-32 (Tex. 2021).  And the Second and Ninth Circuits concluded that statutory codification of state tort law on wrongful death, nuisance, and negligence actions could not satisfy the so-called "predicate exception" set forth in §7903(5)(A)(iii).  *City of N.Y.*, 524 F.3d at 400-04; *Ileto*, 565 F.3d at 1137-38.

**In the Wake of *Bruen*, States Again Attempt to Circumvent the PLCAA.**

25.     Earlier this year, the Supreme Court decided *New York State Rifle & Pistol Association v. Bruen*, 142 S.Ct. 2111 (2022), which confirmed that the right "to keep and bear Arms" means just that—the right to keep *and bear* arms, whether inside or outside of the home. *Id.* at 2134-35.  That guarantee, moreover, is no "second-class right," subject to a unique set of rules or available to only those with "some special need" to exercise it.  *Id.* at 2156.  Accordingly,

when evaluating government burdens on the Second Amendment's "unqualified command," courts must assess "this Nation's historical tradition" of regulating firearms—not conduct some means-end balancing.  *Id.* at 2125-34.  Applying that test, the Court invalidated a New York law requiring law-abiding citizens to show special need to carry a firearm outside the home.  *Id.* at 2134-56.

26.     *Bruen* should have prompted states to reconsider their laws to make them more protective of rights the Supreme Court had just reaffirmed as fundamental.  Unfortunately, it has prompted the opposite reaction in states that are least protective of the Second Amendment right.

27.     Almost immediately, some of the same very few states that had endeavored to keep their law-abiding citizens from carrying firearms undertook efforts "to offset the impact of the court's decision."  Giavanni Alves, *N.Y.'s New Gun Control Laws*, Staten Island Live (July 9, 2022), https://bit.ly/3Q8l2K0.

28.     Some of those efforts were re-runs.  In particular, a few states (following the lead of New York, the state whose restrictive carry regime was invalidated in *Bruen*) passed legislation purporting to authorize civil suits against firearms manufacturers, distributors, and sellers based on the harms caused by gun violence—in other words, purporting to authorize the very same suits that prompted Congress to pass the PLCAA almost 20 years ago.  *See, e.g.*, N.J. A. 1765, 2022-2023 Session (July 5, 2022); Cal. AB 1594, 2021-2022 Regular Session (July 12, 2022); *cf.* N.Y. Gen. Bus. Law §§898-a–898-e (July 6, 2021).

**Delaware's Recently Enacted Senate Bill 302 Authorizes Exactly the Sort of Sprawling Tort Actions that Congress Passed the PLCAA to Prohibit.**

29.     On June 30, 2022, the Governor of Delaware signed into law Senate Bill 302, titled "An Act To Amend Title 10 And Title 11 Of The Delaware Code Relating To Firearms," and now codified in part at Del. Code Ann. tit. 10, §3930.  2022 Delaware Laws Ch. 332 ("SB 302").

30.     SB 302 is fundamentally inconsistent with the PLCAA.  The statute not only

declares its intention to address "legal[] firearms" and regulate legal commerce in legal products, SB 302 §1(3), but purports to chart a way around federal law by codifying the very sort of novel tort theories that the PLCAA explicitly forbids. *But see Ileto*, 565 F.3d at 1136 ("[T]he text and purpose of the PLCAA shows that Congress intended to preempt general tort theories of liability even in jurisdictions … that have codified such causes of action.").

31.     SB 302 creates a new "[c]ivil action for public nuisance," which applies only to "Firearm industry member[s]," *i.e.*, those "engaged in the sale, manufacturing, distribution, importing, or marketing of a firearm-related product." Del. Code Ann. tit. 10, §3930(a)(1).

32.     The new cause of action is sweeping. A "firearm industry member" may be held liable for "the sale, manufacturing, importing, or marketing of a firearm-related product," even if that conduct was fully lawful where it occurred and fully compliant with federal law, if it later is deemed by a Delaware judge or jury to have "knowingly or recklessly create[d], maintain[ed], or contribute[d] to a public nuisance," *id.* §3930(b), which is broadly defined as "a condition which injures, endangers, or threatens to injure or endanger or contributes to the injury or endangerment of the health, safety, peace, comfort, or convenience of others," *id.* §3930(a)(5).

33.     Lawful conduct protected by the First Amendment ("marketing") and the Second Amendment ("sale, manufacturing, importing … of a firearm-related product") thus may be the basis of a Delaware tort action if a product lawfully marketed, lawfully made, and lawfully sold is later used or possessed unlawfully *by someone else* in Delaware. Indeed, SB 302 specifically repealed the provision of Delaware law that used to treat compliance with applicable law as a complete defense to an effort to hold the manufacturer or seller of a firearm liable for its criminal misuse by a third party. *See* SB 302 §2 (repealing Del. Code Ann. tit. 11, §1448A(d)).

34.     And the new statute does not stop there. "A firearm industry member" may also be

held liable under SB 302 for failing to "establish and implement reasonable controls regarding the manufacture, sale, distribution, use, and marketing of [its] firearm-related products," Del. Code Ann. tit. 10, §3930(c), even if the relevant product was not "sold, made, distributed, or marketed" in Delaware, *see id.* §3930(a)(2).

35.     To make matters words, the statute does not key "reasonable controls" solely to the many federal, state, and local laws with which firearms manufacturers and sellers must already comply.  Nor does it identify what controls beyond compliance with existing statutory obligations are or are not "reasonable."  Instead, the most SB 302 does to define "reasonable controls" is supply a recursive gloss:  "'Reasonable controls,'" the law says, "means *reasonable* procedures, safeguards, and business practices."  *Id.* (emphasis added).  Then, in a gloss upon this gloss, SB 302 points to what such "controls" are supposed to accomplish:

    a.    Prevent the sale or distribution of a firearm-related product to a straw purchaser, a firearm trafficker, a person prohibited from possessing a firearm under state or federal law, or a person who the firearm industry member has reasonable cause to believe is at substantial risk of using a firearm-related product to harm themselves or unlawfully harm another or of unlawfully possessing or using a firearm-related product.

    b.    Prevent the loss of a firearm-related product or theft of a firearm-related product from a firearm industry member.

    c.    Ensure that the firearm industry member complies with all provisions of state and federal law and does not otherwise promote the unlawful manufacture, sale, possession, marketing, or use of a firearm-related product.

    d.    Ensure that the firearm industry member does not engage in an act or practice in violation of Subchapter II or Subchapter III of Chapter 25 of Title 6.

*Id.* §3930(a)(6).  In other words, "reasonable controls" are all "reasonable procedures" that will achieve goals as sweeping and abstract as preventing criminal conduct by third parties and complying with all federal and state law.  The failure to implement any one of potentially infinite and unnamed procedures "designed to" achieve those goal likewise "is a public nuisance."  *Id.*

§3930(d).

36.     The broad language of SB 302 also expands the scope of public nuisance law in other unprecedented ways as well.  Most notable, the statute rewrites the definition of "proximate cause" to mean something other than proximate cause.  Under SB 302, "[a] firearm industry member's conduct constitutes a proximate cause of the public nuisance if the harm to the public is a reasonably foreseeable effect of the conduct, notwithstanding any intervening actions, including criminal actions by third parties."  *Id.* §3930(e).  *But see Duphily v. Delaware Elec. Co-op., Inc.*, 662 A.2d 821, 829 (Del. 1995) (under ordinary Delaware law, "a proximate cause is one 'which in natural and continuous sequence, *unbroken by any efficient intervening cause*, produces the injury and without which the result would not have occurred' ").  What is more, the statute explicitly removes the need to prove intent:  Liability may attach under SB 302 without regard to whether "the firearm industry member acted with the intent to engage in a public nuisance or otherwise cause harm to the public."  Del. Code Ann. tit. 10, §3930(h).

37.     SB 302 authorizes "the Attorney General" to bring suit seeking "[r]estitution," "[c]ompensatory and punitive damages," "attorney's fees" and "costs," and "[a]ny other appropriate relief."  *Id.* §3930(f)(3)-(6).  The Attorney General may also seek "[a]n order providing for abatement of the nuisance at the expense of the firearm industry member."  *Id.* §3930(f)(2).  Last but not least, the Attorney General may seek an "injunction prohibiting the firearm industry member from continuing the conduct" that gave rise to the nuisance or "doing any acts in furtherance of th[at] conduct," *id.* §3930(f)(1), even if the relevant conduct occurred entirely out of state, will continue to occur entirely out of state, and was and is protected by the Constitution and/or necessary to ensure that law-abiding citizens may exercise their constitutional rights.

38.     SB 302 also authorizes any "person" who claims to have been "damaged as a result

of a firearm industry member's acts or omissions in violation of this section" to bring suit seeking "[i]njunctive relief" and "[c]ompensatory and punitive damages," as well as "attorney's fees" and "costs." *Id.* §3930(g).

## JURISDICTION AND VENUE

39.     Plaintiff's causes of action arise under 42 U.S.C. §1983 and the United States Constitution.  This Court therefore has jurisdiction pursuant to 28 U.S.C. §1331.

40.     This Court also has jurisdiction under 28 U.S.C. §1343(a)(3) because this action seeks to "redress the deprivation, under color of a[] State law," of "right[s], privilege[s] or immunit[ies] secured by … an[] Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States."

41.     Venue lies in this district pursuant to 28 U.S.C. §1391 because Defendant is located in and performs her official duties in the District of Delaware and is therefore considered to reside within this District as a matter of law.

## CLAIMS FOR RELIEF

### COUNT ONE
### (Preemption)

42.     Plaintiff re-alleges and incorporates by reference the preceding allegations as though fully set out herein.

43.     The Supremacy Clause, which provides that the Constitution, federal statutes, and treaties are "the supreme Law of the Land," U.S. Const. art. VI, cl. 2, provides "a rule of decision" for determining whether federal or state law applies in a particular situation.  *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324 (2015).  When a federal law "imposes restrictions" and a state law "confers rights … that conflict with the federal law," "the state law is preempted." *Kansas v. Garcia*, 140 S.Ct. 791, 801 (2020).

44.     That is exactly the situation here.  To stamp out unjustified expansions of the common law and undue intrusions into lawful commerce in arms, the PLCAA imposes clear restrictions:  Courts may not entertain any "civil action … against a manufacturer or seller of a [firearms] product … for damages … or other relief, resulting from the criminal or unlawful misuse of a [firearms] product by … a third party."  15 U.S.C. §7903(5)(A).  Yet SB 302 explicitly authorizes public and private parties to sue "firearm industry members" for damages, injunctions, and other relief resulting from a third party's misuse of an industry member's products.  Del. Code Ann. tit. 10, §3930.  That direct effort to countermand federal law is plainly preempted.

45.     Under the PLCAA, a "qualified civil liability action may not be brought in any Federal or State court."  15 U.S.C. §7902(a).  Yet the whole point of SB 302 is to authorize "qualified civil liability action[s]."

46.     The PLCAA defines a "qualified civil liability action" as a "[1] civil action … [2] brought by any person" ("including any governmental entity") "[3] against a manufacturer or seller of a qualified product … [4] for damages … or other relief, [5] resulting from the criminal or unlawful misuse of a qualified product by … a third party."  *Id.* §7903(5)(A).

47.     SB 302 suits satisfy each element.

48.     A suit under SB 302 [1] is a "civil action" that [2] can be brought by individuals and government officers.  The title of the section at which the statute is codified is "Civil action for public nuisance by firearm industry member"; and SB 302 authorizes both the Delaware "Attorney General" and "person[s] that ha[ve] been damaged as a result of a firearm industry member's acts or omissions in violation of this section" to "commence an action" under its terms.  Del. Code Ann. tit. 10, §3930(f)-(g).

49.     A suit under SB 302 [3] can be brought "against a manufacturer or seller of a

qualified product, or trade association."  15 U.S.C. §7903(5)(A).  In fact, a suit under SB 302 can be brought *only* against such a party; the statute applies to "firearm industry member[s]" and them alone.  Del. Code Ann. tit. 10, §3930(b)-(c); *see id.* §3930(a)(1) (defining "Firearm industry member" to mean "a person engaged in the sale, manufacturing, distribution, importing, or marketing of a firearm-related product").

50.     Finally, SB 302 [4] authorizes recovery of damages and other relief from firearm industry members [5] for injuries "resulting from" third parties' misuse of their products.  *See* 15 U.S.C. §7903(5)(A).  Indeed, that is the statute's very reason for being.  As its codified "find[ings]" explain, SB 302 is designed to facilitate efforts to hold those engaged in the "sale, manufacture, distribution, and marketing of lethal, but nonetheless legal, firearms" liable for harms resulting from "gun violence."  SB 302 §1(1)-(3).  And SB 302 does just that, subjecting a firearm industry member to liability for harm caused by "intervening … criminal actions by third parties," Del. Code Ann. tit. 10, §3930(e), if the industry member's "sale, manufacturing, importing, or marketing" "contribute[s] to" "a condition which … contributes to the injury or endangerment of health, safety, peace, comfort, or convenience" of the public, *id.* §3930(a)(5), (b), or if the industry member fails to employ "reasonable procedures, safeguards, and business practices" to keep firearms out of the hands of third parties who misuse them, *id.* §3930(a)(6), (c).  SB 302 plainly authorizes "qualified civil liability actions" under the PLCAA.

51.     The kind of liability SB 302 seeks to impose does not fit within any of the narrow exceptions to the PLCAA's preemptive scope enumerated in 15 U.S.C. §7903(5)(A).  SB 302 does not authorize suits commenced by the U.S. Attorney General to enforce any federal laws (§7903(5)(A)(vi)); and it does not confine liability to instances in which a manufacturer or seller unlawfully transferred a firearm (§7903(5)(A)(i)), negligently entrusted a firearm

(§7903(5)(A)(ii)), breached a contract or warranty (§7903(5)(A)(iv)), or defectively made a product (§7903(5)(A)(v)).

52.     Nor does the liability SB 302 authorizes fit within the PLCAA's so-called "predicate exception," which exempts "an action in which a manufacturer or seller of a qualified product knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought." *Id.* §7903(5)(A)(iii).

53.     As the Second Circuit has explained, the term "applicable" in §7903(5)(A)(iii) must be read "in the context of the surrounding language and of the statute as a whole." *City of N.Y.*, 524 F.3d at 400.  And both the immediately surrounding text and the language that immediately follows provide clear indications that the predicate exception exempts from the PLCAA's preemptive reach only statutes that impose concrete obligations and prohibitions that a firearms industry member can understand and comply with, not statutes that merely impose broad duties of care.  Indeed, that is the only sensible way to read the predicate exception, as interpreting it to permit states to reinstate exactly the same kinds of novel public nuisance suits that led Congress to enact the PLCAA through the simple expedient of codifying the same amorphous theories in statutes would "allow the predicate exception to swallow the statute." *City of N.Y.*, 524 F.3d at 403.

54.     At a minimum, SB 302 is preempted to the extent it authorizes the imposition of liability in the absence of either knowing violations or traditional proximate cause.

55.     The PLCAA's predicate exception exempts only "an action in which a manufacturer or seller of a qualified product *knowingly* violated a State or Federal statute applicable to the sale or marketing of the product, *and the violation was a proximate cause of the harm for which relief*

*is sought*."  15 U.S.C. §7903(5)(A)(iii) (emphases added).

56.     By its terms, SB 302 does not require a violation of either of its two categories of prohibited activities to be "knowing."

57.     As to the first category—*i.e.*, "creat[ing], maintain[ing], or contribut[ing] to" "a condition which … contributes to the injury or endangerment of the health, safety, peace, comfort, or convenience of others"—SB 302 explicitly permits liability for violating that command either "knowingly *or* recklessly."  Del. Code Ann. tit. 10, §3930(a)(5), (b).  As for SB 302's second category of prohibited activities—*i.e.*, the absence of "reasonable controls"—that provision does not contain any *mens rea* at all; it sets up a strict liability offense based on any failure to "establish and implement" "reasonable procedures, safeguards, and business practices that are designed to" achieve sweeping goals regarding the manufacture, importation, distribution, marketing, sale, and use of "firearm-related products."  *Id.* §3930(a)(6), (c).  Industry members thus can face liability for each and every failure to abide by that amorphous command, without regard to whether they knew their "procedures, safeguards, and business practices" to be "unreasonable," which (once again) requires blind guessing at what is sufficiently "designed" to "prevent" or "ensure" SB 302's abstract goals.  And lest there be any doubt about what role intent has to play for either kind of violation, the statute makes clear that the answer is none:  "To prevail in an action under this section, the party seeking relief is not required to demonstrate that the firearm industry member acted with the intent to engage in a public nuisance or otherwise cause harm to the public."  *Id.* §3930(h).

58.     Making matters worse, SB 302 does not require "proximate causation" in the traditional sense.  Courts "ordinarily presume that 'Congress intends to incorporate the well-settled meaning of the common-law terms it uses,'" *Jam v. Int'l Fin. Corp.*, 139 S.Ct. 759, 769-70 (2019),

and "proximate cause" is a familiar common-law term.  "The term 'proximate cause' is shorthand

for a concept:  Injuries have countless causes, and not all should give rise to legal liability."  *CSX*

*Transp., Inc. v. McBride*, 564 U.S. 685, 692 (2011) (emphasis omitted).  To distinguish proximate

cause from cause-in-fact, courts have set down several guidelines:  "[F]oreseeability alone is not

sufficient to establish proximate cause," *Bank of Am. Corp. v. City of Miami*, 137 S.Ct. 1296, 1305

(2017), and there must be a "direct relation between the injury asserted and the injurious conduct

alleged," *Holmes v. Secs. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992).

59.    SB 302 explicitly discards any such inquiry.   "A firearm industry member's

conduct" is declared to "constitute[] a proximate cause of the public nuisance" under SB 302 "if

the harm to the public is a reasonably foreseeable effect of the conduct, notwithstanding any

intervening actions, including criminal actions by third parties."  Del. Code Ann. tit. 10, §3930(e).

That, of course, is consistent with SB 302's chief aim—imposing liability on participants in the

firearm industry for harms caused by third parties.  But it is fundamentally inconsistent with what

the PLCAA demands.  For that reason, too, SB 302 is preempted.

**COUNT TWO**
**(Commerce Clause)**

60.    Plaintiff re-alleges and incorporates by reference the preceding allegations as

though fully set out herein.

61.    Consistent with the Framers' "special concern both with the maintenance of a

national economic union unfettered by state-imposed limitations on interstate commerce and with

the autonomy of the individual States within their respective spheres," the Supreme Court has long

held that the Commerce Clause (U.S. Const. art. I, §8, cl. 3) prohibits any state from "control[ling]

commerce occurring wholly outside [its] boundaries."  *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 335-

36 (1989) (footnote omitted).  A state law that has "'the practical effect' of regulating commerce

occurring wholly outside [the] State's borders" thus "exceeds the inherent limits of the enacting State's authority" and is "virtually per se invalid." *Id.* at 336. Such a law is unconstitutional even if it "is addressed only to" conduct "in [the state]," *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579 (1986), and even if "the regulated commerce has effects within the State," *Healy*, 491 U.S. at 336.

62.     SB 302 violates this bedrock constitutional constraint.

63.     SB 302 does not define "firearm industry member" to require that the entity actually do business in Delaware. *See* Del. Code Ann. tit. 10, §3930(a)(1) ("'Firearm industry member' means a person engaged in the sale, manufacturing, distribution, importing, or marketing of a firearm-related product."). And it defines "firearms-related product" to include not just a product "sold, made, distributed, or marketed in this State," but also a product merely "*possessed* in this State." *Id.* §3930(a)(2) (emphasis added). A manufacturer that does not engage in any commerce in Delaware therefore still could be held liable under SB 302 for manufacturing, selling, or marketing its products in other states in ways that meet with Delaware's disapproval.

64.     That is clear on the face of the statute. SB 302 prohibits *any* "firearm industry member"—not just one that operates in Delaware—from "knowingly or recklessly creat[ing], maintain[ing] or contribut[ing] to a public nuisance through the sale, manufacturing, importing, or marketing of a firearm-related product." *Id.* §3298(c). And its requirement that industry members employ "reasonable controls" is not limited to any commercial activities in Delaware. *Id.* §3930(b). For instance, if a native of Little Rock, Arkansas, moves to Dover, Delaware, with a firearm and ammunition he lawfully purchased in his home state and proceeds to misuse the gun in a way that threatens the "comfort" of his new neighbors in Delaware, SB 302 could be deployed to impose liability on a firearms manufacturer operating entirely in Texas and a retail seller

operating entirely in Arkansas.  *Id.* §3930(a)(5), (c).

65.     Making matters worse, SB 302 authorizes Delaware courts to *enjoin* practices that violate its terms even if the practices occur entirely out of state and are lawful where they occur. *See id.* §3930(f)(1).

66.     None of that is remotely consistent with the Commerce Clause.  Indeed, imposing state-law liability (and damages and other relief) on out-of-state actors for actions taken entirely out of state is the definition of unconstitutional extraterritorial state regulation.

67.     SB 302 is no less unconstitutional vis-à-vis the out-of-state commerce of firearm industry members that do other business in Delaware.  What matters under the extraterritoriality doctrine is where the regulated commerce takes place:  "If the transaction to be regulated occurs 'wholly outside' the boundaries of the state, the regulation is unconstitutional," even if the actor, *e.g.*, is incorporated in the regulating state or does some other business in that state.  *A.S. Goldmen & Co. v. N.J. Bur. of Sec.*, 163 F.3d 780, 786 (3d Cir. 1999) (citation omitted).

68.     By directly regulating commerce that takes place entirely in other states, SB 302 plainly violates the constitutional prohibition on extraterritorial state regulation.

69.     SB 302 violates the Commerce Clause in another way as well.  In addition to prohibiting states from regulating conduct that takes place outside of their borders, the Commerce Clause "prohibit[s] States from discriminating against or imposing excessive burdens on interstate commerce" *within* their borders.  *Comptroller of Treasury of Maryland v. Wynne*, 575 U.S. 542, 549 (2015); *see also Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).  SB 302 does that too. Because it imposes liability for commercial transactions occurring in other states, SB 302 unlawfully discriminates against and burdens out-of-state commercial interests within the state.

### COUNT THREE
### (First Amendment)

70.     Plaintiff re-alleges and incorporates by reference the preceding allegations as though fully set out herein.

71.     SB 302 does not just regulate commerce ("the sale, manufacturing, [and] importing … of a firearm-related product").  It also regulates "marketing"—*i.e.*, speech protected by the First Amendment.  "A firearm industry member" may be held liable under SB 302 if its "marketing" is deemed to have "contribute[d] to a public nuisance" or if it failed to employ "reasonable controls" as to its "marketing."  Del. Code Ann. tit. 10, §3930(b), (c).

72.     That is a textbook First Amendment violation.

73.     Laws that single out speech on the basis of its content or viewpoint are subject to the strictest of scrutiny, which they "rare[ly]" survive.  *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 790-91, 799 (2011).  SB 302 does both of those things.  And far from being narrowly tailored or even closely drawn to achieve a compelling or important government interest, SB 302 is radically overbroad in relation to any legitimate objective it may further.

74.     Start with content-based discrimination.  SB 302 undoubtedly regulates speech based on its content or "the topic discussed."  *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 142 S.Ct. 1464, 1471 (2022).  After all, the statute does not apply to *all* marketing; it applies only to "marketing *of a firearm-related product*."  Del. Code Ann. tit. 10, §3930(b), (c) (emphasis added).  Indeed, SB 302 does not even apply to all speech about firearms—only the speech of "firearm industry member[s]," *i.e.*, those "engaged in the sale, manufacturing, distribution, importing, or marketing of a firearm-related product."  *Id.* §3930(a)(1).  And that speaker-based discrimination is no accident.  SB 302 fixates on gun-related speech by gun-related actors because their speech is uniquely likely to communicate a particular *viewpoint* that Delaware disfavors.  *See*

*Sorrell v. IMS Health Inc.*, 564 U.S. 552, 564 (2011).

75.     The topics and views that Delaware has singled out in SB 302 do not fall into any "well-defined and narrowly limited classes of speech" unprotected by the First Amendment. *Brown*, 564 U.S. 786, 791.  To be sure, the First Amendment does not preclude imposing liability for false, deceptive, or otherwise "misleading" commercial speech.  *See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 563 (1980).  But SB 302 does not even purport to target speech that is false or misleading.  It authorizes the imposition of liability for speech about lawful products—products expressly protected by the Constitution, no less—*even when that speech is truthful and not misleading*.  Indeed, the words "false," "misleading," and "deceptive" appear nowhere in the statute.  A manufacturer that publishes advertisements containing *entirely accurate* specifications of its lawful products—ammunition size, magazine capacity, weight, retail price, etc.—thus could be liable under SB 302 if its advertisement could somehow be deemed inconsistent with the "comfort" or "convenience" of Delaware residents, Del. Code Ann. tit. 10, §3930(a)(5), (b).  So too could an industry member who fails to establish what Delaware deems to be a "reasonable procedure" with respect to its marketing materials (whatever that may be)—again, no matter how accurate its marketing materials are.  *Id.* §3930(a)(6), (c).

76.     That the product being marketed is dangerous does not render speech promoting it entitled to any less constitutional protection either.  Truthful speech promoting a lawful product or service is protected by the First Amendment even if the product or service is known to have deleterious health effects.  *See, e.g.*, *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001) (tobacco); *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 184-85 (1999) (gambling); *44 Liquormart*, 517 U.S. at 504 (liquor); *Bigelow v. Virginia*, 421 U.S. 809, 818-25 (1975) (abortion).  Simply put, the mere fact that a product is dangerous does not transform

promotion of that product (*i.e.*, speech) into a tort for which liability may be imposed. And that is, of course, true *a fortiori* when it comes to promotion of products that not only are legal, but are protected by the Second Amendment.

77.     Delaware thus could justify SB 302 only by affirmatively proving that it sufficiently tailored to achieve a sufficiently important state interest. *See Ams. for Prosperity Found. v. Bonta*, 141 S.Ct. 2373, 2384 (2021). That, it cannot do, as SB 302 is both "seriously underinclusive" and "seriously overinclusive" in relating to any public safety interests the state may assert. *Brown*, 564 U.S. at 805. While purportedly aimed at an "epidemic of gun violence," SB 302 §1(1), SB 302 does *nothing* to police the conduct of *criminals* who misuse firearms to perpetrate that problem and endanger the public's health and safety. Nor does it regulate vast swaths of speech—*e.g.*, action and horror films, video games, direct incitements to violence, and countless other forms of expression—that may actually encourage criminal gun violence, leaving it "wildly underinclusive," *Brown*, 564 U.S. at 801-02, even as a regulation of speech. Conversely, by imposing sweeping liability—and even potentially punitive damages—for *any* firearms marketing that could later be thought to "contribute to a public nuisance" in Delaware, even if it is nothing more than entirely truthful, non-misleading speech, *see* Del. Code Ann. tit. 10, §3930(a)(5), (b), SB 302 is "vastly overinclusive" as well. *Brown*, 564 U.S. at 804. SB 302 thus has the inevitable effect of "prohibit[ing] or chill[ing]" vast swaths of fully protected expression, *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 255 (2002), destroying the "breathing space" that "the First Amendment needs," *Broadrick v. Oklahoma*, 413 U.S. 601, 610 (1973).

78.     Not only is SB 302 not remotely tailored to any permissible state objective, it also suffers from a fatal vagueness problem. Vagueness "raises special First Amendment concerns because of its obvious chilling effect on free speech." *Reno v. ACLU*, 521 U.S. 844, 871-72 (1997).

After all, vague laws risk chilling would-be speakers by forcing them "to steer far wider of the unlawful zone" than they otherwise would "if the boundaries of the forbidden areas were clearly marked." *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964).  For that reason, laws touching on speech must themselves speak "only with narrow specificity."  *NAACP v. Button*, 371 U.S. 415, 433 (1963).

79.     SB 302 does precisely the opposite.  Indeed, the statute makes it virtually impossible for regulated parties to tell what speech is and is not permitted, leaving them with no realistic choice but to err on the side of refraining from exercising their First Amendment rights.

80.     By its terms, SB 302 renders unlawful any marketing that could be said to have "recklessly" "contribute[d] to a public nuisance," Del. Code Ann. tit. 10, §3930(b), and it defines "public nuisance" so broadly as to sweep in, *e.g.*, marketing that "contributes to the injury or endangerment of the health, safety, peace, comfort, or convenience of others" or is not subject to sufficiently "reasonable procedures, safeguards, and business practices," *id.* §3930(a)(5), (a)(6). SB 302 thus necessarily "will provoke uncertainty among speakers," *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 871 (1997), as such incomprehensible and subjective abstractions do not even articulate at all—let alone articulate with "narrow specificity"—what kind(s) of speech may later be deemed to have contributed to a "public nuisance."

81.     That profound uncertainty not only "raises special First Amendment concerns because of its obvious chilling effect on free speech," but creates a "risk of discriminatory enforcement," which make the chilling effect even more acute.  *Id.*  After all, "[i]t is not merely the sporadic abuse of power by the censor but the pervasive threat inherent in its very existence that constitutes the danger to freedom of discussion."  *Thornhill v. Alabama*, 310 U.S. 88, 97 (1940).  And that threat is even more pervasive when, as here, a law "does not aim specifically at

evils within the allowable area of State control but, on the contrary, sweeps within its ambit other activities that in ordinary circumstances constitute an exercise of freedom of speech or of the press." *Id.* That inherent vagueness dooms SB 302 under the First Amendment. *See Reno*, 521 U.S. at 871.

82.    There is another problem here too. Even when speech about a product is actually false or misleading—which, again, SB 302 does not require—the traditional principles that govern judicial actions for misrepresentations, including proof of reliance on the allegedly false speech, have always required a substantial link between that speech and the injury for which redress is sought before liability may be imposed. *See, e.g.*, Restatement (Second) of Torts §525 (1977); Dee Pridgen & Richard M. Alderman, *Consumer Protection and the Law* §2.26, at 2-64 (2002); *Stewart v. Wyo. Cattle Ranche Co.*, 128 U.S. 383 (1888). That link is essential to ensure that efforts to impose liability based on speech remain consistent with the First Amendment. After all, if liability could be imposed for misleading (or even truthful) speech at the behest of plaintiffs who did not rely on it and cannot demonstrate injury from it (as opposed to from the intervening acts of a third party), then the threat of massive tort liability could inhibit a speaker from voicing his view "even though [he] believe[s] [it] to be true and even though it is in fact true." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279 (1964). Yet SB 302 *does not even require proof of reliance*.

83.    Nor does SB 302 require a plaintiff to trace alleged injuries directly to the speech in question. On the contrary, under SB 302 "[a] firearm industry member's conduct," *including its speech*, is deemed to "constitute[] a proximate cause of the public nuisance if the harm to the public is a reasonably foreseeable effect of the conduct, notwithstanding any intervening actions, including criminal actions by third parties." Del. Code Ann. tit. 10, §3930(e). The First Amendment demands far more, particularly of speaker-based restrictions on speech. *See Sorrell*

*v. IMS Health Inc.*, 564 U.S. 552, 565-66 (2011).

84.     The First Amendment jealously protects speech by guarding against the imposition of massive liability on speech without significant protections.  That is true even of torts that pre-date the Republic and the First Amendment.  And it is true *a fortiori* of novel and extreme theories of liabilities with no comparable historical pedigree.  SB 302 flunks First Amendment 101 at every turn.

### COUNT FOUR
### (Second Amendment)

85.     Plaintiff re-alleges and incorporates by reference the preceding allegations as though fully set out herein.

86.     "[T]he Second and Fourteenth Amendments protect an individual right to keep and bear arms for self-defense."  *Bruen*, 142 S.Ct. at 2125; *see also* 15 U.S.C. §7901(a)(1)-(2).  And "the core Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to acquire arms."  *Teixeira*, 873 F.3d 670 at 677.  Commerce in arms is thus constitutionally protected.  *See Andrews v. State*, 50 Tenn. 165, 178 (1871) ("The right to keep arms, necessarily involves the right to purchase them, to keep them in a state of efficiency for use, and to purchase and provide ammunition suitable for such arms, and to keep them in repair.").

87.     SB 302 infringes this essential component of the Second Amendment right to keep and bear arms.  Under *Bruen*, a law that regulates Second Amendment activity is unconstitutional unless the state can prove that it "is consistent with this Nation's historical tradition."  142 S.Ct. at 2126.  SB 302 is not remotely consistent with that tradition.  In fact, the Third Circuit squarely held as recently as 2001 that "[t]o extend public nuisance law to embrace the manufacture of handguns would be unprecedented."  *Camden Cnty.*, 273 F.3d at 540-41; *see also* 15 U.S.C. §7901 (Congress finding the same).  Delaware thus cannot "justify its regulation by demonstrating that it

is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S.Ct. at 2130.

88.     As a result, SB 302 violates the Second Amendment.

### COUNT FIVE
### (Due Process)

89.     Plaintiff re-alleges and incorporates by reference the preceding allegations as though fully set out herein.

90.     For many of the same reasons that SB 302 is unconstitutionally vague with respect to speech protected by the First Amendment, it is also unconstitutionally vague under the Due Process Clause with respect to *all* the conduct it polices.  The Fourteenth Amendment prohibits a state from "depriv[ing] any person of life, liberty, or property without due process of law."  U.S. Const. amend. XIV, §1.  A law that forbids or requires an act "in terms so vague that men of common intelligence must necessarily guess at its meaning … violates the first essential of due process of law."  *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 390 (1926).  So too does a law with terms so malleable that it authorizes "arbitrary [or] discriminatory enforcement."  *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

91.     Because the text of the Fourteenth Amendment applies to all manner of state-sanctioned "depriv[ations]," this anti-vagueness guarantee applies to both criminal and civil laws.  *See id.* at 108-09 (collecting cases); *see also Sessions v. Dimaya*, 138 S.Ct. 1204, 1224-26 (2018) (Gorsuch, J., concurring in part and concurring in the judgment).

92.     For all the reasons already discussed, "[t]he vice of unconstitutional vagueness is further aggravated" in the First Amendment context.  *Cramp v. Bd. of Pub. Instruction of Orange Cnty.*, 368 U.S. 278, 287 (1961).  But it is not just First Amendment concerns that demand regulation with especial precision.  A more "stringent" vagueness test applies, moreover, for statutes that "threaten to inhibit the exercise of constitutionally protected rights" of *any* kind, as

well as for statutes that impose "quasi-criminal" penalties. *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982).  The most protective vagueness standard known to our law thus applies here several times over.  SB 302 not only directly regulates speech, but also directly restricts the activities of those engaged in the lawful business of selling arms protected by the Second Amendment.  And the liability SB 302 threatens is no small matter:  "an injunction," "an order providing for abatement," "restitution," "compensatory and punitive damages," "reasonable attorneys' fees, filing fees, and reasonable costs of the action," and "any other appropriate relief" flowing from downstream gun violence perpetrated by criminals.  Del. Code Ann. tit. 10, §3930(f).  SB 302 thus ushers in the "possibility of imposing liability on an entire industry," which, among other things, "threatens the diminution of a basic constitutional right" enabled by that industry—namely, individuals' Second Amendment rights to keep and bear arms. 15 U.S.C §7901(a)(6).  As a result, SB 302 is subject to a "stringent" vagueness test even apart from its direct regulation of speech.

93.     SB 302 flunks that test, as the prohibitions it imposes are hopelessly vague.  The statute makes it unlawful for a "firearm industry member" to, *inter alia*, "recklessly … contribute to a public nuisance through the sale, manufacturing, importing, or marketing of a firearm-related product" "by conduct unlawful in itself *or unreasonable under all the circumstances*."  Del. Code Ann. tit. 10, §3930(b) (emphasis added).  That command leaves industry participants (who already must comply with an interlocking web of federal, state, and local laws) without any guidance on how they are supposed to act—or, more to the point, how they can conduct their businesses without potentially running afoul of the statute.

94.     For starters, the "unreasonable" conduct that SB 302 polices must, by definition, be entirely lawful: What is unreasonable, the statute says, is different from what is already "unlawful

in itself" under federal, state, or local law.  *Id.*  Additionally, "all the circumstances" that a court must consider include the circumstances of any nuisance itself, which may not come into being until long after the manufacturer or seller has acted "through the sale, manufacturing, importing, or marketing of a firearm-related product."  *Id.*  There is thus no way to know *ex ante*—*i.e.*, when a product is actually made, sold, or advertised—if a manufacturer or seller's conduct will or will not be deemed "unreasonable under all the circumstances."

95.    Even if an industry member could somehow conceive of all relevant circumstances yet to come, moreover, it remains a mystery what "reasonable controls" means—especially when it is defined to mean something more than complying with the law.  And the statute's modest effort to supply a definition only makes matters worse:  Rather than identify a firearm industry member's concrete obligations with specificity, SB 302 issues a sweeping command that industry members to adopt any and all procedures "designed to" "prevent" or "ensure" a litany of abstract goals including (but not limited to) preventing the loss or theft of firearms, preventing illegal arms trafficking, and so on. *Id.* §3930(a)(6).  And rather than recycle pre-existing common-law nuisance principles, SB 302 tasks industry members with predicting abstractions like what befits the "comfort" and "convenience" of Delaware residents.  *Id.* §3930(a)(5).  Then it directs courts to punish whenever they guess wrong.

96.    To be clear, "[w]hat renders [this] statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely *what that fact is*."  *United States v. Williams*, 553 U.S. 285, 306 (2008) (emphasis added).  The problem with SB 302 is not mere imprecision at the margins, but the failure to articulate any standard whatsoever.  Determining, for example, what promotes (or disserves) the public convenience invites "wholly subjective judgments without

statutory definitions, narrowing context, or settled legal meanings." *Id.*

97.     Indeed, SB 302 is "so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015).  And the common law is no guide, as the suits that SB 302 contemplates are a radical departure from any known concept of public nuisance or any other tort.  Given its sheer breadth, its lack of any identifiable standards, and its stark departures from the common law, SB 302 "impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Chatin v. Coombe*, 186 F.3d 82, 89 (2d Cir. 1999) (citation omitted).  The Due Process Clause demands far more.

98.     And that is not the only due process problem with SB 302.  Proof that the defendant caused the plaintiff's injury is and always has been a core element of tort law.  *See, e.g.*, Restatement (Second) of Torts §430 (1965); *Bank of Am. Corp. v. City of Miami*, 137 S.Ct. 1296, 1305 (2017); *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 132-33 (2014).  Indeed, even strict-liability torts require proof of causation.  *See, e.g.*, Restatement (Second) of Torts §§504-05, 507, 509, 519 (1977).

99.     That is not just tradition; it is constitutionally mandated.  It has long been settled that "a presumption that is arbitrary, or that operates to deny a fair opportunity to repel it, violates the due process clause."  *W. & Atl. R.R. v. Henderson*, 279 U.S. 639, 642 (1929).  Denying a defendant a meaningful opportunity to demonstrate that it did not actually cause a plaintiff's injuries would be a paradigm arbitrary deprivation of private property.

100.    Yet SB 302 does just that by reimaging proximate cause to include chains of events that extend not only far out of state and back in time, but through the criminal acts of third parties.  *See* Del. Code Ann. tit. 10, §3930(b).  The Constitution does not permit such breathtaking liability.

101.     It makes no difference that SB 302 labels its standard "proximate cause" rather than a presumption.  A state cannot get around that bedrock constitutional protection through the simple expedient of eliminating the traditional elements of liability against which a defendant is entitled to defend.  *See Crowell v. Benson*, 285 U.S. 22, 53 (1932) ("[R]egard must be had, as in other cases where constitutional limits are invoked, not to mere matters of form, but to the substance of what is required.").  In short, labeling something "proximate cause" is no substitute for honoring the basic guarantees of due process.

102.     SB 302's radical relaxing of the traditional requirements of causation not only compounds the vagueness problem, but independently violates due process.

**PRAYER FOR RELIEF**

Plaintiff prays for the following relief from the Court:

1.     a declaration, pursuant to 28 U.S.C. §2202, that SB 302 on its face violates the United States Constitution and is therefore void and unenforceable, or, in the alternative, that SB 302 is unconstitutional as applied to NSSF and its members;

2.     a preliminary injunction enjoining Attorney General Jennings, as well as all officers, agents, and employees subject to her supervision, direction, and/or control, from enforcing or otherwise bringing suit against NSSF and its members under SB 302;

3.     a permanent injunction enjoining Attorney General Jennings, as well as all officers, agents, and employees subject to her supervision, direction, and/or control, from enforcing or otherwise bringing suit against NSSF and its members under SB 302;

4.     such costs and reasonable attorneys' fees to which Plaintiff may be entitled by law;

5.     nominal damages; and

6.     any further relief the Court deems just and proper.

LEWIS BRISBOIS
   BISGAARD & SMITH LLP

**OF COUNSEL**

/s/ Sean M. Brennecke
Sean M. Brennecke (No. 4686)
500 Delaware Ave., Suite 700
Wilmington, DE 19801
(302) 985-6000
Sean.Brennecke@LewisBrisbois.com

Paul D. Clement
(*pro hac vice* motion to be filed)
Erin E. Murphy
(*pro hac vice* motion to be filed)
Matthew D. Rowen
(*pro hac vice* motion to be filed)
Trevor W. Ezell
(*pro hac vice* motion to be filed)
Nicholas M. Gallagher
(*pro hac vice* motion to be filed)
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

*Attorneys for Plaintiff*

Dated: November 16, 2022

4857-6325-2287.2

32