**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| NATIONAL SHOOTING SPORTS FOUNDATION, | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) C.A. No. _____ |
| v. | ) |
| | ) |
| KATHY JENNINGS, ATTORNEY GENERAL OF THE STATE OF DELAWARE, | ) |
| | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

LEWIS BRISBOIS
  BISGAARD & SMITH LLP
Sean M. Brennecke (No. 4686)
500 Delaware Ave., Suite 700
**OF COUNSEL**                                Wilmington, DE 19801
                                             (302) 985-6000
Paul D. Clement                              Sean.Brennecke@LewisBrisbois.com
(*pro hac vice* motion to be filed)
Erin E. Murphy
(*pro hac vice* motion to be filed)          *Attorneys for Plaintiff*
Matthew D. Rowen
(*pro hac vice* motion to be filed)
Trevor W. Ezell
(*pro hac vice* motion to be filed)
Nicholas M. Gallagher
(*pro hac vice* motion to be filed)
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

Dated: November 16, 2022

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................... ii

INTRODUCTION ........................................................................................................................ 1

JURISDICTION ........................................................................................................................... 3

ARGUMENT ................................................................................................................................ 3

I.      NSSF Is Likely To Succeed On The Merits ...................................................................... 3

        A.      SB 302 Is Preempted ............................................................................................. 3

        B.      At a Minimum, SB 302 Is Preempted to the Extent it Requires Neither
                Knowing Violations nor Proximate Cause ............................................................ 9

        C.      SB 302 Violates the Commerce Clause ................................................................ 10

        D.      SB 302 Violates the First Amendment ................................................................. 13

        E.      SB 302 Is Void for Vagueness ............................................................................. 17

        F.      SB 302 Violates the Second Amendment ............................................................ 18

II.     The Remaining Factors All Favor Injunctive Relief ....................................................... 19

CONCLUSION ........................................................................................................................... 20

# TABLE OF AUTHORITIES

**Cases**

*44 Liquormart, Inc. v. Rhode Island,*
    517 U.S. 484 (1996) .................................................................................... 13, 14

*A.S. Goldmen & Co. v. N.J. Bur. of Sec.,*
    163 F.3d 780 (3d Cir. 1999) .................................................................................11

*Ashcroft v. Free Speech Coalition,*
    535 U.S. 234 (2002) .................................................................................... 16

*Bank of Am. Corp. v. City of Miami,*
    137 S.Ct. 1296 (2017) .................................................................................... 10

*BMW of N. Am. Inc. v. Gore,*
    517 U.S. 559 (1997) .................................................................................... 13

*Broadrick v. Oklahoma,*
    413 U.S. 601 (1973) .................................................................................... 16

*Brown v. Entm't Merchants Ass'n,*
    564 U.S. 786 (2011) .................................................................................... 13, 14, 15

*Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.,*
    476 U.S. 573 (1986) .................................................................................11

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.,*
    447 U.S. 557 (1980) .................................................................................... 14

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC,*
    142 S.Ct. 1464 (2022) .................................................................................... 13

*City of N.Y. v. Beretta U.S.A. Corp.,*
    524 F.3d 384 (2d Cir. 2008) .................................................................................... 2, 5, 6, 7

*Comptroller of Treasury of Maryland v. Wynne,*
    575 U.S. 542 (2015) .................................................................................... 12

*Cramp v. Bd. of Pub. Instruction of Orange Cty.,*
    368 U.S. 278 (1961) .................................................................................... 17

*Ctr. for Investigative Reporting v. Se. Penn. Transp. Auth.,*
    975 F.3d 300 (3d Cir. 2020) .................................................................................... 20

*District of Columbia v. Beretta U.S.A. Corp.,*
    940 A.2d 163 (D.C. 2008) .................................................................................... 8

*Greater New Orleans Broad. Ass'n, Inc. v. United States,*
    527 U.S. 173 (1999) ........................................................................................ 14

*Greater Phila. Chamber of Com. v. City of Phila.,*
    949 F.3d 116 (3d Cir. 2020) ......................................................................... 15

*Hazardous Waste Treatment Council v. South Carolina,*
    945 F.2d 781 (4th Cir. 1991) ........................................................................ 20

*Healy v. Beer Inst., Inc.,*
    491 U.S. 324 (1989) ................................................................................ 10, 11

*Hillman v. Maretta,*
    569 U.S. 483 (2013) .......................................................................................... 8

*Holmes v. Secs. Inv. Prot. Corp.,*
    503 U.S. 258 (1992) ........................................................................................ 10

*Ileto v. Glock, Inc.,*
    565 F.3d 1126 (9th Cir. 2009) ........................................................................ 8

*Jam v. Int'l Fin. Corp.,*
    139 S.Ct. 759 (2019) ...................................................................................... 10

*Kansas v. Garcia,*
    140 S.Ct. 791 (2020) ......................................................................................... 3

*KS&E Sports v. Runnels,*
    72 N.E.3d 892 (Ind. 2017) ........................................................................... 20

*Lorillard Tobacco Co. v. Reilly,*
    533 U.S. 525 (2001) ........................................................................................ 14

*Midland Asphalt Corp. v. United States,*
    489 U.S. 794 (1989) ........................................................................................ 19

*Minard Run Oil Co. v. U.S. Forest Serv.,*
    670 F.3d 236 (3d Cir. 2011) ......................................................................... 20

*N.Y. State Rifle & Pistol Ass'n v. Bruen,*
    142 S.Ct. 2111 (2022) .................................................................................... 18

*N.Y. Times Co. v. Sullivan,*
    376 U.S. 254 (1964) ........................................................................................ 17

*NAACP v. Button,*
    371 U.S. 415 (1963) ........................................................................................ 16

*Ramsay v. Nat'l Bd. of Med. Examiners*,
  968 F.3d 251 (3d Cir. 2020) ........................................................................... 20

*Reilly v. City of Harrisburg*,
  858 F.3d 173 (3d Cir. 2017) ........................................................................ 3, 20

*Reno v. ACLU*,
  521 U.S. 844 (1997) ....................................................................................... 16

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
  141 S.Ct. 63 (2020) .......................................................................................... 3

*Sambrano v. Savage Arms, Inc.*,
  338 P.3d 103 (N.M. Ct. App. 2014) ................................................................ 20

*Sorrell v. IMS Health Inc.*,
  564 U.S. 552 (2011) ....................................................................................... 14

*Stilp v. Contino*,
  613 F.3d 405 (3d Cir. 2010) ........................................................................... 19

*Thornhill v. Alabama*,
  310 U.S. 88 (1940) ......................................................................................... 17

*United States v. Oakland Cannabis Buyers' Coop.*,
  532 U.S. 483 (2001) ....................................................................................... 20

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
  455 U.S. 489 (1982) ....................................................................................... 18

*Wash. State Dep't of Soc. & Health Servs. v. Guardianship Est. of Keffeler*,
  537 U.S. 371 (2003) .......................................................................................... 6

**Statutes**

15 U.S.C. §7901(a)(4) ............................................................................................ 7

15 U.S.C. §7901(a)(5) ........................................................................................ 1, 7

15 U.S.C. §7901(a)(6) ...................................................................................... 12, 13

15 U.S.C. §7901(a)(7) ........................................................................................ 8, 18

15 U.S.C. §7902(a) ............................................................................................ 1, 4

15 U.S.C. §7903(5)(A) ................................................................................... *passim*

Del. Code Ann. tit. 10, §3930(a) .................................................................... *passim*

Del. Code Ann. tit. 10, §3930(b) ................................................................................ *passim*

Del. Code Ann. tit. 10, §3930(c) ................................................................................ *passim*

Del. Code Ann. tit. 10, §3930(e) ................................................................................ 10, 12

Del. Code Ann. tit. 10, §3930(f) ...............................................................................11, 15, 19

Del. Code Ann. tit. 10, §3930(g) ................................................................................ 15

Del. Code Ann. tit. 10, §3930(h) ................................................................................ 9

Del. Code Ann. tit. 10, §7903(5) ................................................................................ 4, 5

## Other Authorities

Br. of California et al. as Amici Curiae, *Estados Unidos Mexicanos v. Smith & Wesson Brands, Inc.*, No. 1:21-cv-11269 (D. Mass. Jan. 31, 2022), Dkt.110-1 .................... 19

Nat'l Shooting Sports Found., *Firearms and Ammunition Industry Economic Impact Report* (2022), https://bit.ly/3BdsM9p ........................................................ 12

*Restatement (Second) of Torts* (1977) .......................................................................... 17

SB 302 §1.................................................................................................................... 4, 8, 15

**INTRODUCTION**

In 2005, Congress passed the Protection of Lawful Commerce in Arms Act ("PLCAA") to stamp out efforts to use nebulous state-law "reasonableness" standards to hold law-abiding manufacturers and sellers of firearms liable for harms caused by criminals who misuse their products. That purpose is evident on the face of the statute; Congress declared in the text that the PLCAA's core aim is to prevent lawsuits seeking redress from businesses engaged in lawful commerce "for the harm caused by those who criminally or unlawfully misuse firearm products … that function as designed and intended." 15 U.S.C. §7901(5). To that end, the PLCAA broadly preempts any "civil action" "against a manufacturer or seller of a [firearm or related product]" for injuries "resulting from the … misuse of a [firearm or related product] by … a third party." *Id.* §§7902(a), 7903(5)(A). That rule is subject to only a narrow set of enumerated exceptions, all for suits involving direct and unambiguous misconduct by the manufacturer or seller itself.

Delaware Senate Bill 302 ("SB 302") is an unabashed attempt to end-run the PLCAA. Under SB 302, a manufacturer or seller of firearms may be held liable if it fails to "establish and implement *reasonable* controls regarding the manufacture, sale, distribution, use, and marketing of [its] products," Del. Code Ann. tit. 10, §3930(c) (emphasis added), which the statute (unhelpfully) defines to mean "*reasonable* procedures, safeguards, and business practices that are designed to … [p]revent the loss … or theft of a firearm-related product" and "[p]revent the sale or distribution of a firearm-related product to … a person prohibited from possessing a firearm," *id.* §3930(a)(6) (emphasis added). "A firearm industry member" may also be held liable if it "recklessly … contribute[s]," "through the sale, manufacturing, importing, or marketing of a firearm-related product" and "by conduct … *unreasonable under all the circumstances*," to "a public nuisance," *id.* §3930(b) (emphasis added), which the statute (unhelpfully) defines to mean "a condition which … contributes to the injury or endangerment of the health, safety, peace,

comfort, or convenience of others," *id.* §3930(a)(5).  The statute thus allows firearms sellers and manufacturers to be held liable under nebulous state-law "reasonableness" standards for harms caused by third parties.  In other words, it authorizes exactly what the PLCAA prohibits.

Delaware apparently believes that the PLCAA's so-called "predicate exception," which allows suits alleging that a manufacturer or seller "knowingly violated a State … statute applicable to the sale or marketing of the product" if "the violation was a proximate cause of the harm for which relief is sought," 15 U.S.C. §7903(5)(A)(iii), permits it to revive the very suits that Congress passed the PLCAA to inter simply by enshrining the same ahistorical common-law theories into statutes.  But text, structure, and context—not to mention common sense—foreclose any effort to "allow the predicate exception to swallow the statute."  *City of N.Y. v. Beretta U.S.A. Corp.*, 524 F.3d 384, 403 (2d Cir. 2008).  The predicate exception exempts actions only under statutes that impose clear and concrete obligations on industry members, not statutes under that, like SB 302, merely impose generic duties of reasonableness and redefine proximate cause in the process.

That is reason enough to invalidate SB 302, but additional reasons abound.  SB 302 regulates commerce in and speech relating to lawful firearms even when they take place *entirely outside of Delaware*, in clear violation of the Commerce Clause, which prohibits states from directly regulating conduct that takes place beyond their borders even when it has effects within the state.  The statute unconstitutionally restricts and chills speech and invites arbitrary enforcement by imposing liability on firearms industry members for marketing their products "unreasonably," and it green-lights the imposition of liability based on truthful, non-misleading speech about lawful products, all without proof of reliance, in clear violation of the First Amendment.  And it tramples Second Amendment rights and is void for vagueness to boot.

NSSF is likely to succeed on its claims, and the remaining factors likewise favor injunctive relief. Subjecting NSSF members to an unconstitutional law inflicts irreparable harm as a matter of law, and every dollar spent trying to decipher and comply with the new statute is irreparable harm too given the Eleventh Amendment. The balance of equities and public interest support injunctive relief, as enforcement of an unconstitutional law is always contrary to the public interest, and a state and its officers suffer no cognizable harm by being enjoined from enforcing such a law. The Court should enjoin enforcement of SB 302.

## JURISDICTION

NSSF challenges the validity of SB 302 under 42 U.S.C. §1983 and the U.S. Constitution. This Court has jurisdiction under 28 U.S.C. §1331.

## ARGUMENT

The Court should issue a preliminary injunction because (1) NSSF is "likely to prevail" on the merits, (2) denying an injunction "would lead to irreparable injury," and (3) "granting relief would not harm the public interest." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S.Ct. 63, 66 (2020) (per curiam); *see Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017).

**I.    NSSF Is Likely To Succeed On The Merits.**

    **A.   SB 302 Is Preempted.**

When a federal law "imposes restrictions" and "a state law confers rights … that conflict with the federal law, the federal law takes precedence and the state law is preempted." *Kansas v. Garcia*, 140 S.Ct. 791, 801 (2020). That is exactly the situation here. The PLCAA imposes clear restrictions: Courts may not hear any "civil action … against a manufacturer or seller of a [firearms] product … for damages … or other relief, resulting from the criminal or unlawful misuse of a qualified product by … a third party." 15 U.S.C. §7903(5)(A). SB 302 in turn confers rights that conflict with the PLCAA: It explicitly authorizes the imposition of liability on "firearm

industry members" for damages, injunctions, and other relief resulting from a third party's misuse of an industry member's products.  Del. Code Ann. tit. 10, §3930.  SB 302 is thus preempted.

The PLCAA preempts state efforts to subject those who manufacture or sell firearms or firearm-related products to liability for harms "resulting from the criminal or unlawful misuse of a [firearm or related] product by … a third party." 15 U.S.C. §7903(5)(A).  That is precisely what SB 302 seeks to do.  Indeed, saddling firearm industry members with damages and other liability for injuries resulting from third parties' misuse of their products is the whole point of the statute.  As its codified "find[ings]" explain, SB 302 is designed to facilitate efforts to hold those engaged in the "sale, manufacture, distribution, and marketing of lethal, but nonetheless legal, firearms" liable for harms resulting from "gun violence."  SB 302 §1(1)-(3).  And SB 302 does just that, subjecting a firearm industry member to liability for harm caused by criminal misuse of its products if its "sale, manufacturing, importing, or marketing" of its lawful products is deemed to "contribute to" "a condition which … contributes to the injury or endangerment of health, safety, peace, comfort, or convenience" of the public, or if it is deemed to have failed to employ "reasonable procedures, safeguards, and business practices" to keep firearms out of the hands of third parties who misuse them.  Del. Code Ann. tit. 10, §3930(a)(5)-(6), (b)-(c).  SB 302 thus seeks to revive exactly the kind of suits that the PLCAA says "may not be brought." 15 U.S.C. §7902(a).

The only question, then, is whether SB 302 falls within any of the PLCAA's exceptions.  It does not.  SB 302 does not authorize suits by the U.S. Attorney General to enforce any federal laws (§7903(5)(A)(vi)) or confine liability to cases in which a manufacturer or seller unlawfully transferred a firearm (§7903(5)(A)(i)), negligently entrusted a firearm (§7903(5)(A)(ii)), breached a contract or warranty (§7903(5)(A)(iv)), or defectively made a product (§7903(5)(A)(v)).

SB 302 likewise does not fit within the PLCAA's so-called "predicate exception," which exempts "an action in which a manufacturer or seller of a qualified product knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought." *Id.* §7903(5)(A)(iii). The predicate exception cannot sensibly be read to exempt any and all statutes that apply to the firearms industry, as such a capacious reading "would allow the predicate exception to swallow the statute, which was intended to shield the firearms industry from vicarious liability for harm caused by firearms that were lawfully distributed into primary markets." *City of N.Y.*, 524 F.3d at 403. Nor can it sensibly be read to exempt the very suits that the PLCAA was enacted to foreclose. Rather, text, structure, and context—not to mention common sense—all make clear that the predicate exception exempts only those statutes that impose clear obligations or prohibitions directly on firearms industry members (and that could be tested for consistency with the Second Amendment), not statutes that, like SB 302, impose only duties of care vis-à-vis the misconduct of third parties.

Starting with the statutory text, the term "applicable" in §7903(5)(A)(iii) must be read "in the context of the surrounding language and of the statute as a whole." *Id.* at 400. And both the immediately surrounding text and the language that immediately follows provide clear indications that the predicate exception applies only to laws that impose concrete obligations and prohibitions directly on manufacturers and sellers with respect to manufacturing and sales. By its terms, the exception exempts only civil actions that require proof that the defendant "*knowingly* violated" the relevant statute. 15 U.S.C. §7903(5)(A)(iii) (emphasis added). That presumes some requirement sufficiently concrete that a manufacturer or seller can actually *knowingly* violate it. A manufacturer can knowingly comply (or not) with a command to manufacture in certain ways, and a seller can knowingly comply (or not) with a command to conduct a background check, or to keep specified

records, or to not sell to someone known to be prohibited from possessing a gun.  But it is hard to fathom how an industry member who complies with all of the multitude of federal, state, and local laws that explicitly state what it may and may not do would "know" that it nonetheless has failed to employ "reasonable procedures, safeguards, and business practices," or has conducted its lawful business in a manner so "unreasonable under all the circumstances" that it can be said to have "contribute[d] to" "a condition which … contributes to the injury or endangerment of the health, safety, peace, comfort, or convenience of others."  Del. Code Ann. tit. 10, §3930(a)(5)-(6), (b)-(c).

The illustrative examples Congress supplied of "a State or Federal statute applicable to the sale or marketing of the product," 15 U.S.C. §7903(5)(A)(iii), likewise contemplate statutes that impose concrete obligations or prohibitions on manufacture and sales, not statutes that impose broad duties of care that could be alleged to have been violated years after the manufacture or sale. "The general language … []providing that predicate statutes are those 'applicable to' the sale or marketing of firearms[] is followed by the more specific language referring to statutes imposing record-keeping requirements on the firearms industry, 15 U.S.C. §7903(5)(A)(iii)(I), and statutes prohibiting firearms suppliers from conspiring with or aiding and abetting others in selling firearms directly to prohibited purchasers, 15 U.S.C. §7903(5)(A)(iii)(II)."  *City of N.Y.*, 524 F.3d at 402. "Thus," under basic principles of interpretation, the general "applicable to" language in 15 U.S.C. §7903(5)(A)(iii) must be "construed to embrace only objects similar to those enumerated by" the two specific examples that follow.  *Id.* (quoting *Wash. State Dep't of Soc. & Health Servs. v. Guardianship Est. of Keffeler*, 537 U.S. 371, 384 (2003)).

Each of those examples requires a violation of a concrete obligation or prohibition.  The first requires a knowing violation of a recordkeeping requirement, *e.g.*, knowingly entering false information, knowingly failing to enter appropriate information, or aiding, abetting, or conspiring

with someone to make a false statement material to the lawfulness of a sale.  15 U.S.C. §7903(5)(A)(iii)(I).  The second requires a knowing violation of the obligation not to knowingly facilitate straw purchases, *e.g.*, by aiding, abetting, or conspiring to sell a firearm to someone the seller knows or has reasonable cause to believe is buying it for a prohibited person.  *Id.* §7903(5)(A)(iii)(I).  Those examples look nothing like SB 302, which essentially just commands members of the firearms industry to conduct their operations "reasonably," without giving any guidance as to which controls and procedures are "reasonable" or what conduct is "unreasonable under all the circumstances," and which could cover circumstances that become evident only long after the manufacture or sale.  *See* Del. Code Ann. tit. 10, §3930(a)(6), (b)-(c).

The PLCAA's expressly enumerated findings reinforce the conclusion that the predicate exception applies only to laws that impose concrete obligations or prohibitions, not just duties of care.  As the statute explains, its chief aim is to foreclose efforts to hold those engaged in "the lawful design, manufacture, marketing, distribution, importation, or sale … of firearms or [related] products" "liable for the harm caused by those who criminally or unlawfully misuse firearm products or ammunition products that function as designed and intended."  15 U.S.C. §7901(a)(5).  And as the Second Circuit has recognized, the term "lawful" there means "done in compliance with statutes like those described in" the immediately preceding finding—*i.e.*, "the Gun Control Act of 1968, the National Firearms Act, and the Arms Export Control Act."  *City of N.Y.*, 524 F.3d at 402; *see* 15 U.S.C. §7901(a)(4).  Those statutes do not impose amorphous commands to manufacture, sell, or market firearms "reasonably."  They are comprehensive regulatory regimes that impose concrete obligations and prohibitions with which industry members can confidently ensure compliance (or, conversely, can sensibly be said to violate *knowingly*) in real time.

Finally, reading the predicate exception to exempt statutes like SB 302 would effectively gut the PLCAA. This is not a case in which one must comb through obscure legislative history to divine "Congress' purposes and objectives." *Hillman v. Maretta*, 569 U.S. 483, 491 (2013). Congress enshrined them right in the statute. The unambiguous objective of the PLCAA is to foreclose efforts to impose liability on those engaged in lawful commerce in firearms through novel and expansive "theories without foundation in hundreds of years of the common law and jurisprudence of the United States." 15 U.S.C. §7901(a)(7). To be sure, the theories being invoked at the time may "traditionally have been embodied in the common law" rather than codified in statutes. *Ileto v. Glock, Inc.*, 565 F.3d 1126, 1135-36 (9th Cir. 2009). But the threat Congress redressed did not come from the form of the lawsuit. It came from targeting the firearms industry with novel theories designed to hold it liable for the criminal misconduct of third parties.

It thus makes no difference that SB 302 is a statute. *See id.* at 1138 (holding "that Congress intended to preempt general tort law claims" even when a state "codifie[s] those claims in its civil code"); *District of Columbia v. Beretta U.S.A. Corp.*, 940 A.2d 163, 168-72 (D.C. 2008) (holding similar). The General Assembly itself candidly acknowledged that a suit based on exactly the same theories of liability could not be sustained under the common law. *See* SB 302 §1(4). It cannot be the case that the exact same lawsuit is just fine if a state codifies that theory in a statute.

Congress' aim in enacting the PLCAA was not to prompt states to codify their novel theories and reinitiate the same litigation all over again. It barred such lawsuits altogether, while creating a narrow exception for clear requirements that could be complied with (or knowingly violated) in real time, and that could be tested for compliance with the Second Amendment. To ascribe a contrary meaning to the predicate exception would produce irrational results, as it not only would make the PLCAA trivially easy to evade, but would make whether preemption of

virtually identical lawsuits grounded in virtually identical departures from traditional legal principles turn on the happenstance of whether and how a state has codified those theories.  Simply put, any reading of the predicate exception that would allow states to sneak in through the back door the very claims that Congress tossed out the front would put the PLCAA at war with itself.

### B.   At a Minimum, SB 302 Is Preempted to the Extent it Requires Neither Knowing Violations nor Proximate Cause.

Even assuming SB 302 qualified as "a State or Federal statute applicable to the sale or marketing of the product," 15 U.S.C. §7903(5)(A)(iii), that alone would not be enough to rescue SB 302 from the preemptive force of the PLCAA.  The predicate exception exempts only "an action in which a manufacturer or seller of a qualified product *knowingly* violated a State or Federal statute applicable to the sale or marketing of the product, *and the violation was a proximate cause of the harm for which relief is sought*."  *Id.* (emphases added).  Yet SB 302 explicitly authorizes civil actions that do not comply with either of the italicized conditions.

First, SB 302 does not require a violation of either of its categories of prohibited activities to be "knowing."  The first category—"contribut[ing] to" "a condition which … contributes to the injury or endangerment of the … comfort, or convenience of others"—explicitly permits liability for "reckless[]" violations.  Del. Code Ann. tit. 10, §3930(a)(5), (b).  And the second category— the absence of "reasonable controls"—does not require any *mens rea*; it sets up a strict liability offense based on any failure to "establish and implement" "reasonable procedures, safeguards, and business practices" "regarding the manufacture, sale, distribution, use, and marketing of [their] products."  *Id.* §3930(a)(6), (c); *see also id.* §3930(h) (lack of intent not a defense).

Second, SB 302 does not require proximate causation in the ordinary sense.  The predicate exception requires the conduct that violates the underlying statute to be "a proximate cause of the harm" for which redress is sought.  15 U.S.C. §7903(5)(A)(iii).  SB 302 tried to write around that

command by simply declaring that remote sales and marketing practices "constitute[] a proximate cause of" downstream harm any time it is "reasonably foreseeable." Del. Code Ann. tit. 10, §3930(e). But in requiring "proximate cause" in the PLCAA, Congress plainly did not mean "whatever a state defines to be proximate cause, no matter how attenuated"; it meant "to incorporate the well-settled meaning of the common-law term[] it use[d]." *Jam v. Int'l Fin. Corp.*, 139 S.Ct. 759, 769-70 (2019). And, under the common law, not only is "foreseeability alone [] not sufficient to establish proximate cause," *Bank of Am. Corp. v. City of Miami*, 137 S.Ct. 1296, 1305 (2017), but there must be a "direct relation between the injury asserted and the injurious conduct alleged," *Holmes v. Secs. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992). SB 302 explicitly discards any such inquiry. By deploying a novel variant of "proximate cause" that is explicitly designed to facilitate the very thing the PLCAA forbids—*i.e.*, holding industry members responsible for the criminal misuse of their products by third parties—SB 302 once again contravenes the PLCAA.

**C.**     **SB 302 Violates the Commerce Clause.**

1.     The Supreme Court has long held that a state law that has "'the practical effect' of regulating commerce occurring wholly outside [the] State's borders" "exceeds the inherent limits of the enacting State's authority" and is "virtually per se invalid." *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 335-36 (1989). SB 302 violates this bedrock principle. Under SB 302, a manufacturer or seller that does not engage in *any* commerce in Delaware can still be held liable (and be forced to pay damages to Delaware) simply for manufacturing, selling, or marketing its products *in other states* in ways that meet with Delaware's disapproval, even if that conduct was lawful where it occurred, if one of its products is later misused by a third party in Delaware.

That extraterritorial reach is clear on the face of the statute. SB 302 prohibits *any* "firearm industry member"—not just one operating in Delaware—from "knowingly or recklessly creat[ing] … or contribut[ing] to a public nuisance through the sale, manufacturing, importing, or marketing

of a firearm-related product."  Del. Code Ann. tit. 10, §3930(a)(1), (c).  And the firearm need not have been "sold, made, distributed, or marketed in this State," *or even* "*intended to be*."  *Id.* §3930(a)(2)(A)-(B) (emphasis added).  A manufacturer or seller can thus be liable under SB 302 for "recklessly … contribut[ing] to a public nuisance," even if all of its "sale[s], manufacturing," and "marketing" took place out of state, if a Delaware court later finds that it was "reasonably foreseeable that the product would be possessed or used in this State."  *Id.* §3930(a)(2)(C), (b).

SB 302's command to employ "reasonable controls" is not limited to their activities in Delaware either.  *Id.* §3930(c).  So, for instance, if a native of Arkansas moves to Delaware with a firearm he lawfully purchased in his old home state and proceeds to misuse the gun in a way that endangers the "comfort" of his new neighbors in Delaware, SB 302 could be deployed to impose liability on a manufacturer operating entirely in Texas and a retail seller operating entirely in Arkansas, among others with no connection to Delaware.  *See id.* §3930(a)(5), (c).  Making matters worse, SB 302 authorizes Delaware courts to enjoin practices that violate its terms even if the practices occur entirely out of state and are lawful where they occur.  *See id.* §3930(f)(1).

None of that is remotely consistent with the Commerce Clause.  Under settled doctrine, a state law that imposes liability for transactions that take place out of state is flatly unconstitutional, even if it "is addressed only to" conduct "in [the state]," *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579 (1986), and even if "the regulated commerce has effects within the State," *Healy*, 491 U.S. at 336.  Delaware's apparent belief that guns are a nuisance is not a justification for regulating out-of-state commerce upstream.  "If the transaction to be regulated occurs 'wholly outside' the boundaries of the state, the regulation is unconstitutional." *A.S. Goldmen & Co. v. N.J. Bur. of Sec.*, 163 F.3d 780, 786 (3d Cir. 1999).  Indeed, imposing state-law liability (and damages) for actions taken out of state is the definition of unconstitutional

extraterritorial state regulation.  By directly regulating commerce that takes place entirely in other states, SB 302 plainly violates the constitutional prohibition on extraterritorial state regulation.

2.      In addition to prohibiting states from regulating conduct that takes place outside of their borders even when it may have in-state effects, the Commerce Clause "prohibit[s] States from discriminating against or imposing excessive burdens on interstate commerce."  *Comptroller of Treasury of Maryland v. Wynne*, 575 U.S. 542, 549 (2015).  SB 302 violates that command too.

Whatever Delaware may think of the firearms industry, Congress has made a different judgment, recognizing that the industry not only is critical to ensuring that law-abiding Americans can exercise their Second Amendment rights, but contributes to a vibrant sector of America's economy.  That is precisely why Congress declared that the type of liability SB 302 seeks to impose "invites the disassembly and destabilization of other industries and economic sectors lawfully competing in the free enterprise system of the United States, and constitutes an unreasonable burden on interstate and foreign commerce of the United States."  15 U.S.C. §7901(a)(6).  And the importance of the firearms industry has only grown since the time of PLCAA.  In 2021 alone, for instance, the firearms industry generated more than $70 billion in economic activity nationwide.  *See* Nat'l Shooting Sports Found., *Firearms and Ammunition Industry Economic Impact Report* 3 (2022), https://bit.ly/3BdsM9p.  That translates to quality jobs and considerable tax revenue.  In 2021, the firearms industry helped employ more than 350,000 people—almost all of them outside of Delaware—and generated almost $8 billion in taxes.  *Id.*

SB 302 discriminates against all that economic activity, which is flourishing elsewhere but languishing in Delaware.  *See id.* (listing top states for economic output).  And SB 302 undoubtedly burdens that economic activity; indeed, in Congress' estimation, efforts to impose liability for "criminal actions by third parties," Del. Code Ann. tit. 10, §3930(e), inflict "an unreasonable

burden on interstate and foreign commerce of the United States," 15 U.S.C. §7901(a)(6).  SB 302 inflicts that economic burden, moreover, in an unabashed effort to impose its own views on gun policy on the rest of the country.  But "a State may not impose economic sanctions … with the intent of changing … lawful conduct in other States."  *BMW of N. Am. Inc. v. Gore*, 517 U.S. 559, 572 (1997).  For these reasons, too, SB 302 violates the Commerce Clause.

### D.   SB 302 Violates the First Amendment.

In addition to regulating the manufacture and sale of firearms, SB 302 regulates (and allows courts to enjoin and punish) "marketing"—*i.e.*, speech protected by the First Amendment, *see 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 489 (1996)—based on vague and unconstitutional standards.  SB 302 defines "firearm industry member[s]" to include those engaged in "marketing." Del. Code Ann. tit. 10, §3930(a)(1).  It authorizes liability for contributing to a public nuisance "through … marketing."  *Id.* §3930(b).  And it orders industry members to use "reasonable controls regarding … marketing."  *Id.* §3930(c).  That is not remotely consistent with the First Amendment. Laws like SB 302 that single out speech on the basis of content or viewpoint are subject to the strictest of scrutiny, which they "rare[ly]" survive.  *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 790-91, 799 (2011).  And far from being narrowly tailored to achieve a compelling interest, SB 302 is radically overbroad in relation to any legitimate objective it may further.

1.    Start with content- and viewpoint-based discrimination.  SB 302 plainly regulates speech based on its content or "the topic discussed."  *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 142 S.Ct. 1464, 1471 (2022).  After all, the statute does not apply to *all* marketing; it applies only to "marketing *of a firearm-related product*."  Del. Code Ann. tit. 10, §3930(b) (emphasis added).  Indeed, SB 302 does not even apply to all speech about firearms—only the speech of "firearm industry member[s]," those "engaged in the sale, manufacturing, distribution, importing, or marketing of a firearm-related product."  *Id.* §3930(a)(1).  And it fixates on gun-

related speech by gun-related actors for a reason, as their speech is uniquely likely to communicate a *viewpoint* the state disfavors. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 564 (2011).

The topics and views Delaware has singled out in SB 302 do not fall into any "well-defined and narrowly limited classes of speech" unprotected by the First Amendment. *Brown*, 564 U.S. 786, 791.  To be sure, the First Amendment does not preclude imposing liability for false, deceptive, or otherwise "misleading" commercial speech. *See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 563 (1980).  But SB 302 does not even purport to target speech that is false or misleading.  It authorizes the imposition of liability for speech about a product—one expressly protected by the Constitution, no less—*even when that speech is truthful*. A manufacturer that publishes advertisements containing *entirely accurate* specifications of its lawful products—ammunition size, magazine capacity, weight, retail price, etc.—would still be liable under SB 302 if its advertisements were later deemed to (somehow) have undermined the "comfort" or "convenience" of Delaware residents, Del. Code Ann. tit. 10, §3930(a)(5), (b), as would an industry member who fails to establish a "reasonable procedure" with respect to its marketing materials—again, no matter how accurate its advertisements are, *id.* §3930(c).

That the product being marketed is dangerous does not entitle it to any less constitutional protection either.  Truthful speech promoting lawful products is protected by the First Amendment, even if the products have deleterious health effects. *See, e.g.*, *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001) (tobacco); *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 184-85 (1999) (gambling); *44 Liquormart*, 517 U.S. at 504 (liquor).  And that is true *a fortiori* when it comes to promotion of products that not only are legal, but are protected by the Second Amendment.  SB 302 thus strikes at the heart of the First Amendment, which furnishes no less protection for truthful commercial speech than it furnishes for other kinds of speech.

2.      All of that means that Delaware must affirmatively prove that SB 302 satisfies heightened scrutiny.  Indeed, given the speaker, viewpoint, and content discrimination inherent in SB 302, strict scrutiny should apply.  *See Greater Phila. Chamber of Com. v. City of Phila.*, 949 F.3d 116, 139 (3d Cir. 2020) ("[S]omething more than intermediate scrutiny" is required for commercial speech restrictions that single out "some messages or some speakers based on the content of the speech or the identity of the speaker.").  But in all events, no matter which version of heightened scrutiny applies, the state must pursue its goals "by means that are neither seriously underinclusive nor seriously overinclusive."  *Brown*, 564 U.S. at 805.  SB 302 flunks that test.

For one thing, it is "wildly underinclusive."  *Id.* at 801-02.  While it is ostensibly motivated by a desire to resolve a purported "epidemic of gun violence," SB 302 §1, SB 302 does *nothing* to police the conduct of criminals who misuse firearms.  Nor does it regulate vast swaths of speech that may actually encourage criminal gun violence.  SB 302 is thus impermissibly underinclusive even vis-à-vis the regulation of speech.  SB 302 is "vastly overinclusive" as well, *Brown*, 564 U.S. at 804, as it imposes sweeping liability—and even potentially punitive damages, *see* Del. Code Ann. tit. 10, §3930(f)(4), (g)(1)(B)—for *any* firearms marketing that could later be thought to "contribute to a public nuisance" in Delaware, *id.* §3930(a)(5), (b), even if it is nothing more than entirely truthful, non-misleading speech.  Indeed, the scope is breathtaking:  In conceivably any case of gun violence, countless firearm industry members—perhaps thousands of miles away from Delaware and decades before anyone suffers injury—will have engaged in truthful advertising of their products.  Any such ads later deemed to have indirectly *contributed* to gun-related problems in Delaware, even without the industry member's knowledge, could be grounds for liability for someone else's criminal acts.  SB 302 thus "prohibit[s] or chill[s]" a great deal of protected

expression, *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 255 (2002), destroying the "breathing space" that "the First Amendment needs," *Broadrick v. Oklahoma*, 413 U.S. 601, 610 (1973).

3.      SB 302 also suffers from a fatal vagueness problem.  Vagueness "raises special First Amendment concerns because of its obvious chilling effect on free speech."  *Reno v. ACLU*, 521 U.S. 844, 871-72 (1997).  Laws touching on speech must themselves speak "only with narrow specificity."  *NAACP v. Button*, 371 U.S. 415, 433 (1963).  SB 302 does the opposite.

SB 302 renders unlawful any marketing that could be said to have "recklessly" "contribute[d] to a public nuisance," Del. Code Ann tit. 10, §3930(b), and it defines "public nuisance" so broadly as to sweep in, *e.g.*, truthful marketing that "contributes to the injury or endangerment of the … convenience of others" or is not subject to sufficiently "reasonable controls," *id.* §3930(a)(5)-(6).  It thus necessarily "will provoke uncertainty among speakers," *Reno*, 521 U.S. at 871, as such abstractions do not articulate at all—let alone with "narrow specificity"—what kind of speech may later be deemed to have contributed to a "public nuisance." By contrast, the "legitimate" sweep of the statute's marketing provisions is miniscule— particularly given that SB 302 elsewhere contemplates full compliance with state and federal laws relating to marketing of firearms.  *See* Del. Code Ann tit. 10, §3930(a)(6), (b).  SB 302's vague command to speak "reasonably" is all but certain to chill constitutionally protected speech.

That creates a "risk of discriminatory enforcement," which makes the chilling effect even more acute.  *Reno*, 521 U.S. at 871-72.  Under our constitutional framework, the state does not get decide, after the fact, whether speech was reasonable.  Unless commercial speech is false or inconsistent with traditional limitations, the First Amendment fully protects it, even if others might deem it "unreasonable."  And the threat of discriminatory enforcement is all the more pervasive when, as here, a law "does not aim specifically at evils within the allowable area of State control

but, on the contrary, sweeps within its ambit other activities that in ordinary circumstances constitution an exercise of freedom of speech or of the press." *Thornhill v. Alabama*, 310 U.S. 88, 97 (1940).  That inherent vagueness dooms SB 302 under the First Amendment as well.

On top of all that, even when speech about a product is actually false or misleading, the traditional principles that govern judicial actions for misrepresentations—including, *e.g.*, proof of reliance—have always demanded a substantial link between the speech and the claimed injury. *See, e.g.*, *Restatement (Second) of Torts* §525 (1977).  That link is essential to ensure that efforts to impose liability based on speech are consistent with the First Amendment.  After all, if liability could be imposed for misleading (or even truthful) speech at the behest of plaintiffs who did not rely on it and cannot demonstrate injury from it, then the threat of massive liability could inhibit a speaker from voicing his view "even though [he] believe[s] [it] to be true and even though it is in fact true." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279 (1964).  SB 302, however, does not require proof of reliance, or that a plaintiff trace alleged injuries directly to the speech in question. The First Amendment demands far more, particularly of speaker-based restrictions on speech.

**E.   SB 302 Is Void for Vagueness.**

For many of the reasons that SB 302 is unconstitutionally vague with respect to speech protected by the First Amendment, it is also unconstitutionally vague under the Due Process Clause with respect to all other conduct it polices.  One of the few things that *is* clear about the statute is that it leaves industry members with no meaningful guidance on how they are supposed to act— or, more to the point, how they can conduct their businesses without running afoul of the statute.

For reasons already discussed, "[t]he vice of unconstitutional vagueness is further aggravated" in the First Amendment context. *Cramp v. Bd. of Pub. Instruction of Orange Cty.*, 368 U.S. 278, 287 (1961).  But it is not just First Amendment concerns that demand regulation with especial precision.  A more "stringent" vagueness test applies for statutes that "threaten to

inhibit the exercise of constitutionally protected rights" of *any* kind, as well as for statutes that impose "quasi-criminal" penalties. *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982).   The most protective vagueness standard known to our law thus applies here several times over.   SB 302 flunks that test, as the prohibitions it imposes are hopelessly vague. SB 302 makes it unlawful to, *inter alia,* "recklessly … contribute to a public nuisance through the sale, manufacturing, importing, or marketing of a firearm-related product" "by conduct unlawful in itself *or unreasonable under all the circumstances*."  Del. Code Ann. tit. 10, §3930(b) (emphasis added).   Moreover, "all the circumstances" that a court must consider include the circumstances of any nuisance itself, which may not come into being until long after the manufacturer or seller has engaged in "the sale, manufacturing, importing, or marketing of a firearm-related product." *Id.*   There is thus no way for a manufacturer or seller to know *ex ante*—when a product is actually made, sold, or advertised—if its conduct will or will not be deemed "unreasonable under all the circumstances."   That is the definition of an unconstitutionally vague law.

**F.      SB 302 Violates the Second Amendment.**

There is no question SB 302 burdens Second Amendment activity.   The only question is whether the state can prove that the burdens SB 302 imposes are consistent with "this Nation's historical tradition" of regulating commerce in firearms.   *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S.Ct. 2111, 2125 (2022).   The answer is no.   As Congress itself explained in the PLCAA, efforts to hold those engaged in the lawful manufacture, marketing, and sale of firearms liable for the criminal misuse of their products by third parties are "based on theories without foundation in hundreds of years of the common law and jurisprudence of the United States."   15 U.S.C. §7901(a)(7).   Indeed, even the few courts that accepted such theories before Congress enacted the PLCAA did not do so until the twenty-first century.   The novel liability SB 302 invites lacks any historical pedigree at all, and violates the Second Amendment.

## II.     The Remaining Factors All Favor Injunctive Relief.

1.      The constitutional injuries SB 302 is inflicting on NSSF and its members are sufficient irreparable injury in and of themselves to justify injunctive relief, especially given the significant chilling effect SB 302 has on constitutionally protected speech.  *See Stilp v. Contino*, 613 F.3d 405, 409 (3d Cir. 2010).  But they certainly do not stand alone.

First, the process of trying to ascertain what the vague terms of SB 302 mean and what steps, if any, industry could try to take today to avoid being deemed to have acted unreasonably tomorrow will be considerable—and, thanks to the Eleventh Amendment, unrecoverable.  That is an irreparable and immediate injury.  *See* Reh Decl. ¶¶13-17; Shawver Decl.12-14.  And industry cannot delay in considering steps to limit future liability.  SB 302 allows the Attorney General to bring a civil action for practically any kind of relief if she suspects a violation of the statute.  *See* Del. Code Ann. tit. 10, §3930(f).  And all indications are that she intends to use that authority.  Indeed, Attorney General Jennings has *already* signed onto efforts to use litigation to saddle the firearms industry with crushing liability based on the criminal acts of others:  Earlier this year, Attorney General Jennings signed an amicus brief supporting a lawsuit brought by Mexico seeking to collect more than *$10 billion* from firearms manufacturers for third-party gun violence.  *See* Br. of California et al. as Amici Curiae, *Estados Unidos Mexicanos v. Smith & Wesson Brands, Inc.*, No. 1:21-cv-11269 (D. Mass. Jan. 31, 2022), Dkt.110-1.

Second, the text of the PLCAA could not be clearer that the lawsuits SB 302 authorizes "*may not be brought* in any Federal or State court."  15 U.S.C. §7902(a) (emphasis added).  That unequivocal language is not just a defense against liability; it is "an explicit statutory … guarantee that trial will not occur."  *Midland Asphalt Corp. v. United States*, 489 U.S. 794, 801 (1989).  It is no wonder, then, that courts across the country have consistently interpreted the statute as creating not just a shield from liability, but an immunity from suit entirely.  *See, e.g.*, *KS&E Sports v.*

*Runnels*, 72 N.E.3d 892, 897-98 (Ind. 2017); *Sambrano v. Savage Arms, Inc.*, 338 P.3d 103, 104 (N.M. Ct. App. 2014).  No court can make NSSF's members whole for having to defend against suits that should never have been brought in the first place—particularly when they are brought by the state, which would be immune from any later suit to recoup monetary losses.

Finally, suits under SB 302 threaten to be bankruptcy-inducing.  While some large NSSF members may be able to withstand a litigation firestorm, many others will not be.  The economic harm SB 302 promises is thus irreparable, as it "threaten[s] the existence of [NSSF members'] business."  *Minard Run Oil Co. v. U.S. Forest Serv.*, 670 F.3d 236, 255 (3d Cir. 2011).

2.      Plaintiff's showing on the "two gateway factors"—likelihood of success and irreparable harm—suffices to justify a preliminary injunction.  *Reilly*, 858 F.3d at 179.  But the public interest favors an injunction as well.  SB 302 encroaches on federal authority by flouting Congress' express purposes in passing the PLCAA.  *See United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 497-98 (2001) (public interest favored injunction where state law conflicted with "Congress's policy choice, articulated in a statute"); *Ramsay v. Nat'l Bd. of Med. Examiners*, 968 F.3d 251, 263 (3d Cir. 2020) (same).  SB 302 also foments interstate conflict and burdens interstate commerce by setting Delaware up as the judge of lawful business practices in other states.  *See, e.g.*, *Hazardous Waste Treatment Council v. South Carolina*, 945 F.2d 781, 795 (4th Cir. 1991) (public interest favored injunction where state law burdened interstate commerce).  And it tramples on individual rights.  *See Ctr. for Investigative Reporting v. Se. Penn. Transp. Auth.*, 975 F.3d 300, 317 (3d Cir. 2020) (public interest favored injunction where law burdened constitutional rights).  The public interest does not favor in the slightest keeping in place a statute that poses such a grave threat to fundamental constitutional rights.

## CONCLUSION

For the reasons set forth above, this Court should grant a preliminary injunction.

LEWIS BRISBOIS
  BISGAARD & SMITH LLP

**OF COUNSEL**

Paul D. Clement
(*pro hac vice* motion to be filed)
Erin E. Murphy
(*pro hac vice* motion to be filed)
Matthew D. Rowen
(*pro hac vice* motion to be filed)
Trevor W. Ezell
(*pro hac vice* motion to be filed)
Nicholas M. Gallagher
(*pro hac vice* motion to be filed)
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

Dated: November 16, 2022

*/s/ Sean M. Brennecke*
Sean M. Brennecke (No. 4686)
500 Delaware Ave., Suite 700
Wilmington, DE 19801
(302) 985-6000
Sean.Brennecke@LewisBrisbois.com

*Attorneys for Plaintiff*

4859-0750-7007.1

21