```
 1                 IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF DELAWARE

 3

 4    NATIONAL SHOOTING SPORTS        )
      FOUNDATION,                     )
 5                                    )
                      Plaintiff,      )
 6                                    ) C.A. No. 22-1499-RGA
      v.                              )
 7                                    )
      KATHY JENNINGS, Attorney General)
 8    of the State of Delaware,       )
                                      )
 9                    Defendant.      )

10
                                      J. Caleb Boggs Courthouse
11                                    844 North King Street
                                      Wilmington, Delaware
12
                                      Tuesday, February 28, 2023
13                                    9:06 a.m.
                                      Oral Argument
14

15    BEFORE:  THE HONORABLE RICHARD G. ANDREWS, U.S.D.C.J.

16    APPEARANCES:

17              LEWIS BRISBOIS BISGAARD & SMITH LLP
                BY:  SEAN M. BRENNECKE, ESQUIRE
18
                         -and-
19
                CLEMENT & MURPHY, PLLC
20              BY:  MATTHEW D. ROWEN, ESQUIRE
                BY:  NICHOLAS M. GALLAGHER, ESQUIRE
21
                                  For the Plaintiff
22

23

24

25
```

APPEARANCES CONTINUED:

         STATE OF DELAWARE
         DEPARTMENT OF JUSTICE
         BY:  NICHOLAS D. PICOLLELLI, JR., ESQUIRE

                  For the Defendant

        ***   PROCEEDINGS   ***

08:58:34      DEPUTY CLERK:  All rise.  Court is now in

09:06:50 session.  The Honorable Richard G. Andrews presiding.

09:06:50      THE COURT:  All right.  Please be seated.

09:06:58      All right.  I know one of you is Mr. Brenneke,

09:07:00 but I'm not entirely sure which one.

09:07:03      MR. BRENNEKE:  Good morning, Your Honor.  Sean

09:07:06 Brenneke.

09:07:06      THE COURT:  Your appearance has changed, I'm

09:07:08 pretty sure, since the last time I saw you.  In any event,

09:07:12 good morning, Mr. Brenneke.

09:07:13      MR. BRENNEKE:  Good morning, Your Honor.  I've

09:07:13 grown a bit more hair since the last time I was here.  Sean

09:07:17 Brenneke of Lewis Brisbois on behalf of the Plaintiffs.

09:07:19 With me at counsel table are my colleagues Matthew Rowen and

09:07:23 Nicholas Gallagher of Clement & Murphy.

09:07:26      With Your Honor's permission, Mr. Rowen will

09:07:28 make the argument.

09:07:29      THE COURT:  All right.  And you're Mr. Rowen?

09:07:30      MR. ROWEN:  Yes, Your Honor.

09:07:30 1                     THE COURT:  All right.  Well, good morning to

09:07:32 2    all of you.

09:07:34 3                     And Mr. Picollelli.

09:07:36 4                     MR. PICOLLELLI:  Picollelli.  Yes, Your Honor.

09:07:37 5                     THE COURT:  And are you a Deputy AG?

09:07:41 6                     MR. PICOLLELLI:  Yes, sir.

09:07:41 7                     THE COURT:  All right.  And how long have you

09:07:44 8    been a Deputy AG?

09:07:45 9                     MR. PICOLLELLI:  About two years now.

09:07:46 10                    THE COURT:  All right.  Well, nice to meet you.

09:07:49 11                    All right.  So, we are here for 22-1419 *National*

09:08:02 12   *Shooting Sports Foundation vs. Jennings*, which is a

09:08:04 13   preliminary injunction and a motion to dismiss on the

09:08:07 14   subject of what I, for convenience, am going to call SB 302.

09:08:16 15   I find that's easier to keep straight in my head than the

09:08:19 16   longer statute name.

09:08:20 17                    So, in any event, I assume Plaintiff is going

09:08:23 18   first here; right?

09:08:27 19                    MR. ROWEN:  Yes, Your Honor.

09:08:28 20                    THE COURT:  All right.  So, Mr. Rowen, come on

09:08:28 21   up.

09:08:34 22                    I haven't particularly set a time limit here.

09:08:42 23   Not counting whatever time that I use up by asking

09:08:46 24   questions, how long do you think your sort of prepared

09:08:49 25   remarks might be, just generally?

09:08:52  1          MR. ROWEN:  I'm happy to give prepared remarks

09:08:55  2     for a few minutes.  I'm also happy to just jump into

09:08:58  3     questions, whatever Your Honor would prefer.

09:08:59  4          THE COURT:  All right.  Well, so I had one or

09:09:02  5     two questions that are perhaps tangential to the main

09:09:10  6     points.

09:09:10  7          First off, the Plaintiff, National Shooting

09:09:15  8     Sports Foundation, maybe it says it in the Complaint, I seem

09:09:18  9     to recall somewhere seeing that there's like 9,500 members

09:09:21 10     more or less of this organization.  I'm wondering how many

09:09:25 11     of them, in terms of SB 302, are manufacturers and how many

09:09:33 12     of them are sellers or what I would call sort of

09:09:39 13     point-of-sale entities, roughly?

09:09:43 14          MR. ROWEN:  So, I don't have the exact numbers

09:09:44 15     at hand.  I mean, I know that manufacturers are a minority

09:09:48 16     simply by virtue of the fact that manufacturing is a -- you

09:09:51 17     know, it's done by fewer entities given the number of rules

09:09:54 18     and regulations.

09:09:55 19          THE COURT:  Well, so when you say "minority,"

09:09:58 20     you think like 20 companies?

09:09:59 21          MR. ROWEN:  No, Your Honor.  It's much more than

09:10:01 22     20 companies, because it includes companies that manufacture

09:10:03 23     not just firearms, but ammunition and firearm components.

09:10:07 24     And there are -- I think it's hundreds.

09:10:10 25          THE COURT:  Okay.

09:10:11 1          MR. ROWEN:  It's more than a thousand.  I can't

09:10:13 2  tell you, you know, offhand, but it's -- you know, it's at

09:10:17 3  least hundreds that are manufacturers.  And, you know, I'm

09:10:20 4  happy to provide Your Honor with that information.

09:10:22 5          THE COURT:  Well, I'm just trying to get a

09:10:26 6  sense.  And so, let's assume, for the sake of argument, that

09:10:30 7  it's 500 manufacturers of the sorts of things you've just

09:10:35 8  said.  Is there another class between the manufacturers and

09:10:39 9  the sellers, the point-of-sale sellers, you know,

09:10:44 10 distributors of one kind or another who are just middlemen

09:10:48 11 or generally middlemen, or is it essentially whatever number

09:10:52 12 of hundreds of manufacturers and the rest are point-of-sale

09:10:58 13 entities?

09:10:59 14         MR. ROWEN:  So, distributors are within NSSF's

09:11:06 15 membership.  I mean, there are fewer of those.  Again, there

09:11:08 16 are, you know, a number of federal regulations that regulate

09:11:11 17 the distribution of firearms.  So, all of NSSF's members

09:11:14 18 that are distributors, just like all of their members that

09:11:17 19 are manufacturers and sellers, are all, you know, operating

09:11:20 20 under a federal firearms license.  I believe there are nine

09:11:23 21 different types of federal firearms licenses.  One that's

09:11:27 22 specific to sort of wholesale distributors and a number of

09:11:31 23 those are members of NSSF.  I don't have offhand the number.

09:11:36 24         THE COURT:  Well, and so I can't remember the

09:11:40 25 exact number, but at one point I had a rough idea of how

09:11:45  1    many sort of point of sale or sellers there were in the

09:11:49  2    State of Delaware, which was more than a hundred, and I

09:11:52  3    think less than, say, 400, but where in there it was, I

09:11:56  4    really have no idea.  Or once I knew, but I don't know

09:12:00  5    anymore.

09:12:01  6              And I guess what I'm wondering is it strikes me,

09:12:08  7    and I haven't tried to do the math, but let's assume there's

09:12:11  8    a hundred in Delaware.  There must be like, I don't know, a

09:12:13  9    hundred thousand in the country.  And I guess what I'm

09:12:16 10    wondering is I assume basically all manufacturers are

09:12:21 11    members of your organization, but that a lot of the

09:12:25 12    point-of-sale sellers are not.

09:12:27 13              Is that a fair statement?

09:12:28 14              MR. ROWEN:  Yes, that's a fair statement.  I

09:12:30 15    mean, there are a number of point-of-sale retailers that are

09:12:36 16    NSSF members.  I believe, although I don't have -- I can't

09:12:39 17    tell you a specific one today, but I believe that there are

09:12:42 18    a number of point-of-sale retailers in Delaware that are

09:12:44 19    members of NSSF.  And if that's something Your Honor would

09:12:48 20    like us to provide, I'm happy to do so.

09:12:50 21              THE COURT:  No, I'm not really -- so, one of the

09:12:55 22    things that's kind of, I guess, a concern, which has nothing

09:13:06 23    to do with what I've just been asking you is, for the most

09:13:13 24    part, I seem to be asked to decide things in what I would

09:13:17 25    call in a vacuum.  You know, the State has done -- you know,

09:13:23  1   there are no cases under this statute so far.  The statute

09:13:31  2   itself, of course, therefore, has never been interpreted by

09:13:36  3   any Delaware Court.  The harms, for the most part, that are

09:13:51  4   said to flow from the statute here seem to be pretty

09:13:57  5   theoretical.

09:14:04  6              And so, those are my concerns.  And you can

09:14:07  7   address them as you go along or I'll bring them back up

09:14:10  8   maybe at some appropriate point.

09:14:12  9              One other thing I'm wondering about is whether

09:14:17 10   for example, I gather, but it may be that there's more

09:14:25 11   because I haven't really gone out and looked for them, but I

09:14:28 12   gather there's been two at least similar District Court

09:14:32 13   decisions on the kind of motion that you brought now.  One

09:14:35 14   in New Jersey not long ago.  One in the Northern District of

09:14:40 15   New York last summer.  They're both on appeal to their

09:14:45 16   respective Court of Appeal.

09:14:52 17              And actually I forgot what my thought was on

09:15:03 18   that, but I am interested in knowing because I have the

09:15:11 19   impression from, I don't know, maybe it was something in the

09:15:15 20   Northern District of New York, where in one of those two

09:15:17 21   decisions, I think I read there's like half a dozen or eight

09:15:22 22   states or so that have passed laws that are very similar to

09:15:26 23   SB 302; right?

09:15:28 24              MR. ROWEN:  So, I believe at this point only

09:15:30 25   three have passed laws that are what I would call near

09:15:36 1   carbon copies.  So, those are New York, New Jersey and

09:15:40 2   Delaware.  So, only two that are near carbon copies.

09:15:42 3          California has passed a statute that has not yet

09:15:44 4   taken effect.  It will take effect, I believe, on July 1st

09:15:49 5   that is similar -- it's more of a product liability statute.

09:15:53 6   And there are a number of bills in a number of states that

09:15:58 7   have not yet been enacted.  But unless I'm forgetting one, I

09:16:05 8   believe that the three, New York, New Jersey and Delaware

09:16:07 9   are the only ones that have gone into effect so far.

09:16:10 10          THE COURT:  And so, the extent of my looking at

09:16:13 11  the -- or so, I read the New Jersey opinion.  And in the

09:16:21 12  course of reading it, I did see that there had been an

09:16:24 13  appeal which I take it was an appeal by the State.

09:16:26 14          MR. ROWEN:  Yes, Your Honor.

09:16:27 15          THE COURT:  And you're the Plaintiff in that

09:16:29 16  case, too; right?

09:16:30 17          MR. ROWEN:  Yes, Your Honor.

09:16:31 18          THE COURT:  So, is there any request for

09:16:34 19  expedition in the Third Circuit from the State?

09:16:37 20          MR. ROWEN:  Yes, Your Honor.  So, what's

09:16:39 21  happened so far in that case is the State has moved for a

09:16:43 22  stay pending appeal from Judge Quraishi.  He has not yet

09:16:47 23  acted on that motion.  The State represented to me last

09:16:49 24  night, the State of New Jersey to be clear, that whether or

09:16:55 25  not Judge Quraishi rules on that motion by, I believe,

09:16:57 1    today, although it may have been tomorrow, they're going to

09:16:59 2    ask the Third Circuit for a stay pending appeal.  And when

09:17:02 3    they ask the Third Circuit, they're also going to move for

09:17:05 4    expedited briefing.  And we've consented to expedited

09:17:08 5    briefing.  That has not yet been filed, so I can't point you

09:17:11 6    to a docket entry that says that.  But that is the agreement

09:17:14 7    that Plaintiff and the State of New Jersey have in

09:17:17 8    principle.

09:17:18 9              THE COURT:  And just getting back to the lead up

09:17:20 10   to this, the New Jersey statute, should logically --

09:17:29 11   whatever it is that some Court decides about the New Jersey

09:17:35 12   statute, should logically that then be the same result for

09:17:40 13   the Delaware statute?  I mean, is there enough air or gap

09:17:44 14   between the two state statutes that there could possibly

09:17:48 15   rationally be a different result?

09:17:49 16             MR. ROWEN:  So, I don't think so, Your Honor.  I

09:17:51 17   mean, the only meaningful distinction between the two, they

09:17:54 18   use slightly different words in some places.  But the only

09:17:57 19   meaningful distinction is New Jersey Assembly Bill 1765

09:18:01 20   doesn't authorize a private cause of action, whereas

09:18:05 21   Delaware SB 302 does.

09:18:07 22             Other than that, which doesn't really map onto

09:18:10 23   any of our claims, I don't think that there's a material

09:18:13 24   difference.  So, we certainly think that, you know, whatever

09:18:17 25   the Third Circuit is going to decide in one of these two

09:18:20  1    cases will bind both states.

09:18:24  2            THE COURT:  And I remember now why I was asking

09:18:29  3    you about the Northern District of New York and New Jersey

09:18:34  4    case.  The Northern District of New York case said no

09:18:38  5    preliminary injunction and, you know, the stated claim, your

09:18:42  6    claim is dismissed.

09:18:43  7            The New Jersey case said, I grant the

09:18:46  8    preliminary injunction, and therefore, didn't really need to

09:18:50  9    go any further, I guess at this point.

09:18:52 10            Is this, in your view, essentially a question of

09:18:58 11    law that either I should be granting the preliminary

09:19:02 12    injunction or I should be granting the motion to dismiss,

09:19:05 13    but there's, you know, it's one or -- leaving aside, I don't

09:19:09 14    know, irreparable harm and things like that, but the

09:19:12 15    likelihood of success on the merits, it's just a legal

09:19:15 16    question either way?

09:19:16 17            MR. ROWEN:  Yes, Your Honor.  I mean, that's

09:19:18 18    certainly our understanding.  I'm trying to think through if

09:19:23 19    on any of the claims that that wouldn't be the case, but I

09:19:25 20    don't believe so.  I mean, I think that our view is these

09:19:28 21    are, I always hesitate to say, purely legal questions, but

09:19:33 22    they are legal questions, first and foremost, and that, you

09:19:36 23    know, that the Court's resolution should be essentially

09:19:39 24    based on the text of the statute that Delaware enacted.

09:19:42 25            THE COURT:  So, do you think there's any

09:19:45 1    difference between you and the State in terms of how you

09:19:49 2    think SB 302 should be interpreted?

09:19:55 3                MR. ROWEN:  So, I think so, but, I mean, I think

09:20:00 4    the reason there's a difference is because we think that the

09:20:04 5    Constitution means something different, and we think that

09:20:05 6    that should impact how a Federal Court interprets the

09:20:09 7    statute.

09:20:09 8                THE COURT:  Well, so it should then impact how a

09:20:12 9    Delaware Court interprets the statute; right?

09:20:15 10               MR. ROWEN:  Sure.  Absolutely, Your Honor.

09:20:17 11               THE COURT:  And so, one of the things that I was

09:20:23 12   thinking about was if I interpret the statute and say it's

09:20:30 13   unconstitutional, and meanwhile the Delaware Supreme Court

09:20:34 14   is going, We don't think it means what you think it means,

09:20:39 15   how would somebody have an opportunity to get the state law

09:20:46 16   interpretation, which after all the Delaware Supreme Court

09:20:50 17   would be the final word on what SB 302 actually means?  How

09:20:54 18   would that happen, unless somebody gives them a chance

09:21:01 19   first?

09:21:02 20               MR. ROWEN:  So, I think, as a formal matter, if

09:21:04 21   Your Honor were to enjoin the Attorney General from

09:21:07 22   enforcing the statute at all, as a formal matter a private

09:21:11 23   party would not be subject to that injunction.  SB 302

09:21:16 24   authorizes private rights of action.  So, a private party

09:21:19 25   could sue under SB 302.  And if they sued one of my clients'

09:21:24  1    members, my client would then -- you know, they wouldn't be

09:21:27  2    able to move for something like contempt sanctions.  They'd

09:21:30  3    file a motion to dismiss, and the motion to dismiss would

09:21:33  4    say, We think this is the right answer.  We think that this

09:21:36  5    is preempted by the PLCAA, and this is unconstitutional for

09:21:39  6    all of the reasons that we've put forward.  And we'd point

09:21:42  7    to Your Honor's opinion as strongly persuasive authority.

09:21:47  8    Or, if the suit were brought against someone who is not one

09:21:50  9    of my clients' members, you know, one of the point-of-sale

09:21:53 10    retailers in Delaware, they could do essentially the same

09:21:55 11    thing and file a motion to dismiss and say, you know, We

09:21:59 12    think that this Order enjoining the statute, which doesn't

09:22:02 13    actually bind us, and it doesn't apply to us, and it doesn't

09:22:05 14    bind the Plaintiff in that suit, but we think this is

09:22:08 15    persuasive.  And the State Court at that point could sort of

09:22:12 16    give heads or tails.

09:22:16 17            THE COURT:  Okay.  That's something I hadn't

09:22:18 18    thought about, so that's helpful.

09:22:25 19            So, part of the reason I was asking at the

09:22:28 20    beginning of how many manufacturers, how many point-of-sale

09:22:31 21    sellers was I'm wondering if it's possible that the statute,

09:22:40 22    the SB 302, could be, for example, preempted against your

09:22:48 23    manufacturer clients, but not preempted against your seller

09:22:51 24    clients.

09:22:52 25            MR. ROWEN:  So, we think that the preemption

09:22:55  1   analysis is easiest as to the manufacturers.  You know, we

09:23:01  2   think that it requires a little bit more legwork as to the

09:23:04  3   sellers, and I'm happy to sort of go into that if that would

09:23:07  4   be helpful for Your Honor.

09:23:08  5            THE COURT:  Well, I think it would.  You don't

09:23:10  6   need to do it right now, but that's something that I think

09:23:12  7   you probably should address once I'm finished my preliminary

09:23:17  8   round of questions.

09:23:18  9            But just give me a -- okay.  So, let's hold that

09:23:26 10   thought.  And, you know, I was originally thinking, even

09:23:35 11   though I've started to maybe figure this one out on my own,

09:23:39 12   you know, part of -- something the State mentioned in their

09:23:43 13   briefing was -- well, they pointed out there's been no

09:23:52 14   lawsuits under this statute in the eight months or so since

09:23:55 15   it took effect, but I assume that it's not retroactive.  So,

09:24:04 16   that for somebody to be able to bring a suit, you'd have to

09:24:09 17   have some kind of activity on the part of a manufacturer or

09:24:17 18   seller that postdates June 30th of 2022.  And then something

09:24:25 19   happens with a firearm that gets out there, you know, maybe

09:24:33 20   killed somebody, injured somebody, and then you'd have to

09:24:40 21   solve the crime of who injured or killed somebody.  And then

09:24:47 22   you'd have to trace the firearm back to a seller, which

09:24:55 23   might not be that hard.

09:24:56 24            But, on the other hand, if it was, for example,

09:24:58 25   a stolen firearm, you've got nothing or at least it seems to

09:25:04  1    me you've got nothing.  And then perhaps even before anyone

09:25:10  2    could file a suit, they'd have to figure out what -- they'd

09:25:13  3    have to have a basis for saying what reasonable steps the

09:25:17  4    manufacturer or the seller didn't take.  So, I'm sort of

09:25:23  5    talking myself around to like thinking the fact that there

09:25:30  6    have been no suits so far is kind of understandable.

09:25:35  7           MR. ROWEN:  I think that's right.  I mean, I

09:25:36  8    think there's also an element of, you know, no suits were

09:25:41  9    filed in New York until after the District Court denied my

09:25:45 10    client's motion for a preliminary injunction.  And since

09:25:47 11    then, a number of suits have been filed by municipalities

09:25:50 12    and private parties.

09:25:51 13           THE COURT:  Right.  I saw Rochester and Buffalo.

09:25:53 14           MR. ROWEN:  Yes, Your Honor.  And, you know,

09:25:56 15    again, that's sort of consistent with how a lot of similar

09:26:00 16    restrictions and states, you know, in the pre-*Bruen* error

09:26:04 17    happen where, you know, in the initial run-up, there usually

09:26:08 18    isn't a sort of flurry of initial litigation.  And once

09:26:11 19    suits are filed, assuming they're filed relatively timely,

09:26:14 20    as this one was, then, you know, generally the State, and if

09:26:18 21    private parties are allowed to sue, private parties, in our

09:26:21 22    experience, sort of wait to see what the courts do.  You

09:26:25 23    know, because they're represented by responsible attorneys

09:26:28 24    and they don't want to get out over their skis, excuse me,

09:26:33 25    if it's going to turn out to be all for not.

09:26:35  1      But, you know, Your Honor raised the issue, the

09:26:38  2  fact that this is pre-enforcement, and that's certainly

09:26:42  3  correct.  This is a pre-enforcement challenge, but I think

09:26:45  4  it's particularly noteworthy that the Attorney General

09:26:48  5  hasn't raised any justiciability concerns.

09:26:51  6      THE COURT:  Well, and I'm not trying to raise

09:26:56  7  justiciability concerns, because even though I understand I

09:26:57  8  have an independent duty, the fact that they haven't raised

09:27:00  9  it, and, you know, you've got a couple declarations saying,

09:27:02 10  the manufacturers are -- I forget what the word is -- but,

09:27:06 11  let's say, concerned at least about the possibility.  You

09:27:11 12  know, so I'm not really concerned about justiciability.

09:27:18 13      MR. ROWEN:  Sure.  I mean, so just to sort of

09:27:21 14  spin the point out.  It's more than our members are

09:27:24 15  concerned.  I mean, it's that the statute clearly, you know,

09:27:28 16  the conduct that it prescribes is clearly at least arguably

09:27:32 17  affected with the Constitutional interest.  It's not just

09:27:34 18  the marketing provisions in the First Amendment, but all of

09:27:37 19  the conduct that it regulates is in the language of SBA --

09:27:41 20  at least arguably affected with the Constitutional interest.

09:27:44 21      And, you know, given how broadly this statute is

09:27:47 22  written, manufacturing, marketing and selling of firearms

09:27:51 23  and related products, even at that level of generality, is

09:27:54 24  at least arguably within the scope of what the statute

09:27:57 25  prescribes.  So --

09:27:59 1          THE COURT:  But in terms of -- the one thing the

09:28:11 2   State says, and as far as I can see they're correct about

09:28:13 3   this, is there's not an iota of actual evidence that your

09:28:22 4   clients, any of the 9,500 of them, are doing anything the

09:28:27 5   slightest bit different than they were doing before

09:28:30 6   June 30th; right?

09:28:31 7          MR. ROWEN:  Yes, Your Honor, and that's because

09:28:32 8   our clients are confident that this law will be invalidated

09:28:35 9   as unconstitutional or preempted.  I mean, it's also, you

09:28:40 10  know, a reflection of the reality that --

09:28:42 11         THE COURT:  And but by that logic, why are we

09:28:46 12  doing a preliminary injunction?  Why don't we just wait

09:28:47 13  around until somebody actually sues under the statute, and

09:28:50 14  we can have a concrete case to, you know -- instead of being

09:28:55 15  in hypotheticals about Arkansas, and Texas and such?

09:29:01 16         MR. ROWEN:  So, I mean, I think the answer to

09:29:03 17  that is two-fold.  I mean, one, Congress, through the

09:29:08 18  Declaratory Judgment Act, has made clear that suits can be

09:29:10 19  brought in a pre-enforcement posture so long as Article III

09:29:14 20  is satisfied.  I take my colloquy with Your Honor to be that

09:29:16 21  Your Honor doesn't have particular concerns about Article

09:29:19 22  III here.

09:29:20 23         So, then the question is just:  You know, is

09:29:23 24  there a sufficiently concrete application of the statute to

09:29:28 25  my client's activity?  And here, I mean, I think one of the

09:29:32 1  reasons, you know, my friend on the other side has, you

09:29:35 2  know, argued in their papers, Well, you haven't told us what

09:29:38 3  ads you want to run that you think would be unreasonable

09:29:42 4  under the statute.

09:29:43 5          And, you know, with all due respect to my friend

09:29:46 6  on the other side, that's not how the First Amendment works,

09:29:49 7  and that's not how any of the analysis works.  I mean, it's

09:29:51 8  not a regulated entity's job to come up with hypotheticals

09:29:55 9  that they think might be deemed to be unreasonable under a

09:29:59 10  statute that provides a broad duty of care.  It's their

09:30:03 11  burden to say, you know, my business is directly regulated

09:30:08 12  by this statute.  I want to carry out my business

09:30:11 13  unregulated by dozens and dozens of federal and state laws

09:30:15 14  that impose concrete obligations on me.  And I want to know

09:30:18 15  what the rules of the road are, and I'll comply with them.

09:30:21 16  I mean, this is one of the unique industries in our country

09:30:25 17  where basically everything that you can do has to be

09:30:27 18  licensed at multiple levels.

09:30:30 19          So, you know, my client's members are not here

09:30:32 20  to shirk responsibilities to comply with laws, but they want

09:30:35 21  to know what they're supposed to do.  And they look at this

09:30:38 22  law and it says, you know, even if a manufacturer has done

09:30:43 23  nothing unlawful, that they can be liable for recklessly

09:30:49 24  contributing through unreasonable conduct to a dangerous

09:30:53 25  condition thousands of miles and potentially years away.

09:30:57 1    And they just -- you know, their view is, you know, putting

09:31:01 2    aside the sort of constitutional issues that we can get to,

09:31:04 3    I mean, that's exactly the sort of thing that Congress

09:31:07 4    specifically set out to do away with when it enacted the

09:31:11 5    PLCAA.  And, I mean, the whole point of the PLCAA was to put

09:31:16 6    an end of, you know, a slew of state and local lawsuits that

09:31:20 7    were brought against manufacturers and sellers of firearms

09:31:22 8    who were not alleged to have violated any concrete

09:31:26 9    obligations, but were alleged to have contributed, through

09:31:30 10   simply manufacturing, and selling and marketing, their

09:31:33 11   lawful and constitutionally-protected products to have

09:31:36 12   contributed to a dangerous condition downstream.

09:31:40 13            And, I mean, I think, you know, it's telling

09:31:41 14   that the Attorney General doesn't make a single argument

09:31:44 15   that, but for the codification of this cause of action, this

09:31:49 16   would, obviously -- the actions that SB 302 creates would,

09:31:52 17   obviously, be preempted by the PLCAA.

09:31:56 18            THE COURT:  I'm sorry.  Can you say that again?

09:31:57 19            MR. ROWEN:  Sure.  But for its codification as a

09:32:00 20   statute, there is no argument in the Attorney General's

09:32:02 21   briefs that the actions that SB 302 creates would be

09:32:07 22   preempted.  The only question that they have raised is

09:32:13 23   whether the mere act of codifying the exact sort of causes

09:32:17 24   of action that Congress set out to do away with in a statute

09:32:20 25   that calls out by name firearms, manufacturers and sellers,

09:32:24  1   whether that, you know, evades the broad rule that Congress

09:32:29  2   enacted in the PLCAA.

09:32:31  3              And we think the answer to that is clearly no.

09:32:34  4   And, you know, we think that's true because of text, context

09:32:38  5   and purpose.

09:32:39  6              So, you know, start with the text of PLCAA.

09:32:43  7   We'll get back to Section 7901, which sets out the findings,

09:32:47  8   but if we go to Section 7902, which is the operative

09:32:50  9   preemption provision, it says that a qualified civil

09:32:52 10   liability action --

09:32:53 11              THE COURT:  Right.  I've got 7902.

09:32:55 12              MR. ROWEN:  Right.  So, you know, the actions

09:32:58 13   that SB 302 creates are clearly qualified civil liability

09:33:04 14   actions, but for the predicate exception, that there's no

09:33:06 15   dispute that the actions that it creates --

09:33:08 16              THE COURT:  Right.  I think that's right.

09:33:10 17              MR. ROWEN:  -- are against firearms

09:33:11 18   manufacturers and sellers seeking redress for injuries

09:33:14 19   caused by third parties' misconduct brought by any person.

09:33:19 20   And so, the only question is whether SB 302 is a predicate

09:33:24 21   statute.  And as I said, I think text, context and purpose

09:33:26 22   all make clear that it's not.

09:33:28 23              So, if you start with text, the predicate

09:33:31 24   exception which is, you know, it doesn't just say an action

09:33:36 25   brought pursuant to a state or federal statute applicable to

09:33:40 1    the sale and marketing of the firearm.  It says, An action

09:33:44 2    alleging a knowing violation of such a statute and where the

09:33:49 3    violation was a proximate cause of the harm for which

09:33:53 4    redress is sought.

09:33:54 5           And then it gives, you know, two illustrative

09:33:57 6    examples.  And we think all of those aspects of the text

09:33:59 7    make clear that Congress wasn't just saying, States, you're

09:34:05 8    allowed to codify all of the things that you were doing

09:34:07 9    before under the common law.  And as long as you say we

09:34:09 10   really want it to apply to firearms manufacturers and

09:34:12 11   sellers that you're free to go.

09:34:14 12          You know, what they were saying there is

09:34:16 13   consistent with the other exceptions, which are things like

09:34:20 14   negligent entrustment and, you know, design defect and

09:34:25 15   manufacturing defect, those sorts of concrete obligations

09:34:28 16   that have been imposed on firearms manufacturers and sellers

09:34:31 17   for decades, if not longer, that states are free to codify

09:34:36 18   those sorts of things.  And as long as -- you know, a

09:34:40 19   statute like that, as long as you're alleging a knowing

09:34:44 20   violation of that sort of statute and you're going to prove

09:34:49 21   that, you know, that the harm for which redress is sought is

09:34:52 22   consistent with traditional proximate cause where the harm

09:34:55 23   is sort of within the scope of the duty, the scope of risk

09:34:58 24   that, you know, the tort feasor undertook when they

09:35:01 25   committed the tort or the alleged tort, that that's fine.

09:35:04 1    But, you know, as Judge Quraishi explained in his opinion, I

09:35:09 2    mean, to say that an industry member who's subject to dozens

09:35:13 3    of rules and regulations and who complied with all of those

09:35:16 4    laws, nonetheless, didn't know that it failed to employ

09:35:22 5    reasonable procedures to comply with the laws that it

09:35:25 6    complied with is essentially a contradiction in terms.

09:35:30 7        And, you know, the same thing is true for

09:35:34 8    Section 3930(b), the sort of more traditional public

09:35:38 9    nuisance provision.  To say that a manufacturer that, again,

09:35:43 10   complied with all of the many obligations that are imposed

09:35:46 11   on it, nonetheless, recklessly contributed through

09:35:50 12   unreasonable practices to a dangerous condition is

09:35:55 13   essentially just to revive the exact type of suits that

09:35:59 14   Congress enacted the PLCAA to do away with.

09:36:03 15       So, you know, the illustrative examples that

09:36:06 16   Congress provided in the predicate exception are exactly

09:36:09 17   those sort of concrete obligations that it makes sense to

09:36:14 18   say that a seller or manufacturer knowingly violated.  So,

09:36:18 19   the two, you know, recordkeeping requirements, I can know if

09:36:21 20   I'm supposed to keep certain records, and I don't do it.  I

09:36:23 21   can know that I'm not supposed to make false entries and yet

09:36:27 22   I do so.  I can know that I'm supposed to check ID and run a

09:36:31 23   background check and that I'm not allowed to put my head in

09:36:34 24   the sand when someone comes to me who has no idea what

09:36:37 25   they're talking about, and yet has a list of firearms, and

09:36:40  1    it sure seems like they're a straw purchaser.

09:36:43  2         Those are all things that can be knowingly

09:36:45  3    violated because they're concrete obligations, and I know

09:36:48  4    what they are and I know what I have to do.  But I don't

09:36:51  5    know how, if I'm complying with all of my obligations, I

09:36:56  6    can, nonetheless, be deemed to have knowingly violated an

09:37:00  7    obligation not to act unreasonably.  So, you know, that's

09:37:04  8    the text of the statute that we think makes clear that a law

09:37:07  9    like SB 302 cannot be a predicate statute.  The context and

09:37:12 10    purpose here, you know, only sort of confirmed that.

09:37:15 11         So, you know, Congress's intent is always the

09:37:19 12    touchstone in every preemption case.  In most cases, we're

09:37:24 13    doing our best to define intent by reading the tea leaves.

09:37:27 14    We don't have to do that here because Congress told us

09:37:29 15    exactly what they were after.  And they made clear, for

09:37:33 16    instance, in Subsection (a)(5) of 7901 that they thought

09:37:37 17    that licensed manufacturers, and sellers and other members

09:37:41 18    of the firearms industry that comply with all of the

09:37:44 19    concrete obligations that are on them should not be liable

09:37:48 20    for the harms caused by third parties who misuse their

09:37:51 21    products that operate as intended.

09:37:53 22         And the whole point of SB 302 is to allow the

09:37:57 23    Attorney General and private parties to bring suit against

09:38:01 24    lawful licensed members of the firearms industry for harms

09:38:04 25    caused by third parties who operate -- who misuse their

09:38:08 1  products.

09:38:09 2              THE COURT:  But, you know, you cite (a)(5), and

09:38:15 3  read literally, the way that you are saying it right now,

09:38:22 4  the exceptions that occur in 7903(5)(iii) would not be

09:38:46 5  something that could be brought.

09:38:47 6              MR. ROWEN:  So, I don't think so, Your Honor.  I

09:38:49 7  mean, so the preceding -- I never know whether it's a

09:38:52 8  subparagraph or a subsection, but 7901(a)(4) the immediately

09:38:57 9  preceding paragraph --

09:38:58 10             THE COURT:  Yeah.

09:38:59 11             MR. ROWEN:  -- notes that all of this activity

09:39:00 12 is heavily regulated by federal, state and local law.  And

09:39:04 13 what the exceptions are there to say is the types of things

09:39:08 14 that have long been the regulations that, you know, these

09:39:11 15 businesses are subject to are still things that we want

09:39:15 16 these businesses to be subject to.

09:39:18 17             And, you know, if you go on to look at, I think,

09:39:21 18 it's (7) and (8) of the same subsection, what they're

09:39:24 19 talking about is, you know, expansions of obligations that

09:39:28 20 have no basis in the common law and no basis in the history

09:39:31 21 of jurisprudence of the United States.  And, you know, these

09:39:35 22 sort of expansive public nuisance theories like the one that

09:39:39 23 was brought --

09:39:39 24             THE COURT:  Well, but you go on.  There's

09:39:41 25 another sentence that says the process of sustaining of

09:39:45  1    these actions by a maverick judicial officer or petit jury.

09:39:53  2    And I haven't done this, but I'm guessing a maverick

09:39:56  3    judicial officer probably is not a phrase that appears in

09:39:59  4    any other statute in the United States Code.

09:40:01  5              MR. ROWEN:  I would think not, Your Honor.

09:40:03  6              THE COURT:  What?

09:40:03  7              MR. ROWEN:  I would think not, Your Honor.

09:40:05  8              THE COURT:  Yeah, but it goes on to say, more

09:40:07  9    importantly, would expand the liability in a manner never

09:40:11 10    contemplated by blah, blah, blah or by the legislatures of

09:40:14 11    the several states.  So, doesn't it seem to recognize that

09:40:20 12    the legislatures of the several states have something to say

09:40:24 13    about this?

09:40:25 14              MR. ROWEN:  Yes, Your Honor, and we don't

09:40:26 15    disagree with that.  I mean, we don't think that there are

09:40:28 16    no such thing as predicate statutes.  But what we do think

09:40:33 17    is that to read the PLCAA and the predicate exception, in

09:40:38 18    particular, to allow this sort of statute that just codifies

09:40:42 19    the same sorts of causes of action that Congress

09:40:45 20    specifically called out by name, that's just not a sensible

09:40:50 21    reading of the text.  And I mean, again, our clients are

09:40:53 22    subject to dozens -- my client's members are subject to

09:40:57 23    dozens and dozens of regulations, and we have no qualms of

09:41:02 24    them being regulated.  What they want is to know what the

09:41:05 25    regulations are and what they're supposed to do.

09:41:08  1          And the problem with these sorts of theories, I
09:41:10  2     mean, the *Camden County* case that the Third Circuit decided
09:41:15  3     before the PLCAA was enacted, sort of a perfect illustration
09:41:19  4     of what these public nuisance theories are.  So, the
09:41:21  5     allegations there were the manufacturers made more handguns
09:41:26  6     than they reasonably thought could be bought by lawful
09:41:29  7     purchasers and marketed them in ways that essentially made
09:41:34  8     them look cool to people who maybe shouldn't have handguns.
09:41:37  9          And what the Third Circuit said there is, you
09:41:42 10     know, one, on proximate cause, that's about seven steps
09:41:45 11     removed from the ultimate harm that you're trying to seek
09:41:48 12     redress for if you're talking about, you know, either a
09:41:50 13     discrete instance of gun violence or sort of general gun
09:41:56 14     violence in the air, but it's also just sort of
09:41:58 15     fundamentally inconsistent with our sort of traditional idea
09:42:02 16     of what sort of ideas are on these types of actors.
09:42:06 17          So, I mean, to get back to where I believe Your
09:42:08 18     Honor started, which was the difference between
09:42:10 19     manufacturers and sellers, so, I mean, I do think that as to
09:42:14 20     manufacturers, the preemption here is just the easiest,
09:42:17 21     because they are going to be so far removed from the types
09:42:23 22     of harms that one would be suing under under SB 302.  To say
09:42:28 23     that, you know, the suits are going to be things alleging
09:42:31 24     like what we saw in the *Camden County* case or what we're
09:42:33 25     seeing in Buffalo and Rochester.

09:42:36  1          And as to sellers, I mean, you know, my clients

09:42:39  2     would have -- my client's members would have no problem with

09:42:42  3     a lawsuit that said, you know, you violated some other

09:42:47  4     statute, so your conduct is unlawful in itself.  And the

09:42:53  5     harm for which we're seeking redress is sort of within the

09:42:55  6     scope of the duty and, you know, the risk you undertook when

09:42:58  7     you did the thing.

09:42:59  8          And we're using Section 3930(g), if it's a

09:43:02  9     private party or Section 3930(f) if it's the Attorney

09:43:06 10     General as a cause of action to seek, you know additional,

09:43:09 11     remedies.  You know, we'd have no problem with that.  The

09:43:13 12     states can, you know, adjust the remedies and adjust sort of

09:43:17 13     the universe of potential plaintiffs for concrete

09:43:20 14     obligations that my client's members have to comply with all

09:43:23 15     the time.

09:43:24 16          THE COURT:  Well, so you say you'd have no

09:43:27 17     problem with that --

09:43:29 18          MR. ROWEN:  Putting aside our constitutional

09:43:34 19     non-preemption concerns, Your Honor.

09:43:35 20          THE COURT:  Okay.  I understand what you said.

09:43:37 21          In terms of the preemption, one of the things

09:43:54 22     that I was wondering about was, and I think maybe you said

09:44:02 23     in your brief, you know, you'd like a ruling that this is

09:44:06 24     preempted as to your clients or something like that.

09:44:20 25          But let's assume that, because there is a

09:44:22 1   difference between manufacturers and sellers, maybe I think

09:44:26 2   it's preempted as to some of your clients, but not others of

09:44:29 3   your clients, what would I do then?

09:44:30 4            MR. ROWEN:  Well, I think, you know, I'd hope to

09:44:34 5   be able to dissuade you from that position.

09:44:35 6            THE COURT:  Right, right.

09:44:36 7            MR. ROWEN:  But if that was the position that

09:44:37 8   you took, I think that you would explain what types of

09:44:40 9   conduct the statute cannot reach consistent with the PLCAA.

09:44:45 10           THE COURT:  But how would --

09:44:52 11           MR. ROWEN:  The cleanest --

09:44:53 12           THE COURT:  So, would I write a law review

09:44:57 13  article about over here we've got this, and over here we've

09:45:01 14  got that, and it's all detached from any actual facts?

09:45:04 15           MR. ROWEN:  No, Your Honor.  And so, the

09:45:05 16  cleanest way, again, putting aside our other arguments --

09:45:08 17           THE COURT:  Right, right.

09:45:08 18           MR. ROWEN:  -- seeking somewhat broader relief,

09:45:12 19  the cleanest way that we could articulate the core

09:45:15 20  preemption problem is, you know, an Order that said the

09:45:18 21  following:  SB 302 is not itself a predicate statute, so an

09:45:25 22  action cannot be predicated solely on a violation of SB 302.

09:45:30 23           To the extent someone wants to sue alleging that

09:45:34 24  a firearm industry member committed conduct, in the words of

09:45:37 25  the statute, that was unlawful in itself, i.e. violated some

09:45:41  1    other law, and that the violation was knowing, and that the

09:45:45  2    harm is consistent and that the causal mechanism is

09:45:49  3    consistent with traditional proximate cause, that those

09:45:53  4    potential applications would not be preempted.

09:45:55  5           Now, I have to say, I think, you know, those

09:45:58  6    potential applications are, if not zero, pretty close to

09:46:02  7    zero, because the whole point of the statute is not to

09:46:06  8    increase the penalties for sellers that facilitate straw

09:46:11  9    purchases.  They already can do -- you know, the State could

09:46:14 10    do that very easily without going through the rigamarole of

09:46:19 11    this sort of broad expansive public nuisance theory.

09:46:23 12           So, you know, we think that while that wouldn't

09:46:26 13    technically lead to the entire statute being enjoined, it

09:46:31 14    would, for my client's members' purposes, solve the problem,

09:46:34 15    and I think give effect to the PLCAA, which is saying that,

09:46:38 16    yes, to Your Honor's point, that State legislatures do have

09:46:42 17    a role to play in defining the duties of manufacturers and

09:46:46 18    sellers that operate within their borders, but they actually

09:46:49 19    have to define the duties.  And, you know, other industries

09:46:54 20    may be subject to expansive theories of liability like

09:46:58 21    public nuisance, but licensed firearm manufacturers and

09:47:02 22    sellers can't be because that's specifically what Congress

09:47:05 23    enacted the PLCAA to stamp out.

09:47:09 24           So, if Your Honor --

09:47:11 25           THE COURT:  So, just before we move on to that,

09:47:15  1    beyond that point, could I ask that, you know, some time,

09:47:25  2    maybe by the end of the week, that you submit a form of

09:47:39  3    Order, based on preemption, you know, reserving your rights

09:47:47  4    on the Constitutional law issues, as to how I -- kind of

09:47:59  5    what you just said, but perhaps giving, you know, a little

09:48:03  6    bit more time to think about exactly how it would be worded.

09:48:09  7              And I think that --

09:48:13  8              MR. ROWEN:  Yes, Your Honor.

09:48:14  9              THE COURT:  -- would be helpful.

09:48:15 10              MR. ROWEN:  We're happy to do that.  You know,

09:48:17 11    we're happy to do that within whatever time frame Your Honor

09:48:20 12    would like.

09:48:20 13              THE COURT:  And a different thought is I'm just

09:48:26 14    wondering, I'm wondering if it would be, for lack of a

09:48:37 15    better word, prudent to basically wait and see what the

09:48:44 16    Third Circuit does with the New Jersey appeal.

09:48:49 17              MR. ROWEN:  So, if the Attorney General were

09:48:51 18    willing to agree not to enforce the statute during the

09:48:55 19    pendency of the New Jersey appeal, I don't think we'd have a

09:48:58 20    problem with that.  But, you know, I can't speak for my

09:49:02 21    friend on the other side, but I'm sort of doubtful that

09:49:05 22    they'll agree to that.  And if they don't, then, you know,

09:49:10 23    what we think the right thing to do is to enter a

09:49:12 24    preliminary injunction so that it keeps that status quo in

09:49:15 25    place.  Because, otherwise, if they enforce the statute,

09:49:19  1    then we're going to have to run to Your Honor for an

09:49:22  2    emergency hearing.  And, you know, I understand the impulse

09:49:26  3    to conserve judicial economy.  And, you know, as counsel for

09:49:30  4    a number of these cases, you know, frankly, I appreciate

09:49:32  5    that.

09:49:32  6            But what I don't want is for that to essentially

09:49:35  7    backfire and lead us to be, you know, running here in a week

09:49:39  8    or a month saying, We need something, you know, by the end

09:49:42  9    of the day because --

09:49:42 10            THE COURT:  Well, let me just see here.

09:49:45 11    Mr. Picollelli, this may or may not go beyond your pay grade

09:49:48 12    at this point, but what would the State's position be on

09:49:58 13    whether to stay the enforcement of this pending the outcome

09:50:02 14    of the Third Circuit decision on the New Jersey statute?

09:50:07 15            MR. PICOLLELLI:  Your Honor is correct, that's

09:50:09 16    way above my pay grade.  I haven't been given authority to

09:50:11 17    decide on that, but it's certainly something I can raise

09:50:14 18    after this hearing.

09:50:16 19            THE COURT:  Well, I mean, we're going to finish

09:50:21 20    the argument here today because it's kind of interesting for

09:50:24 21    somebody who spends 70 percent of their time doing patent

09:50:27 22    cases, but I would appreciate, Mr. Picollelli, if you would

09:50:32 23    sort of run it up the food chain and see, because I think it

09:50:46 24    might conserve a certain amount of judicial resources and

09:50:51 25    I'm not sure that the -- and given, it seems to me unlikely

09:50:57  1   from where I sit that the Attorney General is very likely to

09:51:00  2   be trying to enforce this in the near future.  And I'm

09:51:04  3   guessing that, based on the expedited proceedings in the New

09:51:10  4   Jersey case, you know, we're not talking this is going to go

09:51:12  5   on for a year.  I don't know what we are talking about, but

09:51:15  6   I would think it would be not all that long, which I realize

09:51:20  7   is pretty vague, not all that long period of time.

09:51:26  8           So, if you could, and I appreciate the Attorney

09:51:32  9   General and the top deputies probably have a lot of other

09:51:36 10   things to do, but if you could consider that, and in

09:51:45 11   whatever amount of time is reasonable, get back to me on

09:51:50 12   that or perhaps talk to Mr. Rowen.  And, in any event,

09:52:02 13   before too much time has passed, let me know how that goes.

09:52:06 14           Okay?

09:52:07 15           MR. PICOLLELLI:  Okay.

09:52:08 16           THE COURT:  Thank you, Mr. Picollelli.

09:52:09 17           All right.  Mr. Rowen, let's see.

09:52:18 18           On the subject of preemption, is there more

09:52:22 19   stuff you want to say about preemption?  I think I probably

09:52:25 20   have some questions in here, even though some of them are

09:52:28 21   more for Mr. Picollelli.

09:52:31 22           So, actually let me just address one thing.  The

09:52:35 23   question, it was brought up maybe in the *Amicus* brief, I

09:52:44 24   take it the subject of ghost guns, which I understand to be

09:52:50 25   not something any of your clients manufacture and probably

09:52:57 1    not something any of your clients sell, the PLCAA or

09:53:05 2    whatever it is, that has no impact because that only deals

09:53:11 3    with licensed companies.  So, if there was somehow or

09:53:18 4    another a ghost gun out there, the SB 302 would be or the

09:53:27 5    PLCAA would have nothing to say about that?

09:53:29 6            MR. ROWEN:  I think that's right.  I mean,

09:53:33 7    precisely because none of our manufacturer members, you

09:53:37 8    know, could logically make a ghost gun.  And, you know, to

09:53:41 9    my knowledge, none of our seller and distributor members,

09:53:44 10   you know, have anything to do with them.  I haven't spent a

09:53:47 11   lot of time thinking about that, but I think that's right,

09:53:49 12   Your Honor, that, you know, essentially my understanding of

09:53:52 13   what a ghost gun is is something that's basically just

09:53:55 14   created outside of the many rules and regulations that

09:53:59 15   govern the firearms industry.

09:54:01 16           THE COURT:  Are there any other lawful

09:54:03 17   participants in the firearms industry who would be, as a

09:54:10 18   category, excluded from the coverage of the PLCAA?

09:54:14 19           MR. ROWEN:  So, I don't think so.  So, the

09:54:17 20   *Amicus* brief raises the idea that manufacturers of component

09:54:23 21   parts are not covered by the PLCAA.  I don't think that's

09:54:27 22   the right reading of the PLCAA which says -- I can get you

09:54:33 23   the exact language, but I believe it says firearms,

09:54:35 24   ammunition and other related products.

09:54:39 25           THE COURT:  Okay.

09:54:39  1        MR. ROWEN:  And, you know, to me, parts and

09:54:43  2   components is sort of, you know, what's in the eye of the

09:54:46  3   beholder, whether something is a part, or a component or an

09:54:50  4   accessory.  And, you know, all of those things, I think, are

09:54:53  5   arms in the meaning of the Second Amendment, and they sure

09:54:55  6   seem like the sort of things that Congress was trying to get

09:54:59  7   at.  I mean, you know, a manufacturer of firearms

09:55:02  8   accessories is subject to a number of regulations that are

09:55:05  9   specific to that, as well as, you know, the general FFL

09:55:10 10   licensing for manufacturers.

09:55:12 11        So, you know, like, I mean, that's not something

09:55:16 12   that I don't -- I don't think any Court has specifically

09:55:19 13   addressed that, but, in our view, that's just not a faithful

09:55:21 14   reading of the PLCAA.

09:55:26 15        THE COURT:  All right.  I'm going to -- this is

09:55:31 16   more a question for Mr. Picollelli, but if I get -- in terms

09:55:38 17   of SB 302, what it says about proximate cause, to the extent

09:55:46 18   that that is different than or more expansive than what the

09:55:53 19   PLCAA meant by using proximate cause -- which I assume is,

09:56:00 20   you know, essentially a common law or maybe federal common

09:56:03 21   law, but probably common law kind of understanding -- to the

09:56:06 22   extent that it purports to be broader, that's just clearly

09:56:11 23   preempted; right?

09:56:12 24        MR. ROWEN:  Yes, Your Honor.

09:56:13 25        THE COURT:  Okay.  I figured that was an easy

09:56:16 1    question for you, but I'll get Mr. Picollelli's take on that

09:56:19 2    down the road.

09:56:20 3          So, do you think -- you know, again, this is

09:56:39 4    more a question that I had in mind for Mr. Picollelli.  But

09:56:42 5    the two examples that are in Section 5 as, I guess,

09:56:51 6    including examples, are they, in your opinion, entirely

09:57:02 7    consistent with the language that's above it about knowingly

09:57:06 8    violated?

09:57:07 9          MR. ROWEN:  Yes, Your Honor.  So, you know, the

09:57:13 10   Romanette (ii), you know, is the one that says knowing or

09:57:15 11   having reasonable cause to believe.  Reasonable cause to

09:57:18 12   believe is the traditional articulation of either, you know,

09:57:21 13   it's the predicate for willful blindness or it's the

09:57:25 14   traditional articulation of constructive knowledge.  So, you

09:57:28 15   know, our view is maybe constructive knowledge is consistent

09:57:32 16   with what Congress meant by knowingly violated, but

09:57:35 17   constructive knowledge is certainly a very different and

09:57:37 18   higher standard than mere recklessness, let alone

09:57:41 19   reasonableness divorced from a mens rea requirement.

09:57:44 20         So, you know, maybe, you know, some of my

09:57:46 21   client's members would like to argue that, no, I can't tell

09:57:50 22   you that, you know, in a specific application whether

09:57:52 23   constructive knowledge would be enough.  I think that the

09:57:55 24   Court doesn't need to, you know, decide that definitively

09:57:58 25   here because --

35

THE COURT:  Well, I guess one of the things that I was thinking looking at that language is I guess actually one of the things I was thinking is it's entirely consistent with knowingly.

Hold on a minute.  Basically the, you know, Roman I is knowingly made any false entry or failed to make an appropriate entry, or aided, abetted or conspired with any person to make a false or fictitious one.  So, I don't think that one is in dispute that that one has got knowingly at least written all over it.

The second one, which a manufacturer or seller aided, abetted or conspired with any other person to sell or otherwise to dispose of a qualified product, i.e. a gun, let's say, knowing or having reasonable cause to believe that the actual buyer of the qualified product was prohibited from possessing or receiving the firearm, et cetera.

So, I was trying to figure out:  What exactly is the scenario that Roman II is envisioning?  So, you've got a seller, and they have to be aiding and abetting some other person.  Who's that other person?

MR. ROWEN:  So, the straw purchaser, Your Honor.

THE COURT:  Okay.  And so, they know that that person is a straw purchaser.  They may not know whether the actual buyer is prohibited or not.  Sometimes, maybe not

10:00:09 1    usual, at least in my past experience, but sometimes the

10:00:13 2    actual buyer is lawfully allowed to possess a firearm, but,

10:00:17 3    for one reason or another, they don't want there to be a

10:00:20 4    record that they have it.  So, that's the reason why it

10:00:24 5    makes sense to me to say reasonable cause because it's rare

10:00:34 6    that the seller knows what the -- they often know nothing

10:00:44 7    about the third person, the straw purchaser, the actual

10:00:48 8    buyer because the whole point of having the straw purchaser

10:00:53 9    is to cover up that person's involvement.

10:00:56 10           So, it seems to me the statute involves, and I

10:01:02 11   take this, too, from the language aided, abetted or

10:01:05 12   conspired, which is criminal law language, that's not civil

10:01:09 13   language, that they know it's a straw purchase.  They just

10:01:18 14   don't know enough about the actual buyer, but in that

10:01:22 15   scenario they're always going to have reasonable cause to

10:01:25 16   believe the actual buyer is prohibited, even though the

10:01:28 17   actual buyer may not, in fact, be prohibited.

10:01:31 18           MR. ROWEN:  Yes, Your Honor.  I mean, that's

10:01:32 19   exactly our understanding, and, I mean, Your Honor hit the

10:01:35 20   nail on the head.  What Congress called out here was 18

10:01:39 21   U.S.C. Section 922, which, as Your Honor is aware, is a

10:01:41 22   criminal law.  And so, I mean, that's exactly right.

10:01:44 23           So, the initial criminal law violation is

10:01:49 24   selling to someone when you either know or are pretty sure,

10:01:55 25   based on the facts that have been presented to you, that the

10:01:57  1    person in front of you is not the ultimate recipient of the

10:02:00  2    firearm.  And, you know, my understanding, and this is

10:02:04  3    consistent with the mens rea language in those criminal

10:02:06  4    provisions --

10:02:07  5          THE COURT:  Yeah, actually I looked that up,

10:02:09  6    because I was pretty sure I remembered aiding and abetting

10:02:14  7    doesn't actually have the word knowingly or something

10:02:17  8    appearing in front of it in 18 U.S.C. Section 2.  And I

10:02:22  9    looked up conspiracy or conspiring in 18 U.S.C. Section 371,

10:02:27 10    and, again, the same thing.  It says, whoever conspires.

10:02:30 11          Now, to prove it to a jury, you need to show

10:02:36 12    knowing, or intentional or something like that, but the

10:02:40 13    statutory language is essentially exactly the same as the

10:02:45 14    statutory language here.  And, you know, I guess I'd be

10:02:53 15    surprised if there are too many other civil liability

10:02:59 16    statutes that have examples that sound so much like criminal

10:03:04 17    law violations.  And, in any event, I figured you'd probably

10:03:13 18    agree with me on that.

10:03:14 19          Let me see if there's anything else in here that

10:03:16 20    I wanted to ask you about.  All right.  Actually that sort

10:04:06 21    of -- I think we've talked about all the preemption things

10:04:09 22    that I have on my checklist here.

10:04:17 23          So, you know, a lot of this I haven't actually

10:04:19 24    thought about for going on 40 years ago, but basically the

10:04:25 25    reason why you lead on preemption is because that's not a

10:04:29 1    constitutional issue, and so I should decide that first;

10:04:32 2    right?

10:04:33 3                MR. ROWEN:  It's sort of a constitutional issue,

10:04:36 4    but the way that the courts have -- you know, because it,

10:04:38 5    obviously, depends on Article VI, Clause 2 of the

10:04:41 6    Constitution.

10:04:41 7                THE COURT:  Right, but it's really kind of --

10:04:43 8                MR. ROWEN:  Right.

10:04:43 9                THE COURT:  -- they're adhering two statutes.

10:04:46 10   It's not like it's a commerce clause violation.  It's a

10:04:50 11   First Amendment violation, et cetera.

10:04:51 12               Would I be correct in assuming that the order in

10:04:54 13   your briefing, maybe I'm not, you know, broadly speaking,

10:05:01 14   your constitutional issues are commerce clause, First

10:05:06 15   Amendment, Second Amendment and due process?  One of the

10:05:10 16   things I often ask in cases is essentially which one of

10:05:16 17   those is your best argument?

10:05:18 18               MR. ROWEN:  So, I mean, here, I think I would

10:05:25 19   say that commerce clause, First Amendment and Second

10:05:29 20   Amendment are tied.  And that vagueness is good, but less

10:05:34 21   good.

10:05:35 22               THE COURT:  Okay.

10:05:36 23               MR. ROWEN:  And I'm happy to start with any one

10:05:39 24   of those that Your Honor would like me to.

10:05:41 25               THE COURT:  Well, so, you know, frankly, I've

10:05:49  1    spent a lot more time on the preemption issue or, you know,

10:05:53  2    thinking about the preemption issue in advance of today's

10:05:55  3    hearing than I have the other issues.  And correct me if --

10:06:04  4    and I don't actually recall now, but the New Jersey case,

10:06:08  5    that pretty much said preemption and ended; right?

10:06:11  6             MR. ROWEN:  Yes.

10:06:11  7             THE COURT:  So, it didn't address any of these

10:06:13  8    issues?

10:06:13  9             MR. ROWEN:  Yes.

10:06:14 10             THE COURT:  The Northern District of New York

10:06:15 11    case, did it address any of these issues?

10:06:17 12             MR. ROWEN:  Yes.

10:06:18 13             THE COURT:  It must have.

10:06:19 14             MR. ROWEN:  Yes.

10:06:20 15             THE COURT:  And so, I guess it ruled against you

10:06:22 16    or, I'm sorry, were you the Plaintiff in the Northern

10:06:25 17    District of New York, too?

10:06:25 18             MR. ROWEN:  Yes, and NSSF is the Plaintiff there

10:06:28 19    as well.

10:06:28 20             THE COURT:  And so, basically it ruled against

10:06:30 21    you on all these issues?

10:06:31 22             MR. ROWEN:  Yes, Your Honor.

10:06:33 23             THE COURT:  And, you know, I've been asking

10:06:36 24    about the Third Circuit appeal because, you know, that's

10:06:40 25    directly controlling on me.

10:06:42  1          But the Second Circuit, what's the status of the

10:06:46  2   appellate activity there?

10:06:48  3          MR. ROWEN:  So, the briefs have all been filed,

10:06:51  4   including the reply brief.  They have not yet scheduled oral

10:06:55  5   argument, but we assume it will be in the summer based on

10:06:58  6   sort of how the briefing has progressed.

10:07:02  7          THE COURT:  Okay.  So, I take it nobody asked

10:07:09  8   for expedition, or if they did, it wasn't granted?

10:07:13  9          MR. ROWEN:  Yes, Your Honor.  And I will -- so,

10:07:17 10   my firm was not involved at the pleading stage in that case

10:07:20 11   and I don't -- I know that there was a commerce clause claim

10:07:24 12   in that case, but I know there wasn't a Second Amendment

10:07:27 13   claim, and I can't remember if there was a First Amendment

10:07:29 14   claim.

10:07:30 15          THE COURT:  Right.  I guess the Second Amendment

10:07:31 16   claim was invigorated by *Bruen*?

10:07:34 17          MR. ROWEN:  Yes, Your Honor.

10:07:36 18          THE COURT:  All right.  Well, the two things

10:07:41 19   that, I guess, you could most usefully speak to me about

10:07:44 20   would be the commerce clause and the First Amendment.  I

10:07:51 21   suspect the Second Amendment and due process I'd be more

10:07:57 22   likely to just decide that based on the papers.

10:08:00 23          Okay?

10:08:00 24          MR. ROWEN:  Sure, Your Honor.  So, I'll start

10:08:02 25   with the First Amendment.  And so, you know, the briefing

10:08:05  1    has mostly, you know, been in dispute about what level of

10:08:09  2    scrutiny applies.  And while we think that because this is a

10:08:14  3    facially speaker and content-based statute that something

10:08:16  4    more than intermediate scrutiny ought to apply.  I don't

10:08:20  5    want to spend too much time fighting on the standard because

10:08:24  6    we think we clearly win, even under intermediate scrutiny.

10:08:27  7            So, the basic question for any form of

10:08:31  8    constitutional scrutiny above rational basis is:  Is there a

10:08:33  9    reasonable fit between, you know, the scope of the statute

10:08:39 10    and the goals that, you know, the legislature had in mind?

10:08:43 11            THE COURT:  And the only thing in the statute

10:08:46 12    that even implicates the First Amendment is the fact that

10:08:49 13    the word marketing appears; right?  I mean, if it just said,

10:08:53 14    and I forget what the other three or four verb-type forms

10:08:56 15    are, but the rest of the verbs don't implicate the First

10:08:59 16    Amendment at all.

10:09:00 17            MR. ROWEN:  Yes, Your Honor.  I mean, I assume

10:09:04 18    that, you know, a clever Plaintiff's lawyer could come up

10:09:07 19    with saying that one of the other verbs somehow encompasses

10:09:09 20    some form of speech, but if the statute didn't say

10:09:12 21    marketing, we wouldn't be here bringing a First Amendment

10:09:14 22    claim.

10:09:15 23            THE COURT:  Okay.

10:09:16 24            MR. ROWEN:  And --

10:09:17 25            THE COURT:  So --

| | | |
|---|---|---|
| 10:09:18 | 1 | MR. ROWEN:  Sorry, Your Honor. |
| 10:09:19 | 2 | THE COURT:  And maybe this was in the briefing. |
| 10:09:26 | 3 | Are there any -- you know, you talked about the quantity of |
| 10:09:33 | 4 | federal regulation, and maybe in state regulation, too, of |
| 10:09:38 | 5 | the firearms industry.  Is there any current federal |
| 10:09:43 | 6 | regulation that relates to marketing of firearms? |
| 10:09:48 | 7 | MR. ROWEN:  Yes, Your Honor.  And the typical -- |
| 10:09:50 | 8 | I mean, I can't name you chapter and verse offhand, but the, |
| 10:09:57 | 9 | you know, federal regulation of firearms advertising is |
| 10:10:00 | 10 | consistent with sort of what you think of as a normal |
| 10:10:03 | 11 | commercial speech restriction.  It says that certain things |
| 10:10:06 | 12 | need to be disclosed in certain types of context. |
| 10:10:10 | 13 | So, you know, like, you know, the analog is you |
| 10:10:13 | 14 | go to Starbucks, and they have to tell you how many |
| 10:10:15 | 15 | calories, right.  So, those types of commercials speak to |
| 10:10:19 | 16 | restrictions. |
| 10:10:19 | 17 | THE COURT:  Well, so give me an example because |
| 10:10:21 | 18 | I'm unfamiliar with -- |
| 10:10:22 | 19 | MR. ROWEN:  So, I don't have them in front of |
| 10:10:25 | 20 | me, and I don't know that I can do any better than what I've |
| 10:10:30 | 21 | just did standing here. |
| 10:10:31 | 22 | THE COURT:  Okay. |
| 10:10:31 | 23 | MR. ROWEN:  I mean, I'm happy to submit, you |
| 10:10:34 | 24 | know, additional examples if that would be helpful for Your |
| 10:10:37 | 25 | Honor.  But, you know, we think that those types of laws are |

10:10:43 1    what you normally think of as a commercial speech

10:10:45 2    restriction where, you know, they're either saying that you

10:10:49 3    have to say certain truthful things that are just facts or

10:10:53 4    there are specific things that you can't say in specific

10:10:58 5    circumstances.

10:10:59 6            You know, even the latter, those types of laws

10:11:02 7    are typically struck down.  And *Zaberers* is sort of the

10:11:07 8    classic case where the Court upheld the -- compelled the

10:11:10 9    disclosures for attorney advertising and struck down because

10:11:12 10   it said it can't, you know, purport to give legal advice.

10:11:15 11           And, you know, here we don't even have that.

10:11:18 12   What we have is essentially a command not to market

10:11:21 13   unreasonably.  And as far as I'm aware, there are no other

10:11:26 14   laws in any other context for any other lawful product where

10:11:31 15   the command boils down to don't market these lawful products

10:11:35 16   unreasonably.

10:11:36 17           THE COURT:  Well, so just going back to the

10:11:39 18   question of or it's analogous at least, I guess, to what I

10:11:45 19   was asking you in the preemption context.  If I thought the

10:11:51 20   First Amendment, the marketing restriction violated the

10:11:56 21   First Amendment, would there be some way for me to say that

10:12:02 22   part's prohibited, but the rest of it is not?

10:12:07 23           MR. ROWEN:  Yes, Your Honor.  You know, assuming

10:12:10 24   that we've lost on all of our other claims and that the

10:12:13 25   First Amendment were the only claim that Your Honor

10:12:14 1   accepted, then, yes, I mean, I think the remedy would be to

10:12:17 2   say that the statute can't be applied to speech.  And

10:12:21 3   because, you know, we think the marketing language is the

10:12:24 4   only language that applies there.  I mean, I don't know that

10:12:26 5   you need to say, so the marketing provision is sort of

10:12:29 6   scratched out.  I think the Order would just say, the

10:12:31 7   statute can't constitutionally apply to marketing.

10:12:35 8               THE COURT:  Okay.  All right.

10:12:38 9               And I'm sorry.  So, and I think I took you off

10:12:45 10  the track you were on --

10:12:46 11              MR. ROWEN:  That's all right.

10:12:47 12              THE COURT:  -- which is essentially marketing, I

10:12:56 13  can't remember what the State's position was, but the

10:12:59 14  marketing is speech.

10:13:02 15              MR. ROWEN:  Yes, Your Honor.

10:13:02 16              THE COURT:  And so, when you restrict marketing

10:13:10 17  or you make marketing the basis for liability, the First

10:13:18 18  Amendment is necessarily implicated?

10:13:20 19              MR. ROWEN:  Yes, Your Honor, with some very sort

10:13:23 20  of time-honored narrow exceptions.  So, the Supreme Court

10:13:28 21  law said that --

10:13:28 22              THE COURT:  So, the fire in a crowded theater,

10:13:30 23  that kind of thing?

10:13:31 24              MR. ROWEN:  Well, similar, but in the commercial

10:13:33 25  speech context, in particular, we don't dispute that this is

10:13:36 1    a commercial speech regulation.

10:13:37 2            THE COURT:  Okay.  Thank you.

10:13:38 3            MR. ROWEN:  But in the commercial speech context

10:13:41 4    what the Court has long said is speech that's -- you know,

10:13:44 5    commercial speech that's false is not protected.  Commercial

10:13:48 6    speech that's materially misleading is generally not

10:13:53 7    protected, although there are some contexts in which, you

10:13:56 8    know, it's a little different.  And speech that either is

10:13:57 9    about an unlawful product or that proposes an unlawful

10:14:01 10   transaction or that, you know, promotes unlawful conduct.

10:14:05 11           And so, if all this law said was you can't run

10:14:10 12   ads, you know, telling people to go commit crimes with

10:14:14 13   firearms, we wouldn't be here raising a First Amendment

10:14:17 14   challenge.  If all this law said was you can't advertise

10:14:21 15   ghost guns, we wouldn't be here raising a First Amendment

10:14:24 16   challenge.

10:14:26 17           The problem is this says, Don't speak

10:14:28 18   unreasonably, even when you're not saying anything

10:14:32 19   untruthful or misleading, and you're just marketing your

10:14:36 20   product that's lawful and constitutionally protected.

10:14:40 21           THE COURT:  And to just go back, in the

10:14:44 22   framework of commercial speech, you know, you can't make

10:14:51 23   false statements.  Maybe you can't encourage criminal acts,

10:15:02 24   whatever those kinds of things might be.  If those things

10:15:08 25   applied, then it's not covered by the First Amendment.

10:15:11 1          MR. ROWEN:  Correct, Your Honor.

10:15:12 2          THE COURT:  So, I think, but I'm not entirely

10:15:16 3     sure, but let's assume the issue here is, I think you would

10:15:20 4     argue, it's not whether or not it's covered by the First

10:15:23 5     Amendment.  It then just gets to the level of

10:15:27 6     scrutiny-applied arguments, scrutiny, intermediate scrutiny.

10:15:33 7     But you say it's clear even under intermediate scrutiny that

10:15:37 8     you win?

10:15:38 9          MR. ROWEN:  Yes, Your Honor.

10:15:39 10         THE COURT:  And that's because intermediate

10:15:41 11    scrutiny -- so, this is going to be embarrassing for me to

10:15:49 12    ask.  So, strict scrutiny is often along the lines of:  Is

10:15:53 13    this the least restrictive means to accomplish the end;

10:15:57 14    right?

10:15:58 15         MR. ROWEN:  Yes.

10:15:58 16         THE COURT:  So, intermediate scrutiny, is that

10:16:01 17    kind of the standard?  Is there a reasonable -- well, what

10:16:07 18    is the standard for intermediate scrutiny?

10:16:09 19         MR. ROWEN:  So, the law needs to be narrowly

10:16:11 20    tailored to the significant Government interests.  So, the

10:16:16 21    Supreme Court has been clear that narrow tailoring in the

10:16:18 22    intermediate scrutiny context is not the least restrictive

10:16:23 23    means.

10:16:23 24         THE COURT:  Right, right.

10:16:23 25         MR. ROWEN:  But it's also not, ah, it's

10:16:25 1    rationally related to.

10:16:26 2              THE COURT:  Not a rational basis, right.

10:16:28 3              MR. ROWEN:  Right.  So, there has to be some

10:16:29 4    fit.  And, I mean, I can talk about under inclusiveness for,

10:16:33 5    you know, in a minute, but it's hard for me to come up with

10:16:36 6    a more overbroad speech restriction than one that says,

10:16:40 7    Don't market constitutionally-protected products

10:16:42 8    unreasonably.  And this actually goes broader than that by

10:16:47 9    saying, Don't recklessly contribute to a dangerous condition

10:16:51 10   through unreasonable marketing.

10:16:53 11             THE COURT:  Okay.

10:16:55 12             MR. ROWEN:  And, you know, so we think that that

10:16:57 13   sort of overinclusiveness problem is independently fatal,

10:17:00 14   and we also think that that sort of lends itself --

10:17:03 15             THE COURT:  So, I got the overinclusiveness.

10:17:05 16   That's just -- it sort of affects all marketing, or tell me

10:17:16 17   if I've got it, maybe I don't.  It affects all marketing,

10:17:23 18   but only a thin sliver of it could lead to some bad thing,

10:17:29 19   bad thing that's covered by the statute.  Is that right or

10:17:31 20   is that --

10:17:31 21             MR. ROWEN:  So, I think the way that I would

10:17:33 22   articulate it is on the face of the statute, SB 302 applies

10:17:40 23   to all marketing by firearm industry members about

10:17:45 24   firearms-related products.

10:17:47 25             So, the whole universe of marketing of lawful

10:17:52  1   constitutionally-protected products by these regulated

10:17:56  2   entities is covered by the face of the statute.  And what

10:17:59  3   the statute says is all of that can be actionable if it's

10:18:03  4   unreasonable.  And, yeah, so you start with it's content

10:18:09  5   based because it's only about -- it's not just marketing,

10:18:12  6   it's marketing about a particular type of product.  It's

10:18:15  7   speaker based because it's only marketing about these

10:18:18  8   products by firearm industry members.

10:18:20  9          And we think the very fact that, you know, the

10:18:23 10   substantive standard is, is it unreasonable, makes this

10:18:27 11   essentially a classic like backdoor viewpoint-based law.

10:18:31 12          THE COURT:  Well, so, you know, when I was

10:18:34 13   reading the brief and sort of going one to three, the

10:18:44 14   backdoor viewpoint based, is that a recognizable theory?

10:18:49 15          MR. ROWEN:  Yes, Your Honor.  So, what the

10:18:51 16   Supreme Court has said is, you know, vague, incredibly

10:18:56 17   overbroad statutes raise, you know, concerns about viewpoint

10:19:01 18   discrimination lurking in the background because of the

10:19:03 19   selective enforcement possibility.  I think the case that we

10:19:07 20   cite is *Thornhill*, although I may be getting that wrong.

10:19:10 21          And so, you know, like I said at the outset,

10:19:13 22   normally we think about:  Is it viewpoint based and that

10:19:15 23   will tell you what tier of scrutiny you're in.  We agree

10:19:18 24   that nothing on the face of this statute is viewpoint based.

10:19:22 25   And while we think that -- you know, actually because it's

10:19:24  1    sort of operationally it's going to work that way while we

10:19:27  2    do think strict scrutiny is the right standard, again, I

10:19:29  3    don't want to fight too hard on that because once you're

10:19:32  4    intermediate scrutiny, they need to establish a reasonable

10:19:35  5    fit, and they can't.

10:19:37  6              And, you know, the fact that it's so open to

10:19:40  7    selective enforcement, is what, you know, we think is

10:19:44  8    essentially the sort of implicit viewpoint based.  But the

10:19:47  9    Court, in our view, doesn't need to even go there to

10:19:50 10    recognize that --

10:19:51 11              THE COURT:  But the -- all right.  And so,

10:20:00 12    that's your overinclusive side.

10:20:03 13              What's the under inclusive side?

10:20:06 14              MR. ROWEN:  Sure, Your Honor.  So, I think that

10:20:08 15    the interests that the State wants to pursue through SB 302

10:20:13 16    are curbing gun violence.  I mean, I think that's the main

10:20:17 17    interest.  And SB 302 doesn't apply to perpetrators of gun

10:20:22 18    violence.  It doesn't -- you know, and even on the speech

10:20:24 19    side, it could be limited, for instance, to speech that

10:20:29 20    promotes a specific type of unlawful activity.

10:20:33 21              It also doesn't apply to, you know, commercial

10:20:36 22    speech by those who aren't firearm industry members, no

10:20:40 23    matter how sort of gun centric it is.  You know, I remember

10:20:44 24    the Nintendo game Duck Hunt where you used an actual, you

10:20:48 25    know, a thing that looked like a firearm and it was, you

10:20:51  1    know, marketed to children.  And because Nintendo is not a

10:20:54  2    firearm industry member, you know, all of the ads that they

10:20:58  3    would run for that game would not be covered by this

10:21:02  4    statute.

10:21:03  5         And, you know, it seems like there are all sorts

10:21:07  6    of, you know, other types of speech that, you know, if what

10:21:12  7    the State were really worried about were curbing gun

10:21:15  8    violence, they could have gone after.  But instead, they

10:21:18  9    limited it to speech about constitutionally-protected

10:21:22 10    products by the regulated members of the industry.

10:21:24 11         And so, that's what we think is the under

10:21:27 12    inclusiveness problem.  And, I mean, I don't think that they

10:21:32 13    in their briefs have any answer to that.  I mean, in their

10:21:34 14    sur-reply, they just say *Central Hudson* applies and then

10:21:38 15    they end.

10:21:39 16         You know, again, we think that strict scrutiny

10:21:41 17    is the correct standard here.  But even under *Central*

10:21:43 18    *Hudson*, you have to do the analysis.  And the main part of

10:21:47 19    the analysis is the reasonable fit or narrow tailoring

10:21:51 20    analysis.  And, you know, as I said at the outset, I don't

10:21:57 21    think there's ever been a law that's been upheld that was as

10:22:01 22    broad as don't market these products unreasonably.  And I

10:22:04 23    think that makes sense because normally when we think about

10:22:08 24    the First Amendment, even the commercial speech context, we

10:22:11 25    think about the need for breathing room.

10:22:13  1                    THE COURT:  And you know, I think you said, and

10:22:28  2    I haven't thought about these cases in a long time, either,

10:22:30  3    but lawyer advertising, that's commercial speech; right?

10:22:33  4                    MR. ROWEN:  Yes, Your Honor.

10:22:34  5                    THE COURT:  And so, those were struck down under

10:22:43  6    intermediate scrutiny?

10:22:46  7                    MR. ROWEN:  Yes, Your Honor.

10:22:47  8                    THE COURT:  Okay.  Why don't you address the

10:22:55  9    commerce clause for a few minutes, then we'll take a break,

10:22:58 10    and it will be Mr. Picollelli's turn.

10:22:59 11                    MR. ROWEN:  Sure, Your Honor.  So, I would be

10:23:01 12    happy to.  So, our basic submission on the commerce clause

10:23:04 13    is that Delaware does not have the power to regulate

10:23:07 14    transactions that take place wholly outside of Delaware.

10:23:11 15    So, the easiest example of this --

10:23:15 16                    THE COURT:  Well, you say "transactions."  Let's

10:23:19 17    assume a manufacturer, you know, Ruger, sends guns to

10:23:31 18    Miller's Gun Store nearby in Delaware and that Miller's Gun

10:23:38 19    Store sells the gun to someone.  Is what Ruger did wholly

10:23:42 20    outside of Delaware?

10:23:43 21                    MR. ROWEN:  No.

10:23:43 22                    THE COURT:  Okay.  So, you're talking here about

10:23:46 23    your Arkansas and Texas example?

10:23:48 24                    MR. ROWEN:  So, I mean, the two sort of -- well,

10:23:51 25    the three prototypical examples of this are regulations of

10:23:55  1    manufacturing facilities themselves, which we understand the

10:23:59  2    reasonable controls provision here to target because it's,

10:24:04  3    you know, reasonable procedures designed to safeguard the

10:24:06  4    facilities where these products are made to ensure that

10:24:08  5    there isn't theft and things like that.

10:24:10  6            So, that's one of the prototypical examples of a

10:24:14  7    purely extraterritorial regulation.  And Your Honor is

10:24:17  8    correct that manufacturing is not exactly a transaction.  I

10:24:21  9    was using transaction sort of as a shorthand.  So, that's

10:24:24 10    one.

10:24:25 11            Two, is completely out-of-state wholesale

10:24:28 12    transactions.  So, we talked in the beginning about sort of

10:24:32 13    how the distribution network of these products works.  And,

10:24:36 14    as a general matter, most of the members of NSSF are

10:24:41 15    manufacturers.  All of their manufacturing operations are

10:24:44 16    outside of Delaware.  They generally sell to nation --

10:24:50 17            THE COURT:  Yeah.  I'm pretty sure there are no

10:24:51 18    manufacturers in Delaware.

10:24:53 19            MR. ROWEN:  I'm pretty sure of that as well,

10:24:55 20    but, you know, I never want to prove a negative.  So --

10:24:58 21            THE COURT:  That's something I've proven in the

10:25:01 22    past myself and, you know, I'm regularly taking guilty pleas

10:25:07 23    from Assistant U.S. Attorneys or where there are U.S.

10:25:12 24    Assistant Attorneys making that very point as to why the gun

10:25:14 25    traveled in interstate commerce.  So, I'm pretty confident

10:25:17  1    it remains true today.

10:25:19  2                 MR. ROWEN:  I'm happy to take Your Honor's word

10:25:21  3    for that.  And so, you know, the second is wholesale

10:25:24  4    transactions from manufacturers to nationwide distributors.

10:25:27  5    And, you know, to go back to your Your Honor's

10:25:30  6    hypothetical --

10:25:31  7                 THE COURT:  Nationwide distributor, would that

10:25:33  8    be like Walmart?

10:25:34  9                 MR. ROWEN:  No, these are licensed firearm

10:25:36 10    distributors that their sole business --

10:25:38 11                 THE COURT:  So, these are sort of intermediates

10:25:40 12    that the general public wouldn't see because --

10:25:42 13                 MR. ROWEN:  Correct.

10:25:42 14                 THE COURT:  -- they're between the manufacturers

10:25:44 15    and the point-of-sale dealers?

10:25:47 16                 MR. ROWEN:  Correct.

10:25:48 17                 THE COURT:  Okay.

10:25:49 18                 MR. ROWEN:  So, it's very rare for a licensed

10:25:51 19    firearm manufacturer to sell directly to retailers.  And

10:25:55 20    it's essentially never happened for a licensed manufacturer

10:25:58 21    to sell directly to an end user.

10:26:00 22                 THE COURT:  Okay.

10:26:00 23                 MR. ROWEN:  So, the usual transaction that takes

10:26:02 24    place is, you know, if there's marketing -- excuse me, if

10:26:05 25    there's manufacturing in Utah, and they sell to an

10:26:08 1    Ohio-based distributor, that transaction is deemed to take

10:26:15 2    place in both Utah and Ohio, but it didn't take place in

10:26:19 3    Delaware.  And so, that transaction is the thing that -- you

10:26:24 4    know, distributions, one of the things that Section 3930

10:26:29 5    says can violate its terms.

10:26:30 6            THE COURT:  And so, the SB 302 regulates, among

10:26:36 7    other things, the recordkeeping in that transaction?

10:26:39 8            MR. ROWEN:  Yes, Your Honor.  And Delaware, you

10:26:43 9    know, certainly can regulate in-state sales.  It can

10:26:46 10   regulate the types of products that can be sold in state

10:26:50 11   consistent with the Constitution, but what it can't do is

10:26:52 12   impose terms and requirements on out-of-state transactions

10:26:56 13   and practices.

10:26:57 14           So, the third main one is marketing.  So, most

10:27:02 15   marketing in the Internet age is not wholly out of state.

10:27:05 16   You know, I think the Attorney General included some

10:27:09 17   exhibits attached to their motion to dismiss showing that

10:27:11 18   things were available on the websites of some of our

10:27:14 19   client's members.  But a billboard in Illinois, if it's only

10:27:17 20   in Illinois, can't be the basis of a Delaware violation,

10:27:24 21   even if someone saw that in Illinois, then decided to steal

10:27:28 22   a gun from somewhere else and brought it to Delaware.  I

10:27:32 23   mean, it's been clear since, you know, 1935 when the Supreme

10:27:36 24   Court decided the *Baldwin* opinion, where the statute at

10:27:39 25   issue there was the New York Milk Control Act.  And it only

10:27:43 1    applied out of state with respect to sales of milk that were

10:27:48 2    destined for resale in New York.

10:27:49 3            THE COURT:  But, you know, I think maybe the AG

10:27:53 4    or the State said this, I mean, the milk, whatever the State

10:27:58 5    was, milk is something that's got both in-state and

10:28:01 6    out-of-state producers; right?  So, wouldn't that be a

10:28:08 7    different case than this where there are no in-state

10:28:12 8    producers?

10:28:13 9            MR. ROWEN:  So, that fact is relevant to

10:28:16 10   discrimination under the commerce clause, but it's not

10:28:18 11   relevant to extraterritoriality.  So, the

10:28:21 12   extraterritoriality doctrine is very clear.  It's Delaware

10:28:24 13   cannot impose liability on me for doing something in

10:28:28 14   Illinois.  And they can't say that, you know, you charged

10:28:34 15   too much or too little.  They can't say that you

10:28:36 16   manufactured something in a way that we didn't like.  And

10:28:39 17   the fact that the product winds up in the state, while that

10:28:42 18   might be enough for, you know, personal jurisdiction, due

10:28:46 19   process, it doesn't give them the authority to reach out and

10:28:49 20   directly regulate that.

10:28:51 21           So, our basic submission under the commerce

10:28:54 22   clause is, you know, to the extent that this statute were to

10:28:58 23   be applied to conduct that takes place wholly outside of the

10:29:03 24   state, it's in the words of the Supreme Court, per se,

10:29:07 25   invalid under the commerce clause.

10:29:10 1        THE COURT: And so, and again, if this were the

10:29:16 2   case or if you're right about this, does that mean that the

10:29:20 3   statute would be enjoined against your members who are

10:29:25 4   actually in Delaware?

10:29:26 5        MR. ROWEN: Yes, yes. So, I mean, the fact that

10:29:30 6   an entity does -- as a technical matter, it would be -- what

10:29:35 7   would be enjoined would be applications of the statute

10:29:38 8   against out-of-state conduct. And, you know, so, again, I

10:29:45 9   go back to *Baldwin*. The entity there, the distributor

10:29:49 10  essentially, was New York based. But the transaction that

10:29:53 11  New York wanted to reach out and regulate happened in

10:29:55 12  Vermont. And what the Court said is it doesn't matter that

10:29:59 13  they're New York based, and it doesn't matter that the

10:30:01 14  product is going to come back to New York. New York can

10:30:05 15  regulate transactions that take place within its borders.

10:30:09 16  But what it can't do is reach out and dictate the terms of

10:30:12 17  out-of-state commerce.

10:30:13 18       THE COURT: Well, no, no. I get that you're

10:30:15 19  saying that, but so, yeah, if you have a wholly -- the

10:30:21 20  manufacturer to the distributor, and that is occurring

10:30:24 21  somewhere out there, that's fine. What if the thing that

10:30:27 22  the State wants to sue on is against the Delaware licensee

10:30:34 23  who, you know, somehow or another fits into the statute, is

10:30:39 24  that enjoined?

10:30:40 25       MR. ROWEN: So, not under the

10:30:41  1  extraterritoriality claim that we've brought.  No, Your

10:30:43  2  Honor.  So, there the application of the statute would be

10:30:46  3  in-state activity.  Delaware is allowed under the commerce

10:30:49  4  clause to regulate in-state activity consistent with the

10:30:52  5  rest of the Constitution.

10:30:53  6         THE COURT:  Okay.  And so, you know, one of the

10:31:09  7  doctrines that sometimes floats around in constitutional law

10:31:12  8  or maybe actually interpretation of laws is to try to

10:31:17  9  interpret them in a constitutionally allowable way; right?

10:31:23 10         MR. ROWEN:  Yes.

10:31:26 11         THE COURT:  And so, I don't know what

10:31:27 12  Mr. Picollelli is going to say, but what if he says, Well, I

10:31:35 13  don't think the Delaware Supreme Court would interpret

10:31:39 14  these, perhaps on their face, broader portions of SB 302.

10:31:52 15  If he says that, how should I respond to that?

10:31:55 16         MR. ROWEN:  So, in the preliminary injunction

10:31:59 17  posture, I don't think there's a meaningful difference

10:32:01 18  between a ruling that says it would be unconstitutional if

10:32:05 19  it were applied this way and a ruling that says it can't be

10:32:09 20  applied this way.  I mean, I will say, as Your Honor pointed

10:32:13 21  out, there aren't manufacturers in Delaware, and yet, the

10:32:17 22  law on its face applies to manufacturing.

10:32:20 23         THE COURT:  Well, of course, it could be the

10:32:22 24  case, you know, as a fact you say, and I suspect you're

10:32:27 25  right, that manufacturers don't deal directly with anybody

10:32:31  1    in Delaware, but they could.

10:32:34  2            MR. ROWEN:  Oh, so many manufacturers do deal

10:32:36  3    directly with some in Delaware.  I mean, so law enforcement

10:32:41  4    distributors, you know, those types of sales.  And, again,

10:32:45  5    under the commerce clause specifically, transactions that

10:32:47  6    are between an out-of-state entity and a Delaware entity are

10:32:51  7    not wholly out of state.  But my point was simply that

10:32:55  8    because there is either zero or something close to zero

10:32:59  9    manufacturing activity in Delaware, the fact that this

10:33:02 10    statute regulates manufacturing makes me quite skeptical

10:33:06 11    that the Delaware Supreme Court would say there's a

10:33:09 12    textually available limiting construction that this doesn't

10:33:12 13    apply out of state.

10:33:14 14            THE COURT:  Okay.  All right.  Is there anything

10:33:19 15    further you want to say before we take a break, and, I mean,

10:33:23 16    your time is up?

10:33:25 17            MR. ROWEN:  If Your Honor would indulge me one

10:33:27 18    minute on the Second Amendment?

10:33:29 19            THE COURT:  Okay.

10:33:30 20            MR. ROWEN:  So, all that I want to say about

10:33:33 21    that is the Attorney General has argued solely that this law

10:33:39 22    is not subject to the Second Amendment at all.

10:33:42 23            THE COURT:  Right, because it's an individual

10:33:45 24    right to keep and bear arms.

10:33:48 25            MR. ROWEN:  Yes.  And not --

| | |
|---|---|
| 10:33:49 1 | MR. ROWEN:  And that's, in our view, just |
| 10:33:51 2 | squarely foreclosed by Third Circuit precedent.  So, the |
| 10:33:55 3 | very case they rely on is *Robinson Township* -- *Drummond vs.* |
| 10:33:58 4 | *Robinson Township*.  And what the Court there said at the old |
| 10:34:03 5 | step one was -- so, that law involved zoning regulations |
| 10:34:08 6 | that said where sellers and range facilities could operate. |
| 10:34:13 7 | So, they only applied on commercial actors. |
| 10:34:16 8 | And what the Court there said at step one, which |
| 10:34:19 9 | is now the only step after *Bruen* was, Of course, this |
| 10:34:24 10 | implicates the Second Amendment. |
| 10:34:25 11 | THE COURT:  Well, but so I haven't read that |
| 10:34:29 12 | case, but based on what you're saying about it, I take it |
| 10:34:33 13 | that would be saying the regulation is affecting an |
| 10:34:39 14 | individual's right to keep and bear arms -- |
| 10:34:41 15 | MR. ROWEN:  Yes, Your Honor. |
| 10:34:42 16 | THE COURT:  -- because, I don't know, they can't |
| 10:34:44 17 | shoot guns someplace or, I mean, I don't know. |
| 10:34:47 18 | MR. ROWEN:  If you can't acquire a firearm, you |
| 10:34:49 19 | cannot keep or bear one. |
| 10:34:51 20 | THE COURT:  Right.  But how does this prevent |
| 10:34:54 21 | anyone from acquiring a firearm? |
| 10:34:56 22 | MR. ROWEN:  So, taken to its logical conclusion, |
| 10:34:59 23 | if -- you know, the goal of the original suits that led to |
| 10:35:02 24 | the PLCAA to be enacted, you know, the Plaintiff's counsel |
| 10:35:07 25 | were very clear and some of the municipalities were very |

10:35:09  1    clear, they wanted to bankrupt the industry.  So, if those

10:35:12  2    suits were successful, and those suits are the exact

10:35:15  3    precursors to what this statute authorizes, then maybe it

10:35:20  4    wouldn't bankrupt the entire industry, but it certainly

10:35:22  5    would lead to, you know, a lot less firearms commerce.

10:35:28  6            And, you know, what the Court in the *Robinson*

10:35:33  7    *Township* case recognized is, just as we think that, you

10:35:36  8    know, a law that makes it harder for, you know, certain

10:35:40  9    types of publications to publish, you know, putting aside,

10:35:42 10    you know, the publisher's own First Amendment rights, that

10:35:45 11    impacts individuals' First Amendment rights, that this

10:35:49 12    definitely has an infringement on the right of the people to

10:35:53 13    keep and bear arms.  And so, that was the step one holding.

10:35:56 14            And then what they quote from is at step two,

10:36:01 15    which is no longer part of the analysis, but step two was:

10:36:04 16    Is this part of the core of the Second Amendment?  And what

10:36:06 17    the Court said there was, No, it's not part of the core for

10:36:10 18    exactly the reasons Your Honor just said.

10:36:12 19            But the Court went on to invalidate the zoning

10:36:15 20    restrictions under intermediate scrutiny.  They vacated and

10:36:19 21    remanded saying that, at least on the record, it didn't

10:36:21 22    satisfy intermediate scrutiny.  And, again, these were

10:36:25 23    zoning restrictions that applied to commercial actors.

10:36:28 24            And the step one holding is still good law in

10:36:31 25    *Bruen*.  So, under binding Third Circuit precedent, a law

10:36:34 1    like this clearly is within the Second Amendment.  And so,

10:36:38 2    it's the State's burden to come forward with historical

10:36:40 3    analogs.  And they really haven't tried.  What they've done

10:36:44 4    is they've put forward, you know, one declaration that says

10:36:48 5    from a historian who says, I haven't, you know, had enough

10:36:50 6    time to look at this.

10:36:52 7            But public nuisance law is age old.  That's

10:36:56 8    true.  But as the Third Circuit made clear in the *Camden*

10:37:00 9    *County* case, the sorts of public nuisance suits against

10:37:03 10   firearms manufacturers that this law authorizes are not

10:37:06 11   something that's within the, you know, historical tradition

10:37:09 12   of our country's regulation to firearms.

10:37:12 13           So, we think that essentially under binding

10:37:14 14   Third Circuit precedent that, you know, given the State's

10:37:17 15   decision only to rest, you know, or at least largely to rest

10:37:22 16   on this isn't in the Second Amendment, we think because

10:37:24 17   they're wrong about that under binding precedent, that if

10:37:27 18   the Court were to reach that issue that it would -- you

10:37:29 19   know, should find that it violates the Second Amendment.

10:37:31 20           THE COURT:  All right.  Thank you, Mr. Rowen.

10:37:34 21           Okay.  So, we'll take a 15-minute break, and

10:37:40 22   then, Mr. Picollelli, it will be your turn.

10:37:42 23           DEPUTY CLERK:  All rise.

10:37:50 24           (Recess was taken.)

10:54:24 25           DEPUTY CLERK:  All rise.

10:54:24  1                    THE COURT:  All right.  Everyone can be seated.

10:54:26  2                    Mr. Picollelli.

10:54:35  3                    MR. PICOLLELLI:  Good morning, Your Honor.

10:54:36  4       Again, Nick Picollelli.  I represent the Attorney General

10:54:39  5       Jennings in this matter.

10:54:42  6                    Well, I guess I should ask Your Honor, would you

10:54:45  7       also like me to answer preliminary questions first?

10:54:50  8                    THE COURT:  Well, so I think Mr. Rowen agreed

10:54:57  9       with this.  Is this something where basically I should

10:55:02 10       either be granting the preliminary injunction or dismissing

10:55:05 11       the case?  There's really no factual development, one way or

10:55:09 12       the other, so that it's basically a pure question of law?

10:55:16 13                    MR. PICOLLELLI:  I think that's correct, Your

10:55:17 14       Honor.

10:55:18 15                    THE COURT:  Okay.  Thank you.

10:55:26 16                    And I'm sorry if this is a left-field kind of

10:55:30 17       question.  Do you have a sense or do you know what the

10:55:34 18       statute of limitations is for this law?

10:55:37 19                    MR. PICOLLELLI:  I do not know the answer to

10:55:40 20       that question, Your Honor.  I can -- I have the statute with

10:55:42 21       me.  I can try and find it.  I don't think it's in the

10:55:45 22       statute itself, so it would have to be decided with

10:55:48 23       reference to some other maybe general principle.

10:55:52 24                    I just know the Delaware personal injury

10:55:56 25       actions, I think, are a two-year statute of limitations.

10:55:58  1          THE COURT:  All right.  So, one of the things

10:56:03  2   that would be helpful is if you could give me a

10:56:14  3   realistic-sounding hypothetical.  It seems like a

10:56:19  4   contradiction in term, but a realistic hypothetical as to

10:56:23  5   something where SB 302 would apply to a manufacturer.

10:56:29  6          MR. PICOLLELLI:  I was thinking about this

10:56:32  7   during the break, Your Honor.  And I think just knowing some

10:56:37  8   of the manufacturers SIG Sauer and Smith & Wesson, they do

10:56:43  9   some advertising.  And, for instance, this might be an

10:56:47 10   extreme example, but if Smith & Wesson was advertising the

10:56:54 11   strength of their firearms, the particular caliber and the

10:56:58 12   destruction that it could cause in a suicide prevention

10:57:03 13   blog.  And, again, I acknowledge that's a completely

10:57:07 14   out-of-left-field example, but it's one that I think would

10:57:12 15   potentially violate SB 302.

10:57:15 16          THE COURT:  Well, so, it's hard to, honestly,

10:57:23 17   think that a manufacturer would do that on purpose.  Is

10:57:27 18   there some sort of advertising or something else that a

10:57:34 19   manufacturer might realistically expect to do with some

10:57:39 20   degree of intentionality that would be covered by -- that

10:57:47 21   would make them liable under SB 302?

10:57:51 22          MR. PICOLLELLI:  I think it might have been in

10:57:53 23   the Ninth Circuit's *Glock* case, and this is not exactly the

10:57:57 24   example that they use, but what I thought was kind of based

10:58:01 25   on it is if a manufacturer, for instance, knew or had

10:58:07 1    reasonable cause to believe that they were manufacturing

10:58:11 2    more guns than a distributor could possibly sell to, let's

10:58:17 3    say, Delaware's police departments.  So, say there's a

10:58:21 4    hundred officers in Delaware, and they're manufacturing

10:58:24 5    10,000 guns to be sold specifically to Delaware, knowing

10:58:29 6    that they can't possibly use that many firearms.

10:58:32 7          And I think it was the example in the *Glock* case

10:58:35 8    that the manufacturer knew that that meant the officers were

10:58:40 9    selling old inventory on the secondary market and were not

10:58:44 10   being as careful as maybe an FFL would be.  So, I know that

10:58:52 11   includes a lot of knowing requirements, but I think you can

10:58:57 12   take it to an extreme of, you know, say they're selling a

10:59:00 13   million guns to Delaware.  It's not possible to sell that

10:59:07 14   many firearms to legal buyers in Delaware, so there should

10:59:12 15   at least be reasonable cause to believe they might not be

10:59:18 16   going to all legal buyers and could be reasonable cause to

10:59:23 17   believe that it was going to a secondary market that was not

10:59:26 18   following the same practices and procedures that a licensed

10:59:30 19   FFL would be, for instance.

10:59:32 20         THE COURT:  But the secondary market that

10:59:37 21   doesn't follow the same practices and procedures, that's a

10:59:39 22   legal market, isn't it?

10:59:40 23         MR. PICOLLELLI:  In a sense, but I know that

10:59:45 24   some of the gun shows, for instance, were not complete --

10:59:49 25   the private sales between gun owners at one point, I can't

10:59:52  1    say if that's still applicable in Delaware, were not doing

10:59:57  2    federal background checks that are required at a licensed

11:00:02  3    FFL seller.  So, that could be one example where it's

11:00:07  4    technically legal in the sense that no one is breaking the

11:00:11  5    law.  The private seller is not breaking the law by selling

11:00:15  6    without the FBI background check, but it may be unreasonable

11:00:19  7    in the sense that it's impossible for there to be that many

11:00:26  8    eligible gun buyers in the state.

11:00:29  9            So, there should at least be something that's

11:00:32 10    clicking with the manufacturer that there might be something

11:00:35 11    else going on.  And, again, that is an extreme example, Your

11:00:40 12    Honor, and maybe not as particular as some of the other

11:00:44 13    ones.  And that's why I was going to immediately go into the

11:00:48 14    standard of review here because I think it's relevant to

11:00:51 15    that question.  Unless --

11:00:53 16            THE COURT:  All right.  So, let me actually,

11:01:01 17    while we're on the subject of realistic hypotheticals, if

11:01:05 18    you -- for the people who are actually in Delaware, the

11:01:13 19    federal firearms licensees that have a physical location

11:01:17 20    here and sell firearms, I guess, to Delaware citizens, what

11:01:28 21    sort of thing could they be doing that would make them

11:01:33 22    liable under SB 302 besides for selling to people that they

11:01:40 23    know are straw purchasers?

11:01:44 24            MR. PICOLLELLI:  I think one of the examples was

11:01:45 25    not implementing measures to prevent theft at a business

11:01:51 1    where --

11:01:51 2             THE COURT:  So, if they used an easily breakable

11:01:59 3    lock on the front door, didn't have surveillance cameras --

11:02:03 4    I take it surveillance cameras are not required by any law?

11:02:06 5             MR. PICOLLELLI:  Not that I'm aware of, Your

11:02:08 6    Honor.

11:02:08 7             THE COURT:  So, if they didn't have surveillance

11:02:10 8    cameras, and I actually remember from either being a judge

11:02:22 9    on the case or from reading in the newspaper that there have

11:02:26 10   been in the past break-ins of Delaware federal firearms

11:02:30 11   licensees where I think like a hundred guns were stolen.  I

11:02:37 12   don't remember what the circumstances were.

11:02:40 13             But if someone in the judgment of a jury hadn't

11:02:49 14   taken reasonable steps to prevent the theft of firearms,

11:02:56 15   that could be a basis for liability?

11:02:59 16             MR. PICOLLELLI:  And that, I think, leads to the

11:03:03 17   reasonableness standard, again, because a firearms dealer in

11:03:07 18   a low-crime area might not need as many protections against

11:03:12 19   theft that another firearms dealer needs in a very

11:03:17 20   high-crime area or who had been recently burglarized and had

11:03:22 21   their firearm stolen.  If after that, say, they do

11:03:25 22   absolutely nothing that could lead into -- while they're

11:03:29 23   complying with all federal laws on that, it could be

11:03:32 24   unreasonable under SB 302.

11:03:35 25             THE COURT:  But Delaware hasn't taken it upon

11:03:37 1    itself to actually, either by regulation or otherwise, tell

11:03:50 2    licensees in Delaware what the minimum steps they need to

11:03:53 3    take are to reasonably prevent theft; right?

11:04:01 4              MR. PICOLLELLI:  That's correct.  It does give

11:04:03 5    examples in the statute.  I know they were a little bit more

11:04:07 6    specific about like straw purchasers, and it's not an exact

11:04:10 7    you cannot sell to someone doing this thing, but it gives

11:04:15 8    examples --

11:04:15 9              THE COURT:  Which is already the law; right?

11:04:17 10             MR. PICOLLELLI:  Right.  But I believe -- I'm

11:04:21 11   trying to think if it was in the *Amicus* brief about the U.S.

11:04:25 12   Attorney General issuing guidance to FFLs about how to

11:04:30 13   comply with certain laws or training on how to do certain

11:04:35 14   things.  So, even though they're trying to make accurate

11:04:40 15   inputs into whatever reporting requirements, they could

11:04:43 16   actually be trained better on how to do that properly or how

11:04:47 17   to track sales in a better way.  I think that is in the

11:04:53 18   *Amicus* brief.  So, there are guidelines given by other

11:04:55 19   organizations to help with certain things, maybe not every

11:05:00 20   possibility.  And I would think also that the firearms

11:05:04 21   industry would be, I think, more aware or better prepared to

11:05:09 22   know what types of preventative measures it would need to

11:05:14 23   take than the Attorney General.

11:05:15 24             THE COURT:  But, nevertheless, the statute

11:05:17 25   doesn't incorporate by reference the Attorney General's, you

11:05:21 1    know, best firearm practices or whatever the document was

11:05:25 2    called.  And I do remember seeing that in -- I think it

11:05:28 3    probably was the *Amicus* brief, but somewhere.  And whatever

11:05:38 4    industry standards might be out there that aren't already in

11:05:40 5    some regulation, state or federal, I mean, it really -- I

11:05:49 6    guess the point is what is reasonable or not is not subject

11:06:02 7    to any obvious standards for the Delaware-based FFL; right?

11:06:12 8          MR. PICOLLELLI:  I don't believe -- correct.

11:06:16 9    There's no list of things that the AG would consider

11:06:18 10   reasonable specifically for FFLs, but it is consistent with

11:06:25 11   other nuisance laws.  I know traditional common law

11:06:30 12   practices or understandings, which is an issue with the

11:06:35 13   PLCAA, but those terms reasonable and unreasonable are

11:06:39 14   consistently defined in other nuisance statutes.  So, there

11:06:43 15   is meaning, maybe not specifically to FFLs, but those are

11:06:48 16   things courts have pinned them to that will have to pin them

11:06:53 17   to firearms as well.

11:06:55 18          So, just because 20 years ago or a hundred years

11:06:59 19   ago there was nothing about electronics, it doesn't mean

11:07:02 20   that a judge now can't find that certain types of electronic

11:07:08 21   missions aren't a nuisance under Delaware's general nuisance

11:07:11 22   law, for instance.  So, it's not incapable of being applied

11:07:14 23   and has been applied in all other instances under general

11:07:18 24   nuisance law.  So, those terms are defined as just up to a

11:07:22 25   Delaware Court to define them in the context of firearms.

11:07:28  1          THE COURT:  All right.  I did have a couple more

11:07:31  2   questions here.

11:07:33  3          So, do you agree that the definition of probable

11:07:47  4   cause that's in SB 302 can't set the standard -- probable

11:07:56  5   cause, that's not the right phrase.  Proximate cause, sorry.

11:08:01  6   I can give away my background here.

11:08:03  7          That their definition in the statute in SB 302

11:08:08  8   of proximate cause can't expand the scope of proximate cause

11:08:15  9   beyond whatever that term means in the PLCAA?

11:08:20 10          MR. PICOLLELLI:  I think I follow Your Honor's

11:08:23 11   reasoning.  The PLCAA incorporates the federal common law

11:08:28 12   standard of proximate cause.  Delaware's SB 302 would not be

11:08:33 13   able to extend beyond that.

11:08:35 14          Now, how that's exactly defined, proximate

11:08:38 15   cause, under the federal common law as its applied to the

11:08:42 16   PLCAA is another issue in itself.  I know courts in other

11:08:47 17   areas have had difficulty defining that exact --

11:08:50 18          THE COURT:  Well --

11:08:51 19          MR. PICOLLELLI:  Yes.

11:08:52 20          THE COURT:  That's right.  And I'm not -- you

11:08:55 21   know, defining exactly what proximate cause is, it's a

11:08:58 22   challenge.  But Delaware can't expand the concept to go

11:09:05 23   beyond whatever it means in the PLCAA, and I think you're

11:09:10 24   agreeing with me on that?

11:09:12 25          MR. PICOLLELLI:  Yes, Your Honor.  And I don't

11:09:13 1    think it does.

11:09:15 2              THE COURT:  Okay.  Well, that's a separate

11:09:17 3    issue, but I don't think that's necessarily one that has to

11:09:26 4    be decided for the sake of the current dispute.

11:09:33 5              Hold on a minute.  So, a different actually way

11:09:48 6    of saying that is to the extent somewhere down the road SB

11:09:55 7    302 was understood to have broadened the meaning of

11:10:02 8    proximate cause beyond what's in the PLCAA, whatever that

11:10:09 9    broadening is that would be preempted; right?

11:10:13 10             MR. PICOLLELLI:  I think.  Yes, Your Honor.

11:10:15 11             THE COURT:  Okay.  So, in terms of SB 302, and

11:10:25 12   I'm going to ask this open ended, but I may have some more

11:10:28 13   specific examples down the road.

11:10:30 14             Do you think that you and the Plaintiffs here

11:10:38 15   have any materially different interpretations of what's

11:10:43 16   covered by SB 302?

11:10:45 17             MR. PICOLLELLI:  I can't think of one, Your

11:10:53 18   Honor, and it's difficult because the courts haven't applied

11:10:57 19   it yet.  So, I think our plain reading of the statute is

11:11:01 20   probably the same at this point.

11:11:03 21             THE COURT:  Well, so one of the questions about

11:11:06 22   plain reading would be what I think would be what state of

11:11:14 23   mind has to be proven to hold somebody liable under SB 302,

11:11:28 24   and whether SB 302 has any state of minds that essentially

11:11:35 25   are less than what's in the PLCAA's exceptions.  It's very

11:11:47  1    hard to talk about this and keep all this stuff straight in

11:11:53  2    one's mind.

11:11:55  3             So, what would you say is the state of mind

11:12:01  4    required for SB 302 to apply to a manufacturer or a seller?

11:12:08  5             MR. PICOLLELLI:  It's knowing or reasonable

11:12:10  6    cause to believe, I believe it is.

11:12:13  7             THE COURT:  So, that's in SB 302?

11:12:15  8             MR. PICOLLELLI:  I'm sorry.  I'm thinking of the

11:12:21  9    PLCAA.

11:12:22 10             THE COURT:  Yeah, that's what I thought.

11:12:24 11             MR. PICOLLELLI:  Knowingly or recklessly create.

11:12:30 12             THE COURT:  Okay.  And so, recklessly is

11:12:36 13    essentially, and I may not have this right, but you would

11:12:40 14    agree that that's something like disregarding a known risk?

11:12:49 15             MR. PICOLLELLI:  Disregarding a known risk or I

11:12:54 16    believe having information that should lead you to conclude

11:12:58 17    that it's a risk.  I believe that's --

11:13:03 18             THE COURT:  Yeah.

11:13:03 19             MR. ROWEN:  It's above negligent.

11:13:05 20             THE COURT:  I think those two are pretty close.

11:13:09 21    I mean, but so does the PLCAA permit -- so, the PLCAA

11:13:22 22    certainly says knowingly violates.  How would reckless, in

11:13:32 23    SB 302, how would that be consistent with knowingly violates

11:13:41 24    in the PLCAA?  Because I take it if recklessly is a lesser

11:13:49 25    requirement, than knowingly violates, it's preempted; right?

11:13:54  1           MR. PICOLLELLI:  No, Your Honor.  Just based on

11:13:57  2     the second predicate exception, having the language

11:14:01  3     reasonable cause to believe, that, according to our

11:14:07  4     interpretation, is less than knowingly.  And so, it's a

11:14:13  5     non-exhaustive list of examples.  And within those examples

11:14:18  6     shows that you can have a lesser scienter requirement.

11:14:22  7           So, SB 302, yes, recklessly is a lower standard

11:14:28  8     than knowingly, but it's still what PLCAA contemplates, a

11:14:34  9     lesser scienter requirement within the statute itself.

11:14:39 10           THE COURT:  But isn't that sort of what I asked

11:14:43 11     Mr. Rowen?  Doesn't that subsection as a whole make it clear

11:14:50 12     that, in fact, while there's some fact that you just have to

11:14:57 13     have reasonable cause to believe in that particular example,

11:15:01 14     you, in fact, have to have knowledge that you're aiding and

11:15:08 15     abetting or conspiring with another person to do something?

11:15:14 16     Isn't that a knowledge requirement?  And the reasonable

11:15:18 17     cause to believe that the ultimate -- the actual buyer is a

11:15:24 18     prohibited person, that's just an additional requirement.

11:15:29 19           MR. PICOLLELLI:  I think they are two separate

11:15:32 20     requirements.  As Your Honor mentioned, with aiding and

11:15:36 21     abetting, having a more intentional mindset under criminal

11:15:40 22     law.  But because there is that distinction between the two,

11:15:45 23     he doesn't have to know that that third party is an

11:15:52 24     ineligible member to buy a firearm.  He just has to --

11:15:55 25           THE COURT:  Right.  He doesn't have to know, he

11:15:57 1    just has to have reasonable cause to believe.  But there's

11:16:00 2    two parties besides for the seller, or yeah, the seller,

11:16:05 3    there is, as Mr. Rowen agreed, and there is a -- you know,

11:16:13 4    there's three parties involved in example two.  There's the

11:16:15 5    seller.  There's the other person.  And then there's the

11:16:19 6    actual buyer; right?

11:16:20 7                    MR. PICOLLELLI:  Right.

11:16:21 8                    THE COURT:  And so, the knowledge requirement is

11:16:24 9    you have to know that that other person is essentially a

11:16:34 10   straw purchaser; right?

11:16:36 11                   MR. PICOLLELLI:  The middle person, you would --

11:16:39 12   with the aided and abetted standards, you would have to know

11:16:44 13   that it's a straw purchaser.

11:16:45 14                   THE COURT:  So, there's the knowledge

11:16:46 15   requirement.  So, to say that Roman Numeral II, that that

11:16:58 16   example involves a lesser standard than knowingly, if you've

11:17:06 17   got a knowledge requirement, it's not a lesser standard than

11:17:10 18   knowingly.

11:17:12 19                   MR. PICOLLELLI:  Well, I think you can separate

11:17:14 20   out the two.  You may have to know that the straw purchaser

11:17:18 21   is a straw purchaser, but then there's the separate standard

11:17:22 22   of having to know or having reasonable cause to believe that

11:17:25 23   the ultimate buyer is unqualified to possess a firearm.

11:17:30 24                   So, I do agree in one sense that there may be a

11:17:33 25   knowing requirement to the straw purchaser, but it still

11:17:38  1   includes a different knowledge requirement or scienter

11:17:41  2   requirement to the ultimate buyer.  So, I think that's

11:17:45  3   enough to at least find some ambiguity in the language to

11:17:49  4   survive review here.

11:17:53  5           I would say it's you can have a lesser scienter

11:17:56  6   requirement under that example, but also that leads into the

11:18:01  7   standard of review that we're at at this stage as well.

11:18:04  8           THE COURT:  All right.  We'll get there in a

11:18:06  9   minute.

11:18:06 10           So, but going back to SB 302, what is it that SB

11:18:17 11   302, what is it that it requires of the, let's call it,

11:18:22 12   firearms industry participant, that it knowing or recklessly

11:18:30 13   does or what is it that it's -- let's just skip the

11:18:34 14   recklessly for a second.  What does it have to know when

11:18:37 15   it's knowingly in order to fall within the statute?

11:18:41 16           MR. PICOLLELLI:  Having actual knowledge of, I

11:18:46 17   think the easiest example is a straw purchaser to a

11:18:50 18   manufacturer down.  I think the -- I'm trying to think of

11:18:54 19   the exact example.  Having a manufacturer that knows a

11:19:02 20   seller frequently permits straw purchases, that could

11:19:09 21   impune -- that knowing portion of it could trigger SB 302

11:19:14 22   even though the manufacturer is not technically committing

11:19:18 23   any crime.

11:19:21 24           THE COURT:  Okay.

11:19:24 25           MR. PICOLLELLI:  For instance, frequently the

11:19:26 1    seller doesn't employ measures that other sellers in the

11:19:30 2    industry use and has, therefore, led to frequent break-ins,

11:19:35 3    something like that.

11:19:37 4          THE COURT:  And this may not really be a

11:19:44 5    question for today, but how would a manufacturer know that

11:19:48 6    sort of thing?

11:19:50 7          MR. PICOLLELLI:  I know it's possible because of

11:19:56 8    the Ninth Circuit's *Glock* decision.  There were higher-up

11:20:01 9    levels in the chain that had actual knowledge of certain

11:20:05 10   secondary markets that were being created where illegal guns

11:20:08 11   were being sold.

11:20:11 12         So, there was information somehow that was

11:20:14 13   passed up that they knew or had -- I think in the Ninth

11:20:19 14   Circuit *Glock* case, they did.  They actually knew that

11:20:21 15   things were -- there was a secondary illegal market

11:20:24 16   essentially being created because of the distribution

11:20:29 17   measures that they were employing.

11:20:32 18         THE COURT:  So, is it the State's position that

11:20:42 19   the circumstances under which SB 302 would apply are few and

11:21:03 20   far between?

11:21:04 21         MR. PICOLLELLI:  To a manufacturer, I think it

11:21:08 22   would -- there may be less times that it would apply because

11:21:13 23   for it to be reasonably foreseeable that they didn't employ

11:21:22 24   proper measures that ultimately led to a suit being filed, I

11:21:28 25   think it's more difficult at the manufacturer level than it

11:21:30  1    would be at the seller level in Delaware, for instance.

11:21:36  2    Because the chain example of, you know, manufacturer going

11:21:41  3    to a distributor going to maybe another distributor to a

11:21:45  4    seller and then ultimately being sold, there's a potential

11:21:48  5    for it to not be reasonably foreseeable that something that

11:21:53  6    occurred down at one end of the chain could impune liability

11:22:01  7    on the manufacturer, for instance.  But there are acts by

11:22:04  8    the manufacturer itself that could trigger SB 302.

11:22:10  9         THE COURT:  And so far the only act that I think

11:22:14 10    you've suggested is either advertising guns to a suicide

11:22:19 11    prevention group, and would that be they're just out there

11:22:25 12    on the Internet or would that be, you know, targeted

11:22:30 13    advertising just to that group?

11:22:33 14         MR. PICOLLELLI:  Targeted advertising or perhaps

11:22:36 15    general advertising, but they are eventually told:  Do you

11:22:39 16    know that your guns are being advertised on this blog or --

11:22:45 17         THE COURT:  How would --

11:22:51 18         MR. PICOLLELLI:  And I understand that's not

11:22:53 19    very --

11:22:53 20         THE COURT:  I mean, I get advertising because I

11:22:56 21    once showed interest in buying a particular product, which

11:22:59 22    is legal.  I'm still two years later getting advertisements

11:23:05 23    because Google or somebody has figured I'm interested in

11:23:08 24    this particular product.  And I would guess, I don't think

11:23:14 25    it's unreasonable, that people who are considering suicide

11:23:17  1    might be actually looking up guns on the Internet.

11:23:23  2    Hopefully they wouldn't take the next step, but, you know,

11:23:28  3    if you have that state of mind, you might be exploring ways

11:23:34  4    to end your life.

11:23:36  5            And if Google then spends the next two years

11:23:39  6    sending gun advertisements to that person, and then they,

11:23:44  7    you know, a year later, unfortunately, go out and buy a gun

11:23:49  8    and kill themselves, is the manufacturer or anybody in the

11:23:55  9    firearms industry actually responsible for that under SB

11:23:59 10    302?

11:23:59 11            MR. PICOLLELLI:  I think that's a difficult

11:24:01 12    question to answer, but that would play into the

11:24:06 13    foreseeability argument.  So, if *Glock* was specifically,

11:24:12 14    with no other reason, advertising to the suicide blog, that

11:24:16 15    might be a little bit more foreseeable that they're not

11:24:19 16    using reasonable practices.

11:24:21 17            THE COURT:  Well, what kind of reasonable

11:24:23 18    practice would prevent Google from inundating this

11:24:29 19    unfortunate person with firearm ads?

11:24:31 20            MR. PICOLLELLI:  Well, in that case, it may be

11:24:33 21    less foreseeable that Glock's actions specifically caused

11:24:38 22    the death down the line.  If there's multiple intermediaries

11:24:42 23    that Glock has control over, doesn't have knowledge that

11:24:45 24    Google is doing this, has no reason to follow up with Google

11:24:50 25    about this, but say Glock gets information that they're

11:24:55 1  being advertised by Google to the suicide blog, then that

11:24:59 2  point may trigger them to step in and employ reasonable

11:25:03 3  measures to prevent that.

11:25:04 4      They can call Google and say, Stop advertising

11:25:07 5  our products to this website or this type of website.

11:25:10 6      THE COURT:  Would they have to threaten to sue

11:25:13 7  Google?

11:25:14 8      MR. PICOLLELLI:  I think it's a potential.  But

11:25:17 9  in that case if they say, Google, take this down, and Google

11:25:21 10  doesn't do it that, again, leads to who's responsible -- in

11:25:25 11  that case, Google would probably be responsible versus Glock

11:25:30 12  because they're employing reasonable measures to try to have

11:25:33 13  it removed.  And I think that's up to a Delaware judge to

11:25:36 14  decide whether they did enough under SB 302 to prevent that.

11:25:43 15      THE COURT:  So, let's just put that to the side

11:25:46 16  for a minute.  I understand very reasonably there are

11:25:55 17  certain things that are not within your authority to agree

11:26:01 18  to today.  But I'm wondering, it occurs to me that one of

11:26:06 19  the things that may be something that you would have looked

11:26:12 20  into before today and that you may be in a place to answer

11:26:19 21  is:  Does the Attorney General have any particular plans to

11:26:27 22  enforce this statute any time in the near future?

11:26:33 23      I'm not asking, you know, what's the case, but

11:26:36 24  is there something that the Attorney General is developing

11:26:46 25  as the case?

11:26:48  1          MR. PICOLLELLI:  I think the only thing I can

11:26:53  2   say on that is that SB 302 is not preventing the Attorney

11:26:57  3   General from pursuing anything under the statute, or this

11:27:01  4   case is not preventing the Attorney General from pursuing

11:27:04  5   any cases under SB 302.  I think that's all I can probably

11:27:08  6   say.

11:27:09  7          THE COURT:  Okay.  And that's all you can

11:27:11  8   probably say because that's all you know, or that's all you

11:27:14  9   can probably say because confidentiality or, you know, other

11:27:22 10   concerns like that?

11:27:23 11          MR. PICOLLELLI:  Confidentiality, Your Honor.  I

11:27:26 12   don't know the status of -- I don't think I can reveal any

11:27:31 13   more than that, Your Honor.

11:27:31 14          THE COURT:  Okay.  All right.

11:27:49 15          Do you agree -- you know, in your brief, you

11:27:54 16   pointed out very reasonably that there had been no suits

11:28:07 17   under SB 302 at the time you wrote the brief.  And I assume

11:28:14 18   that that's still true as of today, because if it was not

11:28:17 19   true, Mr. Rowen at least would know about that and would

11:28:20 20   have told me about that.

11:28:25 21          But the way such a suit would develop, it would

11:28:31 22   take time, right, because it is not retroactive.  So, it

11:28:35 23   would have to be something where whoever was sought to be

11:28:39 24   held liable had done something after June 30th of 2022 to

11:28:45 25   have a shot -- that's a poor example -- to have a chance

11:28:49 1    of -- to have a reason to sue?

11:28:53 2            MR. PICOLLELLI:  I think, at a minimum, Your

11:28:54 3    Honor, our office would have to issue a subpoena to, I don't

11:28:58 4    know, say, Cabela's or something.  Maybe there was suspicion

11:29:02 5    of some practices that they weren't doing properly.  So, the

11:29:06 6    most direct way would probably be a subpoena as part of an

11:29:11 7    investigation.

11:29:12 8            THE COURT:  But unless it's something that

11:29:14 9    happened after June 30th of 2022, it wouldn't even be

11:29:21 10   subject to the administrative subpoena process or anything

11:29:27 11   else; right?

11:29:28 12           MR. PICOLLELLI:  That's correct.

11:29:29 13           THE COURT:  And I guess, I think, the SB 302 has

11:29:39 14   two provisions, which I think are little (b) and little (c).

11:29:48 15   And the administrative subpoena you were talking about to

11:29:56 16   Cabela's, Mr. Picollelli, that's really most likely to be

11:30:00 17   something that would be directed at little (c); right?

11:30:03 18           MR. PICOLLELLI:  I think it's certainly more

11:30:16 19   applicable, but I could see it applying to subsection (b) as

11:30:21 20   well.

11:30:21 21           THE COURT:  Well, no, no, no.  And so, yes, I

11:30:24 22   think that's right, but an administrative subpoena relating

11:30:29 23   to subsection (b) would be, I'm guessing, something where

11:30:38 24   there's been some bad thing that's happened, whereas an

11:30:43 25   administrative subpoena under section (c) could essentially

11:30:47  1    just be the Attorney General checking up on a known federal

11:30:53  2    firearms licensee located in Delaware; right?

11:30:57  3                MR. PICOLLELLI:  That's true.

11:30:59  4                THE COURT:  And you know, I should have asked

11:31:02  5    this of Mr. Rowen, but let me ask it of you, and he can tell

11:31:07  6    me.  You know, I've been concentrating, I think, on

11:31:19  7    subsection (b), and I guess actually the logic of -- I mean,

11:31:40  8    the preemption logic, that doesn't even apply to subsection

11:31:46  9    (c), does it; right?

11:31:54 10                Because what the PLCAA is talking about is

11:31:57 11    lawsuits.  So, subsection (c) saying a firearm industry

11:32:03 12    member, you know, maybe there's a commerce clause problem

11:32:08 13    with it, but there's no preemption problem with it because

11:32:14 14    all it does is say implement reasonable controls.  And

11:32:18 15    nothing in the PLCAA says that Delaware can't do that law;

11:32:25 16    right?

11:32:25 17                MR. PICOLLELLI:  Well, I hate to benefit my

11:32:29 18    colleague, but I think the Attorney General could sue to

11:32:33 19    enjoin Cabela's for not implementing these controls.

11:32:44 20                THE COURT:  All right.  But there would be no

11:32:48 21    damages, that would be essentially an injunctive relief kind

11:32:51 22    of thing.  Maybe attorneys' fees, firearms fees, but there

11:32:58 23    wouldn't be any damages; right?

11:33:00 24                MR. PICOLLELLI:  I don't believe so, Your Honor.

11:33:04 25                THE COURT:  And let me -- just hold on a second.

11:33:06  1    Mr. Rowen, I don't need a long answer, but your arguments,

11:33:12  2    do they apply to both (b) and (c) equally, or are they

11:33:15  3    mostly -- a lot of these applying to (b)?

11:33:18  4            MR. ROWEN:  They apply to (b) and (c) equally,

11:33:21  5    Your Honor.  And the way this works under the statute is

11:33:23  6    subsection (d) makes a violation of both (b) and (c), a

11:33:28  7    public nuisance.  And then (f) and (g) authorize the

11:33:32  8    Attorney General and private parties respectively to bring

11:33:35  9    suit alleging a violation of one of those two provisions.

11:33:40 10            So, indeed -- so, operation for purposes of

11:33:44 11    preemption is exactly the same.  They're just different ways

11:33:46 12    of violating what this provides as a public nuisance.

11:33:54 13            MR. PICOLLELLI:  And Your Honor --

11:33:54 14            THE COURT:  Right.  Okay.  Thank you.

11:33:56 15            Mr. Picollelli.

11:33:56 16            MR. PICOLLELLI:  Again, I hate to help the other

11:34:00 17    side, but I do see here an order abating the nuisance at the

11:34:04 18    expense of the firearm industry member.  So, there could be,

11:34:09 19    in the sense of a penalty, monetary penalty in some sense of

11:34:13 20    the word.

11:34:14 21            THE COURT:  All right.  So, could the Attorney

11:34:24 22    General -- has the Attorney General's regulation -- does

11:34:26 23    subsection (c) mean that Ruger, wherever they manufacture

11:34:35 24    firearms, which we know is not Delaware, do they have to

11:34:41 25    establish and implement reasonable controls?  Let's say they

11:34:47  1    do that in Connecticut.  Would they have to establish those

11:34:53  2    things in Connecticut?  And if they don't, then Delaware can

11:34:58  3    sue them here?

11:35:00  4            MR. PICOLLELLI:  Yes, under the limitation that

11:35:04  5    it has to be reasonably foreseeable that their products

11:35:10  6    would end up in Delaware.  And then also --

11:35:13  7            THE COURT:  I think Ruger firearms are

11:35:15  8    ubiquitous across the country.

11:35:17  9            MR. PICOLLELLI:  And it does implicate issues of

11:35:21 10    standing as well.  The statute doesn't eliminate that

11:35:26 11    analysis.

11:35:27 12            THE COURT:  Standing, but the statute gives

11:35:30 13    Delaware the ability to regulate the Ruger plant in

11:35:35 14    Connecticut.  Let's assume it is in Connecticut.  And so, if

11:35:45 15    Ruger doesn't do that, what, doesn't the Attorney General

11:35:48 16    have standing to enforce this law?

11:35:50 17            MR. PICOLLELLI:  For a manufacturer wholly

11:35:56 18    outside of Delaware, I just know it would present standing

11:36:00 19    issues because it's not like they can -- well, I'm not sure

11:36:09 20    I can exactly answer it, Your Honor.  Again, the reasonably

11:36:13 21    foreseeable analysis on that, as well as other traditional

11:36:18 22    Constitutional limitations, would still apply.

11:36:20 23            THE COURT:  But, I mean, subsection (c) says a

11:36:27 24    firearm industry member shall establish and implement

11:36:33 25    reasonable controls regarding the manufacture, sale, blah,

11:36:37 1    blah of the firearm industry members firearm-related

11:36:40 2    products.  It says nothing there about reasonable

11:36:42 3    foreseeability or really anything else.

11:36:50 4              And then it says, the next thing says, A

11:36:52 5    violation of subsection (c) is a public nuisance.  Is

11:37:05 6    there --

11:37:06 7              MR. PICOLLELLI:  I think that leads to

11:37:08 8    subsection (e), Your Honor, which doesn't specify between

11:37:11 9    the two once it's found to be a public nuisance.  It has to

11:37:18 10   still constitute a proximate cause of the public nuisance

11:37:24 11   and whether -- if the harm to the public is reasonably

11:37:27 12   foreseeable an effect of that conduct.

11:37:31 13             THE COURT:  Notwithstanding any intervening

11:37:33 14   actions, including criminal actions by third parties -- hold

11:37:54 15   on a minute.

11:37:55 16             So, subsection (b) has the words public nuisance

11:40:36 17   in the subsection.  Subsection (c) does not.  So, I would

11:40:47 18   take it that the reasonable interpretation of subsection (c)

11:40:56 19   is -- of subsection (d) is that, by definition, subsection

11:41:14 20   (c), if that's violated, that's a public nuisance.  I

11:41:23 21   understand your position.

11:41:25 22             Mr. Rowen, am I wrong about that?

11:41:27 23             MR. ROWEN:  No, Your Honor.  Subsection (c), if

11:41:29 24   that were violated, would be a public nuisance.  So, the

11:41:33 25   words public nuisance are only used in subsection (b), not

11:41:36 1    subsection (c).  So, if you look to subsection (a)(5), that

11:41:40 2    defines public nuisance, and I think that that definitional

11:41:44 3    section is limited to the words public nuisance in

11:41:48 4    subsection (b).  It's the only way that that makes sense

11:41:52 5    because, of course, subsection (d) deems a violation of (b)

11:41:56 6    or (c) to be a public nuisance.

11:41:58 7            So, the way that we read the statute is the many

11:42:02 8    words in (a)(5) that define public nuisance are essentially

11:42:08 9    transposed into (b).  But the thing that is, you know, the

11:42:13 10   tort here essentially, the public nuisance, is a violation

11:42:16 11   of (b) or (c).  And that's under subsection (d).

11:42:23 12           THE COURT:  All right.  And maybe that

11:42:27 13   difference in interpretation has something to do with the

11:42:35 14   arguments about extraterritoriality, because if my instinct

11:42:47 15   is right, then (c) actually is providing for the Attorney

11:42:52 16   General's regulation of reasonable controls of firearm

11:42:58 17   industry members throughout the country.

11:43:00 18           That's your point; right, Mr. Rowen?

11:43:03 19           MR. ROWEN:  Yes, Your Honor.  I think (b) does

11:43:05 20   the same, and I mean, it's less obvious.  But so, you know,

11:43:10 21   (c) essentially invites exactly the sort of actions that

11:43:13 22   were brought in the *Legato Vapors* case that we cited wherein

11:43:19 23   Indiana passed a statute that regulated all sorts of

11:43:21 24   practices for the manufacturing of vapor e-liquids for

11:43:25 25   out-of-state facilities.

11:43:26 1          And the Court there said, No, of course, we

11:43:28 2   don't think that's an out-of-state violation of the state.

11:43:30 3   Just because there's fallback concerning one in another

11:43:32 4   state, it doesn't give, you know, this state the authority

11:43:34 5   to regulate out-of-state manufacturing.

11:43:36 6          And subsection (b), while it's less obvious how

11:43:40 7   it would work, I think it's telling the example that my

11:43:43 8   friend gave as to a thing they think could apply to a

11:43:46 9   manufacturer.  And so, he said essentially the allegations

11:43:49 10  in the *Ileto* case were that manufacturer knew that it

11:43:53 11  produced more firearms than could be --

11:43:55 12         THE COURT:  This is what he's calling the *Glock*

11:43:56 13  case?

11:43:57 14         MR. ROWEN:  Right.  *Ileto vs. Glock*.  Those were

11:44:00 15  just allegations.  That case never went past the motion to

11:44:02 16  dismiss stage.  And the Ninth Circuit there held that that

11:44:05 17  actually was preempted by the PLCAA.  And the only

11:44:08 18  difference between the law issue there and the law issue

11:44:13 19  here is that this one is explicit that it applies to firearm

11:44:17 20  sellers and manufacturers.

11:44:18 21         THE COURT:  All right.  Thank you, Mr. Rowen.

11:44:23 22         All right.  Mr. Picollelli, but to make sure,

11:44:26 23  because I think I understand Mr. Rowen's position, your

11:44:29 24  position is that subsection (c) is only a public nuisance if

11:44:45 25  it also incorporates the definition in (5) where it says,

11:44:55  1   Public nuisance means a condition which injures, endangers

11:45:00  2   or threatens to injure or endanger or contributes to an

11:45:02  3   injury or endangerment of health, safety, peace, comfort or

11:45:05  4   convenience of others, or otherwise constitutes the public

11:45:09  5   nuisance under common law?

11:45:13  6          Am I being fair to you there?

11:45:15  7          MR. PICOLLELLI:  I understand the point.  Just

11:45:18  8   looking at the plain language of subsection (d), just a

11:45:22  9   violation of (c) is a public nuisance.  So, by that

11:45:27 10   language, it doesn't technically have to meet subsection

11:45:33 11   (a)(5)'s definition.  It just labels it a public nuisance.

11:45:39 12          THE COURT:  All right.  So, then basically the

11:45:43 13   Attorney General could, for lack of a better word, follow up

11:45:53 14   and bring suit about any manufacturer, distributor, even a

11:46:07 15   point-of-sale sort of operation to see whether or not

11:46:13 16   they're establishing the reasonable controls the statute

11:46:16 17   requires?

11:46:17 18          MR. PICOLLELLI:  I think that's correct, Your

11:46:23 19   Honor.

11:46:23 20          THE COURT:  All right.  Thank you.

11:46:26 21          Okay.  All right.  I think that's pretty much

11:47:21 22   all the questions I can think of in relation to preemption.

11:47:28 23   So, if there's anything else you want to say about

11:47:30 24   preemption, go ahead.  Otherwise, maybe you could address

11:47:36 25   the constitutional issues that Mr. Rowen has discussed.

11:47:41 1          MR. PICOLLELLI:  Your Honor, certainly I would

11:47:43 2   like, if it's okay with Your Honor, to discuss the standard

11:47:48 3   of review.

11:47:48 4          THE COURT:  Oh, yeah, yeah.  I'm sorry.  I've

11:47:50 5   been telling you forever that you'll get to do that, and yet

11:47:53 6   I've resolutely blocked you from doing that.  Go ahead.

11:47:56 7          MR. PICOLLELLI:  Thank you.  And it's just very

11:47:58 8   important in this context to recognize that this is a facial

11:48:03 9   challenge, even though it's been labeled as an as-applied

11:48:06 10  challenge in some circumstance.  But the text of the request

11:48:11 11  for relief frames it alternatively asking for the statute to

11:48:16 12  be overturned completely, blocked completely or and then, in

11:48:22 13  the alternative, just to Plaintiffs.  But Plaintiffs, Your

11:48:28 14  Honor, recognize constitute a pretty large group, at least

11:48:33 15  9,000 plus, 9,500 members, which certainly probably doesn't

11:48:36 16  cover every seller in the United States, but --

11:48:40 17         THE COURT:  I mean, I would imagine there's a

11:48:45 18  hundred thousand federally firearm licensed

11:48:51 19  point-of-sale-type organizations.  But however many there

11:48:55 20  are, there are a lot more than 9,500.

11:48:57 21         MR. PICOLLELLI:  Yes, but I think in the

11:49:00 22  manufacturer-distributor aspects of things that it probably

11:49:04 23  more than likely makes up the majority, if not all of them.

11:49:10 24  And, also, in the Complaint, not having a specific

11:49:15 25  allegation of marketing or distributing that Plaintiff is

11:49:21  1    concerned about, only relying on the text of SB 302 just

11:49:28  2    further affirms that it is, in essence, a facial challenge.

11:49:33  3            And that's important because the standard is

11:49:35  4    much more difficult to satisfy than an as-applied challenge.

11:49:40  5    There must be no set of circumstances under which SB 302

11:49:45  6    would be valid.  And I know the standard is a little bit

11:49:48  7    different for the First Amendment.  There must be a

11:49:54  8    substantial number of SB 302's applications that are

11:49:57  9    unconstitutional judged in relation to the laws of plainly

11:50:02 10    legitimate sweep.

11:50:03 11            I think either way the standard is more

11:50:06 12    difficult than we've even been discussing.  Some of the

11:50:10 13    examples are, you know, the extreme ones.  But that's

11:50:13 14    important because it has to -- you have to show that there's

11:50:17 15    no possibility that this law would apply, would be --

11:50:22 16            THE COURT:  Well, I think you said a minute ago

11:50:27 17    something like -- so, other than the sorts of things

11:51:02 18    involving a straw purchaser and a seller, it seems to me,

11:51:13 19    maybe this is not being fair to you, but it seems to me that

11:51:18 20    it's pretty hard to articulate a plausible theory of

11:51:29 21    liability that would not seem to be preempted or

11:51:47 22    unconstitutional.  And that the various -- I mean, the great

11:52:09 23    bulk of whoever the Plaintiffs are are people who have

11:52:14 24    pretty good claims that this law cannot be applied to them.

11:52:20 25    And there's a much smaller set of people of firearms dealers

11:52:24 1   actually in Delaware that probably are in a less good

11:52:28 2   position.

11:52:31 3          Do you think the facial challenge -- let's

11:52:34 4   assume, for the sake of argument, that I said, Yeah, a lot

11:52:38 5   of this could be applied to Delaware-based firearms dealers,

11:52:46 6   but that it couldn't be applied to pretty much anybody else.

11:52:54 7   Would that be, well, then there's no set of circumstances,

11:52:57 8   because even though the law purports to cover the whole

11:53:00 9   country, it actually covers the, you know, .3 percent of the

11:53:12 10  country that is Delaware, so that's enough?

11:53:16 11         MR. PICOLLELLI:  I think just based on the

11:53:18 12  standard of a facial challenge.  So, that's why it starts

11:53:22 13  bleeding into the an as-applied challenge when you're

11:53:25 14  talking specifically about one group of people.  And to

11:53:29 15  bring an as-applied challenge, there should be specific

11:53:33 16  facts that are being questioned under the law, not just that

11:53:37 17  it's unconstitutional on its face.

11:53:39 18         THE COURT:  I mean, for example, the Attorney

11:53:42 19  General issues an administrative subpoena to Ruger, and then

11:53:48 20  Ruger is in Court the next day.  That would be a preferred

11:53:51 21  scenario for this sort of thing?

11:53:53 22         MR. PICOLLELLI:  Yes, Your Honor.  And that's

11:53:55 23  based on U.S. Supreme Court's precedent saying that it

11:53:59 24  highly disfavors facial challenges because you are

11:54:04 25  invalidating a law, even though basically saying there's no

11:54:08  1    way that this is constitutional whatsoever under any

11:54:11  2    circumstance.  I think it's a very difficult standard to

11:54:15  3    meet when we have at least identified some applications of

11:54:20  4    it.

11:54:22  5            THE COURT:  In the New Jersey case which, as I

11:54:31  6    said, I did read, but it's essentially escaping me right

11:54:41  7    now, obviously, the Court there said that it was -- the

11:54:48  8    Court did there say it was facially unconstitutional to New

11:54:51  9    Jersey's law; right?

11:54:52 10            MR. PICOLLELLI:  Right.

11:54:53 11            THE COURT:  So, what was wrong with the District

11:54:58 12    Court's analysis there?

11:54:59 13            MR. PICOLLELLI:  From my recollection, the Court

11:55:03 14    didn't go into much analysis on whether there was any

11:55:08 15    potential applications of New Jersey's law.  Kind of

11:55:13 16    shortcutted it, said that the law is unconstitutional on its

11:55:16 17    face, but I don't believe that the Court applied the facial

11:55:21 18    analysis correctly.

11:55:25 19            THE COURT:  Okay.  And so, the way that you

11:55:39 20    would say -- so, earlier when I was talking about:  Is this

11:55:51 21    a question of law, the as-applied challenge, in your view,

11:56:02 22    that would require some facts that we don't have right now?

11:56:07 23            MR. PICOLLELLI:  Some facts, yes, Your Honor.

11:56:09 24            THE COURT:  And so, would your view be that I

11:56:18 25    should be dismissing -- you know, denying the preliminary

11:56:23  1    injunction and dismissing without prejudice to an as-applied

11:56:28  2    challenge?

11:56:28  3                MR. PICOLLELLI:  That does make sense because if

11:56:34  4    a new complaint was filed, Amended Complaint was filed with

11:56:37  5    specific allegations that the Plaintiff, you know, is

11:56:43  6    concerned and intends to employ under traditional standing

11:56:50  7    while --

11:56:51  8                THE COURT:  So, does it hurt the Plaintiff here

11:56:55  9    or is it just neutral the fact that there's 9,500

11:57:00 10    Plaintiffs, in essence, as opposed to one Plaintiff with a

11:57:04 11    concrete problem?

11:57:05 12                MR. PICOLLELLI:  I think it does hurt the

11:57:07 13    Plaintiffs.  It's such a large group and does include -- it

11:57:10 14    may not include every seller, as we've discussed, but more

11:57:13 15    than likely includes every manufacturer and high-level

11:57:17 16    distributor and probably covers quite a bit in between as

11:57:21 17    well.

11:57:25 18                THE COURT:  Okay.  But so under your analysis --

11:57:47 19    so, in terms of -- does your facial challenge versus

11:57:58 20    as-applied challenge implicate all of Plaintiff's different

11:58:02 21    theories, preemption and the four constitutional ones?

11:58:06 22                MR. PICOLLELLI:  Yes, Your Honor, because

11:58:09 23    there's no specific allegations as to the other -- the

11:58:14 24    constitutional claims.

11:58:17 25                THE COURT:  And so, the way you'd envision me

11:58:21 1    resolving this would be to say, okay, preliminary injunction

11:58:27 2    denied.  This is a facial challenge.  Here's a scenario

11:58:33 3    under which there's -- part of the statute that is valid.

11:58:43 4    And maybe you have to say something about the First

11:58:45 5    Amendment in marketing, but otherwise dismissed, and without

11:58:49 6    prejudice.  And we'll wait for the Attorney General to or

11:58:57 7    possibly a private citizen to take some action and then

11:59:06 8    consider it in a specific factual context.

11:59:09 9             MR. PICOLLELLI:  Yes, Your Honor.

11:59:10 10            THE COURT:  Okay.  What about the First

11:59:12 11   Amendment in terms of facial challenge?  I think you said

11:59:15 12   you recognize that was a little different.  And so, how

11:59:29 13   would that play out?

11:59:30 14            MR. PICOLLELLI:  So, that analysis requires that

11:59:34 15   a substantial number of its applications be unconstitutional

11:59:39 16   in the First Amendment.  And as part of the First Amendment

11:59:42 17   analysis, we don't think that SB 302 violates the First

11:59:50 18   Amendment.  So, it's not as much of an issue there.

11:59:54 19            THE COURT:  Well, so let's go to where I think

11:59:58 20   Mr. Rowen was is we're talking about commercial speech here;

12:00:01 21   right?

12:00:02 22            MR. PICOLLELLI:  Mm-hmm.

12:00:02 23            THE COURT:  And so, there's First Amendment

12:00:04 24   protection.  And the First Amendment protection, at a

12:00:13 25   minimum, is intermediate scrutiny; right?

12:00:16  1          MR. PICOLLELLI:  Yes, Your Honor.

12:00:17  2          THE COURT:  And for present purposes, he then

12:00:23  3   says, Okay, under intermediate scrutiny, and used some words

12:00:31  4   like narrowly tailored, which is a lesser standard than

12:00:38  5   least restrictive means.  Are you in agreement that the

12:00:43  6   narrowly tailored is the way to be looking at the First

12:00:46  7   Amendment issue?

12:00:47  8          MR. PICOLLELLI:  I have the exact language for

12:00:50  9   you, Your Honor.  It's the *Central Hudson* test.

12:00:53 10          THE COURT:  Which I believe is what he said,

12:00:54 11   too.

12:00:55 12          MR. PICOLLELLI:  Yes.  My apologies, Your Honor.

12:01:22 13   Under *Central Hudson*, the analysis is whether the asserted

12:01:26 14   governmental interest is substantial, whether the regulation

12:01:30 15   directly advances the governmental interest asserted and

12:01:34 16   whether it is more extensive than is necessary to serve that

12:01:38 17   interest.  So, for SB 302, we have the substantial

12:01:45 18   Government interest of protecting Delawareans against gun

12:01:50 19   violence.  And SB 302 is one tool that Delaware has decided

12:01:56 20   to enact to protect Delawareans by creating cause of action

12:02:04 21   against those who knowingly or recklessly engage in conduct

12:02:07 22   that results in firearms ending up in the hands of

12:02:12 23   unqualified individuals.  Marketing as well promotes the

12:02:19 24   dissemination of those products.

12:02:22 25          THE COURT:  So, in the scheme of things -- hold

12:02:35  1    on just a minute.  In the scheme of the four kinds of verbs

12:02:49  2    that are said to be -- that I think are implicated in SB

12:02:57  3    302, we've got sold, made, distributed or marketed.

12:03:05  4    Obviously, I think it's pretty, obviously, sold, made and

12:03:08  5    distributed, they don't implicate the First Amendment.

12:03:11  6    Marketing does.

12:03:13  7            In terms of harm to or potential harm to

12:03:19  8    Delawareans, aren't sold and probably made and distributed a

12:03:32  9    lot more likely to cause harm than marketing?

12:03:39 10            MR. PICOLLELLI:  I can't say that definitively,

12:03:42 11    especially with how much marketing is being pushed at this

12:03:51 12    point.  I mean, I think marketing is more than just a

12:03:54 13    billboard on the side of the road at this point.  It's on

12:03:57 14    every ap that you can think of, cell phones, TV.  You can't

12:04:02 15    watch a show without seeing five ads for it.

12:04:06 16            So, while maybe under --

12:04:09 17            THE COURT:  What shows are you watching?

12:04:12 18            MR. PICOLLELLI:  I don't have the, you know,

12:04:14 19    ad-free version of Hulu, Your Honor.  There's a lot of ads.

12:04:18 20            THE COURT:  But --

12:04:24 21            MR. PICOLLELLI:  So I think --

12:04:25 22            THE COURT:  I'm just trying to think.  I watch

12:04:27 23    more than my share of television.  I'm trying to recall.

12:04:35 24    The Super Bowl, were there any ads for firearms?

12:04:38 25            MR. PICOLLELLI:  I can't recall any, but --

12:04:43  1          THE COURT:  No.  Once upon a time there used to

12:04:46  2    be tons of advertisements for beer and maybe alcohol and, of

12:04:50  3    course, that's gone away.  And I know there's a lot of

12:04:55  4    advertisements for all kinds of things, but not for

12:04:59  5    firearms.

12:05:01  6          And in any event, I guess the point is because

12:05:05  7    of the Internet, you know, there could be lots of marketing

12:05:12  8    out there.  You know, every manufacturer for sure has a

12:05:15  9    website that's essentially marketing.  But it seems like,

12:05:24 10    and I believe this will probably be their argument for

12:05:28 11    everything, but it seems like the amount of marketing that

12:05:31 12    is unrelated to public nuisance grossly outweighs whatever

12:05:46 13    kind of marketing one could hypothetically imagine that

12:05:50 14    would contribute to a public nuisance.

12:05:55 15          I mean, if you have -- you know, I mean, I'm

12:06:00 16    handicapped because I can't recall ever seeing any actual

12:06:04 17    firearms advertisements on TV or the Internet, but it would

12:06:14 18    strike me that -- but I have seen actually, because I was

12:06:26 19    having a different argument on Delaware's firearms laws on

12:06:31 20    Friday.  You know, I have seen sort of what appear to be

12:06:34 21    paper magazine advertisements, and I gather they're all

12:06:44 22    perfectly legal, you know, suggesting get the sort of power

12:06:52 23    that, you know, the Armed Forces have when traipsing through

12:06:58 24    sand.  I don't know, maybe pictures of the Cowboys who used

12:07:06 25    to smoke cigarettes, but they don't do that anymore, but

12:07:10  1    they still have firearms.

12:07:11  2         I don't see how any of that is anything other

12:07:13  3    than just general advertising.  And so, essentially -- well,

12:07:33  4    in any event, not really the time for me to be talking.

12:07:37  5    Time for you to be talking.

12:07:38  6         I mean, why isn't the marketing, which we know

12:07:54  7    is covered by the First Amendment, why isn't that just, I

12:07:59  8    don't know, clearly unconstitutional given the fact that

12:08:08  9    there's no standard for what kind of marketing could later

12:08:12 10    on be used as the basis for a lawsuit?

12:08:16 11         MR. PICOLLELLI:  I would have to disagree as

12:08:17 12    there being no standards.  They may be flexible standards,

12:08:22 13    certainly more flexible than Plaintiff would like, but there

12:08:25 14    are reasonable controls as defined -- what a public nuisance

12:08:32 15    is is defined and these are --

12:08:34 16         THE COURT:  Yeah, but so reasonable controls,

12:08:36 17    marketing, how would reasonable controls impact marketing?

12:08:43 18    I mean, presumably we're not talking about Ruger takes out

12:08:47 19    an ad saying, Federal firearms licensees, you may not have

12:08:52 20    read this anywhere, but Congress has repealed all laws, and

12:08:56 21    you don't have to follow any rules anymore.  And, you know,

12:09:03 22    Ruger arms are the ones to be selling now that everything's

12:09:08 23    lifted.

12:09:08 24         I mean, I can't even -- I mean, it seems to me

12:09:19 25    that other than the incredibly unlikely hypothetical that

12:09:25  1    the firearms industry decides to advertise to suicide

12:09:29  2    prevention groups, that it's hard to justify any burden on

12:09:36  3    marketing at all.

12:09:40  4              MR. PICOLLELLI:   That was going to be the

12:09:41  5    example I used, again, Your Honor.  But with the other

12:09:45  6    limitations within the statute, as comparing it to

12:09:50  7    protecting Delawareans against gun violence, I think those

12:09:54  8    are probably the two most important factors in the *Central*

12:09:57  9    *Hudson* analysis, at least here.  It's an extreme -- not an

12:10:04 10    extreme governmental interest, but it's a very important

12:10:07 11    governmental interest combined with limitations that, again,

12:10:12 12    are certainly flexible, but have been defined consistently

12:10:16 13    in other states as well as Delaware's own public nuisance

12:10:21 14    statute, general public nuisance statute.  So, they're not

12:10:24 15    words that are unknown.  They just haven't been applied in

12:10:29 16    this exact context yet.

12:10:31 17              So, that, again, is why we need an as-applied

12:10:38 18    challenge to see the actual outcome of this law and not a

12:10:42 19    theoretical analysis.  And because I can't think of a

12:10:51 20    hundred examples of where this might be applicable, I'm sure

12:10:55 21    I could -- I'm sure as soon as I walk out of here, I'll

12:10:58 22    think of five more.  And that's why it's important to look

12:11:02 23    at the standard of review here, because, again, I'm not

12:11:06 24    saying that there isn't some potential application of this

12:11:10 25    law that may be -- that may violate the First Amendment.

12:11:14  1    There potentially may be, but under our analysis, under

12:11:19  2    facial analysis, the standard is the opposite.  There has to

12:11:24  3    be a substantial number of applications that are

12:11:27  4    unconstitutional.

12:11:29  5           THE COURT:  All right.  Okay.  So, and perhaps

12:11:36  6    this was in the briefing, but in any event, on the First

12:11:41  7    Amendment, you both get down to saying the same cases, the

12:11:46  8    leading case, so that's helpful.

12:11:48  9           And so, why don't you talk about the commerce

12:11:59 10    clause for a minute or two.

12:12:01 11           MR. PICOLLELLI:  Certainly.  I think I addressed

12:12:08 12    this pretty well in the reply brief, but the dispute here, I

12:12:14 13    think, is mainly over the extraterritoriality analysis,

12:12:20 14    sorry, and Plaintiff relies on the *Baldwin* and *Healy* line of

12:12:26 15    cases.  That doesn't apply under these circumstances because

12:12:30 16    under *Baldwin* and *Healy*, you have to tie prices of

12:12:35 17    out-of-state products to in-state products.  That was

12:12:38 18    explicitly stated in -- I believe it was --

12:12:42 19           THE COURT:  Right.  I think they're not arguing

12:12:44 20    the discriminates against out-of-state commerce sort of

12:12:47 21    thing.

12:12:48 22           MR. PICOLLELLI:  Well, no.  That's the milk case

12:12:50 23    talking about milk producers wholly outside the state then

12:12:54 24    selling within the state.  So, there they were setting

12:12:59 25    prices on -- New York was setting prices on milk.

12:13:02  1         And that's the distinction.  It's the price

12:13:04  2    distinction.  That's where *Baldwin* and *Healy* come in line.

12:13:08  3    So, if Delaware was saying, If you want to sell an AR-15 in

12:13:14  4    Delaware, it's $500, and everyone else it's $300, which is

12:13:21  5    way too low for an AR-15.  But for example purposes, that

12:13:25  6    potentially could violate *Baldwin* and *Healy*.  But the Third

12:13:29  7    Circuit has explicitly said that *Baldwin* and *Healy* do not

12:13:32  8    apply, unless it's setting prices.

12:13:36  9         So, again, if Delaware is setting an actual

12:13:38 10    price, that would be different.  But that's not what we have

12:13:41 11    here.

12:13:41 12         THE COURT:  Well, so can Delaware regulate

12:13:47 13    firearms manufacturers in Texas?

12:13:51 14         MR. PICOLLELLI:  It could, subject to the other

12:13:55 15    provisions of SB 302.

12:13:58 16         THE COURT:  Well, but I think we got around to

12:14:04 17    you agreeing that subsection (c) allowed Delaware to set

12:14:11 18    reasonable controls for firearms manufacturers anywhere in

12:14:21 19    the country.  That's constitutional under the commerce

12:14:30 20    clause?

12:14:31 21         MR. PICOLLELLI:  Subject to, again, subsection

12:14:34 22    (e) with foreseeability and proximate cause.

12:14:37 23         THE COURT:  Well, that's subsection (b).  I'm

12:14:39 24    talking about subsection (c) right now which doesn't depend

12:14:42 25    on subsection (b); right?

12:14:44  1          MR. PICOLLELLI:  Correct.  I was referring --

12:14:45  2     I'm sorry if I misstated.  Subsection (e) --

12:14:48  3          THE COURT:  Okay.

12:14:49  4          MR. PICOLLELLI:  -- inapplicable to both and

12:14:51  5     requiring proximate cause with reasonable foreseeability.

12:14:56  6     And so, but once you are out of the realm of the

12:15:00  7     *Baldwin-Healy* analysis, you get to whether it discriminates

12:15:06  8     against in-state versus out-of-state commerce.  And there's

12:15:10  9     no distinction here between Delaware, you know, getting more

12:15:15  10    benefits than out of states completely equal across the

12:15:21  11    line.

12:15:21  12          And that's when *Pike* is triggered.  And

12:15:26  13    that's -- my apologies.  It passes muster under *Pike* because

12:15:37  14    it's aimed at a legitimate public interest of promoting and

12:15:41  15    protecting the health, safety and welfare of the people of

12:15:44  16    Delaware by providing redress to Delawareans confronting the

12:15:50  17    epidemic of gun violence.

12:15:52  18          And I don't believe Plaintiff has alleged that

12:16:02  19    the incidental interests of interstate commerce are clearly

12:16:09  20    excessive compared to the local benefits of Delaware.

12:16:13  21    That's the discrimination portion of it.  So, in that

12:16:19  22    regard, SB 302 does not violate the commerce clause.

12:16:30  23          THE COURT:  All right.  And we're nearly done

12:16:35  24    here.  On the Second Amendment, Mr. Rowen cited a case of

12:16:41  25    *Drummond vs. Robinson Township* saying the Third Circuit has

12:16:46  1    already decided this question.

12:16:47  2               Do you have any comment on that?

12:16:49  3               MR. PICOLLELLI:  I do, Your Honor.  It's a quote

12:16:51  4    directly from that case.

12:16:52  5               THE COURT:  Okay.

12:16:52  6               MR. PICOLLELLI:  It says, "We know of no court,

12:16:54  7    modern or otherwise, to hold that the Second Amendment

12:16:58  8    secures a stand-alone right to sell guns or range times."

12:17:02  9               THE COURT:  Well, and I think -- I don't know

12:17:05 10    that they're necessarily disagreeing with you on that, but

12:17:09 11    wasn't the -- I assume, though, as I said a couple times I

12:17:16 12    haven't read the case, that *Drummond vs. Robinson Township*

12:17:20 13    ended up -- whatever *Robinson Township* was doing being

12:17:23 14    invalidated; right?

12:17:25 15               MR. PICOLLELLI:  I don't recall that

12:17:26 16    specifically, Your Honor.

12:17:27 17               THE COURT:  Okay.

12:17:30 18               MR. PICOLLELLI:  But we cited other cases in our

12:17:32 19    brief that state substantially the same thing.  There's

12:17:37 20    never been a recognized right for a manufacturer to sell

12:17:41 21    firearms.  It's only an individual's right to keep and bear

12:17:46 22    arms.  So, it would be different if there was a Delawarean

12:17:49 23    suing saying that SB 302 violates my Second Amendment right

12:17:54 24    because I can't buy guns at a reasonable price because this

12:17:59 25    law somehow implements too many restrictions that it causes

12:18:03 1    prices in Delaware.

12:18:05 2              I know New York has some issues like that.  But

12:18:07 3    so that would be a completely different case, if there was

12:18:10 4    an individual, because the courts have recognized an

12:18:14 5    individual person's right to keep and bear arms.  But

12:18:17 6    there's -- I am not aware of and the cases that I've cited

12:18:21 7    have stated that there's no right for a company essentially

12:18:27 8    to sell firearms.

12:18:29 9              And I know there was some quotes in there about

12:18:32 10   First Amendment, you can't regulate papers and stamps to get

12:18:37 11   around the First Amendment.  But it's different because

12:18:40 12   there is a First Amendment right applicable to those, like,

12:18:45 13   news organizations that might be having the paper taxed to

12:18:49 14   them.  So, it's different.

12:18:50 15             If there was only an individual person's right

12:18:53 16   to First Amendment, then that would probably be a different

12:18:57 17   analysis with the papers and stamps, but there's a

12:19:00 18   recognized right to news organizations as well.  Whereas

12:19:05 19   here, again, Second Amendment, only applicable to

12:19:07 20   individuals, and we don't have that claim here.

12:19:12 21             THE COURT:  All right.  Anything you want to --

12:19:16 22             MR. PICOLLELLI:  I was just going to mention,

12:19:17 23   Your Honor, if you do find that we get to that second step

12:19:20 24   in *Bruen*, we would ask to allow additional time to research

12:19:28 25   this particular issue.  Because our expert did provide

12:19:31 1    analysis, and I think it's sufficient for a preliminary

12:19:36 2    review of things.  Certainly she needs more time and --

12:19:40 3            THE COURT:  And remind me, because in my

12:19:43 4    preparation for this, I think I missed your expert's

12:19:47 5    declaration.  Was this one of the individuals whose

12:19:53 6    declarations I did read last week for my different Second

12:19:57 7    Amendment cases?

12:19:58 8            MR. PICOLLELLI:  It was probably one of the

12:20:00 9    same.  I don't --

12:20:01 10            THE COURT:  But what was the person's name?

12:20:03 11            MR. PICOLLELLI:  Rivas, I think.

12:20:05 12            THE COURT:  Okay.

12:20:06 13            MR. PICOLLELLI:  But she essentially goes

12:20:08 14    through kind of the history of public nuisance laws as well

12:20:14 15    as some different laws against Native Americans holding

12:20:22 16    firearms, and she connects it much better than I do.  But it

12:20:26 17    was a preliminary analysis, and I understand that under

12:20:30 18    *Bruen* that legislatures should be contemplating these

12:20:33 19    constitutional issues.  But this law is pretty close to

12:20:39 20    *Bruen*, like in time to *Bruen*, so I'm not sure that a

12:20:44 21    requirement that a legislature do all of its research before

12:20:48 22    the law is passed and that you can't do any research at the

12:20:51 23    judicial level, I'm not sure that that's entirely fair or

12:20:55 24    that it's the law.

12:20:56 25            THE COURT:  All right.  Are you done?

12:21:00  1              MR. PICOLLELLI:  I can address preemption, but I
12:21:04  2    definitely want to at least say that there's a preference
12:21:09  3    against finding that federal laws preempt state laws.
12:21:14  4    Again, it goes back to just the standard of review.
12:21:18  5              THE COURT:  Okay.  I don't think you need to do
12:21:20  6    that.
12:21:20  7              Anything else?
12:21:21  8              MR. PICOLLELLI:  Can I just briefly, Your Honor,
12:21:25  9    discuss the purpose of the PLCAA, and I won't quote the
12:21:31 10    exact --
12:21:31 11              THE COURT:  I mean, the purpose is pretty much
12:21:36 12    laid out in the first statute, isn't it?
12:21:40 13              MR. PICOLLELLI:  It is, Your Honor.  And so,
12:21:41 14    maybe I can just briefly summarize how we have interpreted
12:21:46 15    it at least, since Plaintiffs raised it as SB 302 being in
12:21:56 16    direct contradiction of the PLCAA's purpose.
12:22:00 17              THE COURT:  Okay.
12:22:01 18              MR. PICOLLELLI:  And so, my review of it and our
12:22:04 19    client's review is that the PLCAA was not enacted to prevent
12:22:11 20    legislatures from codifying laws that complied with the
12:22:16 21    PLCAA.  It was focused on essentially older nuisance laws
12:22:22 22    that had never been applied to regulate firearms being
12:22:27 23    interpreted by judges as now applying to firearms.  But it
12:22:35 24    does not prevent the legislature from passing new laws that
12:22:39 25    specifically apply to the regulation of firearms, and that

12:22:43 1    was contemplated by the Second Circuit.

12:22:46 2            THE COURT:  Well, so, you know, the 7901 has a

12:22:51 3    person has eight findings, and then it has seven purposes.

12:22:56 4    What you're talking about is mostly in the findings.  The

12:22:59 5    purposes, the first one, which is the one I underlined, is

12:23:04 6    and I quote "to prohibit causes of actions against

12:23:08 7    manufacturers, distributors, dealers and importers of

12:23:12 8    firearms or ammunition products and their trade associations

12:23:16 9    for the harm solely caused by the criminal or unlawful

12:23:22 10   misuse of firearm products or ammunition products by others

12:23:26 11   when the product functioned as designed and intended."

12:23:31 12           It's the first listed purpose.  Most of the

12:23:37 13   other purposes seem to be, you know, more designed to show

12:23:43 14   that Congress has the power to pass such a law.  Isn't that

12:23:47 15   really the express statement of the purpose, and it does not

12:23:52 16   draw any distinction at all between the common law or

12:23:56 17   legislative action?

12:23:57 18           MR. PICOLLELLI:  It does technically fall under

12:23:59 19   the bolded "Purposes" section, but since Plaintiffs raised

12:24:03 20   the other portions within the briefing, I thought it

12:24:07 21   necessary to address that.  And on that note, SB 302, in

12:24:14 22   Defendant's view, is not regulating conduct solely caused by

12:24:20 23   a criminal.  It's regulating the conduct of the

12:24:24 24   manufacturers.  So, there is a difference, in our mind.

12:24:30 25           THE COURT:  Well, you know --

12:24:31 1         MR. PICOLLELLI:  I think of it as -- and I hope
12:24:41 2    this all wasn't actually overturned, but a restaurant that
12:24:46 3    has a parking lot that is known to be a high-crime area by
12:24:50 4    the restaurant who implements zero controls to prevent that,
12:24:55 5    lighting, something like that.  In that case, certainly
12:24:59 6    there's criminal conduct.  And at the beginning point when
12:25:03 7    they have no clue about that conduct, there might not be a
12:25:06 8    duty to intervene on behalf of -- on the part of the
12:25:10 9    restaurant.  But at a certain point of their knowledge or
12:25:13 10   their -- where they should have knowledge that they need to
12:25:17 11   implement controls, that does shift more towards the
12:25:21 12   liability realm.
12:25:22 13        So, if there's a hundred robberies in a
12:25:24 14   restaurant's parking lot last week, the restaurant could be
12:25:28 15   liable.  If there's one robbery in ten years, probably not.
12:25:33 16   So, that's the distinction I like to use.
12:25:36 17        THE COURT:  Okay.  Thank you.
12:25:45 18        All right.  Mr. Rowen, you know, you don't need
12:25:49 19   to say anything you already said, but if there's some
12:25:54 20   particular things that you'd like to respond to briefly --
12:25:59 21        MR. ROWEN:  Sure, Your Honor.
12:26:00 22        THE COURT:  -- with the keyword being briefly.
12:26:02 23        MR. ROWEN:  I will be very brief.  So, the only
12:26:04 24   two things that I want to point out, so, first, on the
12:26:08 25   commercial clause.  So, I mean, my friend on the other side

12:26:10 1    is just incorrectly describing the cases.  So it's surely

12:26:13 2    the case that *Baldwin* and *Healy* involved pricing statutes.

12:26:18 3    But there's nothing in the Supreme Court's cases or in the

12:26:21 4    Third Circuit's case that says that a state law that said

12:26:24 5    it's unlawful for you to sell gasoline in Nevada is

12:26:29 6    constitutional whereas the law that says it's unlawful for

12:26:31 7    you to sell gasoline in Nevada at this price and the

12:26:35 8    regulated state is Delaware, that that would be okay.  So,

12:26:38 9    that's one point.

12:26:39 10          The second point is on the facial versus

12:26:41 11   as-applied challenge, you know --

12:26:43 12          THE COURT:  And I'm glad you brought that up

12:26:45 13   because that was actually like the first thing I was going

12:26:48 14   to ask you is exactly how you were characterizing this?

12:26:55 15   Because I think there might have been, there might have

12:26:59 16   been, maybe there wasn't, but there might have been some

12:27:01 17   ambiguity in some of your briefing about that.

12:27:04 18          MR. PICOLLELLI:  So, I don't think that the

12:27:06 19   difference between facial and as applied is sort of what my

12:27:10 20   friend on the other side says it is.  And I'd like to read

12:27:12 21   to the Court recent Third Circuit precedent on this.

12:27:15 22          THE COURT:  Well, before you do that, because

12:27:16 23   I'll let you do that, is if there's a category that's facial

12:27:22 24   and there's a category that's --

12:27:23 25          MR. ROWEN:  Yes.

12:27:24  1          THE COURT:  -- as applied --

12:27:25  2          MR. ROWEN:  Yes.

12:27:25  3          THE COURT:  -- which one are you bringing?

12:27:28  4          MR. ROWEN:  I think we're bringing both for all

12:27:29  5   of our claims.  And so, let me read this.  This is, again,

12:27:33  6   *Drummond vs. Robinson Township.*

12:27:34  7          THE COURT:  Okay.

12:27:35  8          MR. ROWEN:  And it's 9 F.4th 225 Note 5.  And

12:27:40  9   what the Court says is, I'm quoting, "The distinction

12:27:43 10   between facial and as-applied claims goes to the breadth of

12:27:46 11   the remedy employed by the Court, not what must be pleaded

12:27:51 12   in a complaint.  For this reason, the Supreme Court

12:27:54 13   typically considers facial challenges simply by applying the

12:27:58 14   relevant constitutional test to the challenged conduct

12:28:02 15   without trying to dream up whether or not there exists some

12:28:06 16   hypothetical situation in which application of the statute

12:28:09 17   might be valid."

12:28:10 18          So, my friend relies on the *Salerno* case from

12:28:15 19   the 1980s, the Supreme Court and Third Circuit.  What I was

12:28:18 20   reading was a 2021 Third Circuit opinion, has made clear

12:28:22 21   that, you know, especially in the pre-enforcement context,

12:28:26 22   so long as standing is satisfied, the difference between a

12:28:30 23   facial and as-applied claim solely goes to the remedy.  And

12:28:32 24   the reason why I think that there is some ambiguity is so,

12:28:36 25   the statute on its face is unconstitutional as applied to

12:28:40  1    marketing.  Right.

12:28:43  2            So, for purposes of First Amendment, the statute

12:28:46  3    is not unconstitutional under the First Amendment as applied

12:28:50  4    to selling.  So, it's both facial in the sense that you look

12:28:54  5    at the statute on its face, but the scope of relief would be

12:28:58  6    as applied because it's only certain applications of the

12:29:01  7    statute.  And my friend says, Well, you didn't plead

12:29:05  8    particular applications, but of course, we did.  And --

12:29:07  9            THE COURT:  And just to go back, if the

12:29:09 10    difference in remedy is a facial challenge, then I just

12:29:15 11    would say the statute is unconstitutional, and Attorney

12:29:19 12    General, you're prohibited from enforcing it.  As applied, I

12:29:24 13    do the same thing, but at the end I'd say against you.

12:29:28 14            MR. PICOLLELLI:  Yes.  So, just quickly, and

12:29:30 15    this will be the last point that I make.  And so, for the

12:29:32 16    First Amendment, what you would do consistent with the case

12:29:34 17    I've just read is you'd apply the test.  The test, you know,

12:29:37 18    we think it's scrutiny, but if you apply *Central Hudson*,

12:29:40 19    you'd say, What is the fit?  As Your Honor -- I didn't hear

12:29:42 20    my friend articulate that there was a fit.  You'd say, okay,

12:29:45 21    well, this statute fails *Central Hudson*; therefore, this

12:29:50 22    statute violates the First Amendment with respect to

12:29:53 23    marketing or as applied to marketing.

12:29:56 24            On the commerce clause, you would say this

12:29:57 25    statute violates the commerce clause as applied to conduct

12:30:01  1    that takes place outside the state.  And so, it gets

12:30:05  2    confusing because it's both facial and as applied, but we

12:30:08  3    cited the San Francisco case, en banc case from the Ninth

12:30:12  4    Circuit where I believe the quote is that the statute there

12:30:14  5    was facially invalid under the commerce clause as applied to

12:30:18  6    out-of-state conduct.

12:30:19  7            And on the commerce clauses, the remedy that we

12:30:22  8    would be asking for on the First Amendment, that would be

12:30:24  9    the remedy that we would be asking for, except instead of as

12:30:26 10    applied to out-of-state conduct, it would be as applied to

12:30:31 11    marketing.

12:30:32 12            Thank you, Your Honor.

12:30:33 13            THE COURT:  So, the Proposed Order that we

12:30:35 14    talked about earlier, you'll have the language not just for

12:30:42 15    the preemption, but for each of those different

12:30:45 16    constitutional things, if I were to agree with you, what I

12:30:48 17    would be saying?

12:30:49 18            MR. ROWEN:  Yes, Your Honor.

12:30:50 19            THE COURT:  Okay.  Thank you.

12:30:51 20            All right.  And just to wrap up one other --

12:30:56 21    thank you, Mr. Rowen.

12:30:57 22            Right, you're done?

12:30:58 23            MR. ROWEN:  Yes, Your Honor.

12:30:59 24            THE COURT:  That was a question.  Yes, you're

12:31:02 25    done?

12:31:02  1          MR. ROWEN:  Yes.  Yes, Your Honor.

12:31:03  2          THE COURT:  All right.  And just to wrap up the

12:31:06  3  one other loose end, Mr. Picollelli, you have a good idea

12:31:12  4  how the Attorney General's office works.  The question that

12:31:15  5  I raised earlier that I asked you to deal with the chain of

12:31:20  6  command and see what the point of view was, what's a

12:31:26  7  reasonable estimate, do you think, for how long it would

12:31:28  8  take for you to get a response on that?

12:31:37  9          MR. PICOLLELLI:  I can certainly send it out

12:31:39 10  today, expedite it.  I would say by the end of the week.

12:31:46 11          THE COURT:  Okay.  Well, that's quicker than --

12:31:48 12  the main thing is I didn't want it to linger.  So, I don't

12:31:51 13  think it's something that has to be decided by the end of

12:31:54 14  the week.  So, can we just say that I will hear from you by

12:31:57 15  the end of next week?

12:31:59 16          MR. PICOLLELLI:  That's fair, Your Honor.

12:32:00 17          THE COURT:  Okay.  All right.  Is there anything

12:32:03 18  else?

12:32:04 19          MR. PICOLLELLI:  No, Your Honor.

12:32:07 20          MR. ROWEN:  No.

12:32:07 21          THE COURT:  No.  Okay.

12:32:08 22          All right.  Well, listen, I've enjoyed both your

12:32:15 23  arguments, and it's definitely been helpful stuff that each

12:32:23 24  of you has said.  And you know, on the whole, I'd prefer to

12:32:33 25  stay the case and wait and see what the Third Circuit says,

12:32:36  1    but if that's not the way this is going, I do think there's

12:32:46  2    a priority that I have to get out an opinion in the Second

12:32:51  3    Amendment case that I had on Friday, which has a more

12:32:57  4    immediate impact on Delawareans than this one.

12:33:02  5              So, you know, I do understand we're talking

12:33:06  6    preliminary injunction here.  And, I guess, the one other

12:33:11  7    thing that I would ask in that regard is if the case isn't

12:33:17  8    stayed, if something happens in either the Third Circuit or

12:33:23  9    the Second Circuit in the pending cases, the Third Circuit,

12:33:28 10    I would see if there was an opinion.  I wouldn't from the

12:33:34 11    Second Circuit.

12:33:37 12              But if there's something noteworthy, and I'll

12:33:41 13    leave it to your judgment, Mr. Rowen, as to what that is,

12:33:45 14    getting a letter with notice of what it is, but that would

12:33:54 15    be helpful.  Okay?

12:33:56 16              All right.  Well, thank you very much.  Have a

12:33:58 17    nice day.  We'll be in recess.

12:34:00 18              DEPUTY CLERK:  All rise.

19              (Court was recessed at 12:34 p.m.)

20              I hereby certify the foregoing is a true and

21    accurate transcript from my stenographic notes in the

22    proceeding.

23              /s/ Heather M. Triozzi
                Certified Merit and Real-Time Reporter
24              U.S. District Court

25